Michael J. Curls (SBN 159651)
Nichelle D. Jordan (SBN 186308)
LAW OFFICE OF MICHAEL J. CURLS
4340 Leimert Blvd., Suite 200
Los Angeles, CA 90008
Telephone:    (323) 293-2314
Facsimile:    (323) 293-2350
Email: nichelle@mjclawoffice.com


Attorneys for Plaintiff ANTHONY C. HILL

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHONY C. HILL, an individual | ) Case No.: 23-CV-06558-PHK |
| Plaintiff, | ) |
| vs. | ) PLAINTIFF ANTHONY C. HILL'S FIRST |
| | ) AMENDED COMPLAINT FOR: |
| WORKDAY, INC., a Delaware Corporation, and DOES 1 through 10, inclusive, | ) |
| Defendants | ) |

1) RACE DISCRIMINATION IN VIOLATION OF CALIFORNIA GOVERNMENT CODE § 12900 *et seq.*

2) DISABILITY DISCRIMINATION IN VIOLATION OF CALIFORNIA GOVERNMENT CODE § 12900 *et seq.*

3) RETALIATION IN VIOLATION OF CALIFORNIA GOVERNMENT CODE § 12900 *et seq.*

4) HARASSMENT AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF CALIFORNIA GOVERNMENT CODE §12900 *et seq.*

5) FAILURE TO MAINTAIN A DISCRMINATION AND HARASSMENT FREE ENVIRONMENT IN VIOLATION

|   | OF GOVERNMENT CODE § 12900 *et seq.* |
|---|---|
| 6) | FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS AND PROVIDE REASONABLE ACCOMMODATIONS IN VIOLATION OF FEHA (Cal. Gov. Code § 12900 et seq.), AND THE CFRA (Cal. Gov. Code § 12945.1 et seq.); |
| 7) | CFRA INTERFERENCE AND RETALIATION (in violation of Cal. Gov. Code § 12945.1 *et seq.*); |
| 8) | RETALIATION IN VIOLATION OF LABOR CODE § 1102.5 |
| 9) | PROMISSORY FRAUD (in violation of Cal. Civ. Code §§ 1572, 1709 and 1710); |
| 10) | INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; |
| 11) | VIOLATIONS OF CMIA (Cal. Civ. Code § 56 et seq.); AND |

**DEMAND FOR JURY TRIAL**

Plaintiff ANTHONY C. HILL alleges:

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND MONETARY DAMAGES**

Plaintiff, Anthony C. Hill ("Hill" or "Plaintiff"), by and through his counsel, files this First Amended Complaint against Workday, Inc., ("Defendant" or "WORKDAY, INC.") alleging he has suffered a long-standing, pervasive, and continuing practice of unlawful conduct against him, namely: race and disability discrimination in violation of the Fair Employment and Housing Act ("FEHA") (Cal. Gov. Code § 12900 *et seq.*); harassment and the creation of a hostile work environment in violation of FEHA; retaliation in violation of FEHA; failure to engage in the interactive process in violation of FEHA and the California Family Rights Act ("CFRA") (Cal. Gov. Code § 12945.1 *et seq.*); failure to maintain a discrimination and harassment free environment in violation

of FEHA; failure to provide reasonable accommodations in violation of FEHA and the CFRA; CFRA interference; CFRA retaliation against Defendant WORKDAY, INC.; in violation of Ca. Labor Code § 1102.5; in violation of Cal. Civ. Code §§ 1572, 1709 and 1710; intentional infliction of emotional distress; and violations of the Confidentiality of Medical Information Act ("CMIA") in violation of Cal. Civ. Code § 56 *et seq*.).

## **THE PARTIES**

1.    At all times relevant hereto, Plaintiff ANTHONY C. HILL ("Plaintiff") was a resident of the State of Maryland. The instances, occurrences and unlawful conduct alleged within this First Amended Complaint occurred in the Northern District of the United States District Court, and/or was ratified by decision makers and/or participants in the Northern District of the United States District Court.

2.    At all times relevant hereto, Defendant WORKDAY, INC. ("Workday") was a Delaware corporation organized to do business in the State of California, County of Alameda.

3.    The true names and capacities, whether individual, corporate, associate or otherwise of Defendants Does 1 through 10, and each of them, are unknown to Plaintiff at this time, and therefore they are sued by such fictitious names.

4.    Plaintiff is informed and believes and thereon alleges that the Defendants herein, and each of them, are in some manner negligent, or otherwise responsible, for directly and proximately causing the injuries and damages hereinafter set forth.

5.    At all times herein mentioned, the Defendant WORKDAY, INC. committed the acts and omissions described herein, by and through performed within the scope of their agency, employment and/or authority of said agency and employment and with the consent of the Defendant.

6.    The acts committed by individual employees and agents of Defendant WORKDAY, INC. and DOES 1 through 10, and as described in this First Amended Complaint were duly authorized and directed by the Defendant's officers, directors and/or managing agents.  In addition, the employer identified herein participated in the

acts of its employees and agents as described in this First Amended Complaint, and ratified or accepted the benefits of such acts.

## JURISDICTION AND VENUE

7.    This Court has personal jurisdiction over the Defendant because its principal place of business is in California, and the unlawful conduct complained of by Plaintiff was engaged in, ratified or approved by decision makers and/or participants located in California.

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and the Defendant, and the amount in controversy exceeds $75,000.  Diversity of citizenship exists because Plaintiff is a citizen of the State of Maryland and the Defendant is a corporation with its principal place of business in the Northern District of California; the acts complained of herein occurred in this state and/or were ratified by decision-makers working at Defendant WORKDAY, INC.'S  headquarters in the State of California.

9.    Venue is proper in this Court because the Defendant has as its principal place of business a campus headquartered at 6110 Stoneridge Mall Road, Pleasanton, CA 94588 located in this District wherein business records are maintained relevant to Plaintiff and his claims, and because a substantial portion of the events and omissions giving rise to Plaintiff's claims occurred in this District,  and/or were ratified by decision-makers working in this District.

## ADMINISTRATIVE EXHAUSTION

10.    Prior to the filing of this First Amended Complaint, Plaintiff filed charges of discrimination, retaliation, interference, harassment, the creation of a hostile work environment, failure to engage in the interactive process, failure to promote, failure to provide reasonable accommodations, and failure to prevent harassment in violation of FEHA and the CFRA with the California Civil Rights Department ("CRD") against Defendant WORKDAY, INC..  The CRD charges arose out of the same facts alleged herein.

11.     On or about August 28, 2023, Plaintiff received a "Notice of Case Closure and Right to Sue" letter as to Defendant WORKDAY, INC. from the CRD.

12.     All other prerequisites to the filing of this lawsuit have been met.

## FACTS COMMON TO ALL CAUSES OF ACTION
### INTRODUCTION

13.     Plaintiff is a black male with disabilities.

14.      Plaintiff has been practicing law as an attorney for approximately 20 years dealing almost exclusively with regulatory and compliance matters.

15.     Plaintiff is a 2004 graduate of the Howard University School of Law.  Upon graduating law school, Plaintiff worked for one year as a judicial law clerk to the Chief Judge of D.C.'s highest court (equivalent of a state supreme court), the D.C. Court of Appeals, and then he worked for two years as a judicial law clerk to a judge on the U.S. District Court for the District of Columbia.  Plaintiff also interned for judges on the D.C. Court of Appeals and the U.S. District Court for the District of Columbia while in law school.

16.     Immediately after clerking, Plaintiff worked as an Associate for three years and then was promoted to Counsel, a role he served in for almost three more years, at the international law firm Akin Gump Strauss Hauer & Feld LLP.  Following his time in private practice, Plaintiff served as General Counsel of Financial Markets International Inc. ("FMI"), a former client of Akin Gump's, for two years.  Plaintiff then worked for six years as in-house counsel for Accenture Federal Services ("AFS"), which is the federal subsidiary of Accenture LLP, one of the largest consulting firms in the world by revenue and size.

17.     Plaintiff suffers from acute anxiety, panic disorder, chronic diverticulitis, clinical depression and post-traumatic stress disorder. These disabilities  cause energy loss, impaired concentration and sleep disorder among other symptoms.  Before the alleged events leading him to file a complaint, Plaintiff was able to manage these symptoms and enjoy a successful career as an attorney.

18.     Plaintiff's current employer, Defendant WORKDAY, INC., is a *Fortune* 500, multinational cloud software corporation headquartered in Pleasanton, California, with more than 55 office locations in the U.S., Canada, Mexico, Europe, Africa, and Asia Pacific.  Defendant WORKDAY, INC. is worth tens of billions of dollars and counts more than half of all *Fortune* 500 companies as current clients, according to *Forbes*.

19.     In 2021, Defendant WORKDAY, INC. boosted its brand ID by signing Naomi Osaka, a global sports icon who "is of Japanese, Haitian, and American heritage," and had been ranked No. 1 in the world by the Women's Tennis Association, to be a "Workday Brand Ambassador."  Defendant WORKDAY, INC. stated as the basis for its branding partnership with Ms. Osaka, who famously uses her platform to promote social justice and racial equity, that both Defendant WORKDAY, INC. and Ms. Osaka share "core values" and a commitment to "doing the right thing to support the greater good…." Defendant WORKDAY, INC. employs more than 12,500 people worldwide; less than 2.5% of whom are black.

20.     Key ingredients of Defendant WORKDAY, INC.'s purported brand and ultimate success are diversity, ethics, and compliance.  The company proudly proclaims, for example, that for three years in a row it has been named one of "The World's Most Ethical Companies" by Ethisphere Institute, an honor purportedly "based on our culture, environmental and social practices, ethics and compliance activities, governance, diversity, and initiatives to support a strong value chain."

21.     However, during a 2020 company-wide forum focusing on racial issues closely following public "protests over police brutality against Black Americans," Aneel Bhusri (Indian American male), the company's co-founder and current co-CEO, admitted that WORKDAY, INC. has a "Black diversity problem" stemming from the fact that less than 3% of its workforce is black.

22.     WORKDAY, INC. fosters a work culture whereby racial discrimination and harassment are tolerated and complaints of racial discrimination and harassment are ignored.

23.     Defendant WORKDAY, INC. has a long history of operating its business in a discriminatory and harassing manner as it relates to individuals protected by FEHA—specifically, California Government Code § 12940(a) and 12940(h) – (k), and similar laws.  Such practices include harassment, disparate treatment, retaliation, discrimination, and the maintenance of a hostile work environment for protected classes of employees, including Plaintiff, as alleged herein and otherwise.  This history has produced a culture of racism, discrimination, harassment, and retaliation which is so pervasive that it adversely affects the entire workplace where Plaintiff is employed by Defendant WORKDAY, INC. and supervised by its supervisors.  Plaintiff suffers such conduct due to his race and disabilities.

24.     Defendant WORKDAY, INC. has failed and refused to properly train, screen, conduct background checks, supervise, reprimand, direct and instruct its senior management personnel in a manner at or above the same standard of care and in accordance with Defendant WORKDAY, INC.'s stated policies and the laws of the State of California as all of the same relate to maintaining and promoting a work environment which is free of discrimination and harassment based upon race, disability, ethnicity, and other protected classes.  Defendant WORKDAY, INC. fails and refuses to properly address complaints of discrimination and/or to undertake any effective measures to address, minimize, and/or eliminate discriminatory practices in the workplace.  Moreover, Defendant WORKDAY, INC. has actual, constructive, and inquiry knowledge that the workplace is discriminatory and that a hostile work environment for these protected classes of persons exists.  Notwithstanding such knowledge, Defendant WORKDAY, INC. and its managing agents, officers, directors, and senior executives, etc., have taken no action; and in fact have taken part in, participated in, supported, and condoned such discrimination.

25.     During Plaintiff's employment, Defendant WORKDAY, INC. along with Plaintiff's supervisors, has created, encouraged, condoned, permitted, allowed and refused to take any reasonable steps to correct this hostile and discriminatory work

environment.  Black and disabled employees, including Plaintiff, are treated in an inequitable, unfair, discriminatory, and disparate manner due to their protected status; while other, non-protected classes of employees are not subjected to such conduct.  These protected employees, including Plaintiff, are subjected to considerably less favorable working conditions and severe and blatant disparate treatment in comparison to their non-protected counterparts.  The workplace is permeated by disparate treatment and harassment of these protected employees and more favorable treatment of employees who are not members of any protected class.  Such conditions are more specifically alleged herein.  Members of such protected groups, including Plaintiff, are adversely affected, harmed, and damaged by a working culture of discrimination against members of protected groups.  In this work environment, members of protected groups under FEHA and the CFRA, including black and disabled employees, are generally treated less-favorably than their non-protected counterparts.

26.     This systemic treatment permeates the workplace and adversely affects the overall work environment, causing direct and indirect harm to Plaintiff.  Even by witnessing the manner in which protected employees are disparately treated, harassed, and retaliated against for reporting such conduct, Plaintiff suffers the indirect effects of the hostile, discriminatory environment.  Protected employees at WORKDAY, INC. who are black and disabled, are:

     a.  generally treated less favorably than their non-protected counterparts;

     b.  paid less than their non-protected counterparts;

     c.  assigned to less-favorable, lower profiled and more menial assignments and duties within the scope of their respective job assignments;

     d.  treated rudely, subjected to demeaning behavior, and unfairly criticized and bad-mouthed;

     e.  treated unprofessionally and subjected to salacious comments, negative jokes, and stereotypical characterizations;

f.   subject to greater scrutiny in their work and receive disparaging and untrue comments about their performance which are inaccurate and false;

g.   more closely monitored, micro-managed and more frequently written-up to the point where it adversely affects productivity and creates a hostile work environment for such protected employees, including Plaintiff;

h.   scrutinized more harshly under Defendant WORKDAY, INC.'s policies and practices, which are more leniently applied to non-protected employees;

i.   generally disfavored as compared to non-protected employees who have lesser qualification, educational accomplishments, and performance;

j.   not fairly considered, and are considered to a significantly lesser extent, for salary increases, promotions and higher quality assignments within the purview of their existing positions;

k.   more likely to get "grunt work" and are over-worked as compared to their non-protected counterparts;

l.   terminated and constructively terminated disproportionately as compared to their non-protected counterparts; and

m.   less supported, receive less (quality and quantity) training, and are provided lesser job resources than their non-protected counterparts.

27.   In addition, Defendant WORKDAY, INC. does not illustrate a commitment to diversity, despite consistently asserting that it possesses such a commitment, nor to rectifying the foregoing issues.  Employees and consultants at WORKDAY, INC. who complain are retaliated against and intimidated.  Defendant WORKDAY, INC. does not engage in any reasonable efforts to eliminate or minimize discrimination, harassment, and retaliation.  Defendant WORKDAY, INC. has failed and refused to conduct proper investigations into complaints of discrimination, harassment, and retaliation.  Defendant WORKDAY, INC. has allowed the foregoing conditions to exist, fester, and worsen to the extent that the conditions have materially disrupted the work environment, duties, assignments, career paths and salaries of protected employees, including Plaintiff.

28.    These problems are embedded in the culture of Defendant WORKDAY, INC. and are systemic in nature.  As a result, protected employees, including Plaintiff, are faced with working and trying to excel in a discriminatory environment that is harassing, unfair, and which has a negative impact on the performance of such protected employees. These conditions limit the ability of protected employees, including Plaintiff, to excel, advance, and receive the full benefits of being employed by Defendant WORKDAY, INC. as compared to their non-protected counterparts.

29.    The foregoing factors create a hostile work environment for each protected employee, including Plaintiff, as a result of the systemic nature of such conduct.  The conduct creates a working environment which is heavily charged with discriminatory and stereotypical insults, ridicule, and disparate treatment.  Furthermore, the environment is hostile and abusive for such protected employees, including Plaintiff.

30.    Discriminatory intimidation, ridicule and insult is permitted to exist in a manner which is severe, pervasive, and commonplace.  All of these factors are openly and notoriously present in the work environment and are condoned and ratified by Defendant WORKDAY, INC.'s human resources officers and senior executives who work and/or ratify WORKDAY, INC. conduct and activities from the Pleasanton, CA headquarters.  As a result of all of the foregoing, the environment is so severely and pervasively discriminatory against such protected employees, including Plaintiff, that Plaintiff's work environment is not reasonably tolerable for Plaintiff and other protected employees.

31.    The foregoing has occurred by design and with the full knowledge of Defendant WORKDAY, INC.  When such conduct was brought to the attention of Defendant WORKDAY, INC., on repeated occasions it failed and refused to take any corrective action and continued in its course of discrimination.  The reason for such conduct is the status of Plaintiff being a member of the applicable protected classes alleged herein.  Accordingly, as a result of such status and membership, Plaintiff is subjected to the harassment, hostile work environment,  discrimination, and retaliation

described herein, without limitation.  Plaintiff is also subjected to other similar and dissimilar disparate, discriminatory, and hostile treatment solely because  of Plaintiff's membership in the protected classes alleged herein.

32.    The foregoing harassment, discrimination, disparate treatment, retaliation, and unlawful conduct, along with the intentional, apathetic, and unreasonable supporting and furthering conduct of Defendant WORKDAY, INC. and its supervisors, senior executives, and decision-makers, has permitted such conduct to exist, occur and recur without any appropriate action being taken, which further violates the intent, spirit, and specific provisions of FEHA, the CFRA, and other applicable laws.

33.    The employees and agents of Defendant WORKDAY, INC. named herein were acting in the course and scope of their employment while all of the foregoing systemic conduct was occurring.  The conduct that is the subject of this First Amended Complaint was committed, and/or ratified by managing officers in the Pleasanton, CA headquarters of Defendant WORKDAY, INC.  Each such individual employee and/or agent of Defendant WORKDAY, INC. not only participated directly in systemic conduct but conspired with other employees and/or agents to engage in, continue, and maintain a work environment permeated by such systemic conduct and a culture consistent therewith and tolerable thereof.  Each supervisor knew and had reason to know of each instance of the systemic conduct and the other conduct alleged herein yet failed and refused to take immediate and/or appropriate corrective action as required by Cal. Gov't Code § 12940(j)(1).

34.    Consistent with Defendant WORKDAY, INC.'s systemic conduct and tolerance of a discriminatory workplace, Plaintiff suffers from injuries caused by specific acts of discrimination, harassment, and retaliation which have been perpetrated by Plaintiff's supervisors directly and in their respective capacities on behalf of Defendant WORKDAY, INC.  Each supervisor intentionally, and in some instances in a grossly negligent, capricious, and indifferent manner, has wrongfully, maliciously, knowingly, and willingly allowed all the alleged discriminatory conduct to regularly occur.  Each

supervisor has failed and refused to intervene, cease, and desist, and/or make any reasonable efforts to eliminate or minimize such ongoing conditions or the damages that such conditions cause. Each such supervisor has acted in concert, conspired, encouraged, and cooperated with each other in condoning, supporting, implementing, and furthering such unlawful conduct with the intent to deprive Plaintiff of his rights, to cause Plaintiff injury, and to force Plaintiff to abandon his complaints and resign from his employment at Defendant WORKDAY, INC.

35.     Plaintiff has been treated in an unfair, inequitable, disparate, and less-favorable manner compared with Plaintiff's non-black and/or non-disabled counterparts by Defendant WORKDAY, INC. on nearly a daily basis during Plaintiff's employment. Such conduct specifically is prohibited by FEHA, including sections 12940(a) and 12940(h) – (k) of the California Government Code, and other legal authority cited herein.

36.     More specifically, Plaintiff has been subjected to the following conduct at the hands of Defendant WORKDAY, INC. Such specific acts of discrimination, harassment, and retaliation include but are not limited to the following:

a. Paying Plaintiff less compensation than Plaintiff's comparable co-workers who are not black and/or disabled, and thus so protected under FEHA, for performing the same, or less, quality and quantity of work;

b. Providing Plaintiff substantially less training, direction, supervision, and information resources regarding Defendant WORKDAY, INC.'s practices and procedures for Plaintiff's job duties than what is provided to Plaintiff's co-workers and counterparts who are not black and/or disabled, and thus so protected under FEHA. Such efforts are undertaken with a specific intent to adversely affect Plaintiff's employment and to limit Plaintiff's ability to excel in his position, while assisting Plaintiff's co-workers who were not black and/or disabled, and thus so protected under FEHA, in excelling;

c. Assigning Plaintiff more complex, convoluted, and burdensome assignments than Plaintiff's co-workers who are not black and/or disabled, and thus so protected under FEHA. Such efforts are also undertaken with a specific intent to adversely affect Plaintiff's employment and to limit Plaintiff's ability to excel in his position, while assisting Plaintiff's co-workers and counterparts who are not black and/or disabled, and thus so protected under FEHA, in excelling;

d. More harshly, unfairly, and unjustly criticizing Plaintiff's work performance and generating inaccurate and unfair comments about Plaintiff's performance in an effort to minimize Plaintiff's ability to excel compared to Plaintiff's co-workers and counterparts who are not black and/or disabled, and thus so protected under FEHA. More specifically, Defendant WORKDAY, INC., by its supervisors and managers, jointly elected to cause and instruct supervisors and managers to manufacture negative comments about his performance because of Plaintiff's race, disabilities, and complaints of disparate treatment. Such conduct is taken by Defendant WORKDAY, INC. as a result of Plaintiff's protected status and in an effort to further the systemic conduct alleged herein. Plaintiff sought to engage in the process which Defendant WORKDAY, INC. purports is available to all of its employees to question his unequal treatment when compared to Plaintiff's co-workers and counterparts who are not protected under FEHA; yet, in furtherance of Defendant WORKDAY, INC.'s discriminatory motives and the conduct alleged herein, Plaintiff has been denied the right to take advantage of such process and/or to pursue Plaintiff's grievances regarding his working conditions.

e. Unjustly refusing to acknowledge, accept, and respect Plaintiff's medical leave, while such requests were routinely accepted and respected under

significantly less-valid circumstances when made by Plaintiff's co-workers and counterparts who are not black and/or disabled, and thus so protected under FEHA.

f.   Ignoring and failing to investigate Plaintiff's complaints, and the allegations contained therein  the Defendant know to be legitimate, while such requests are routinely investigated under significantly less-valid circumstances when made by Plaintiff's co-workers and counterparts who are not black and/or disabled, and thus so protected under FEHA.

37.    In connection with all of the foregoing conduct, the systemic conduct and other similar and related discriminatory, harassing, and retaliatory conduct based upon Plaintiff's protected status (collectively referred to herein as the "unlawful conduct"), Defendant WORKDAY, INC. has been aware of the unlawful conduct, was notified by Plaintiff and/or others of the unlawful conduct, yet has elected to condone, ratify, permit the continuance of and turn a blind eye toward such unlawful conduct.

38.    At all times, Plaintiff fully and faithfully performed his job duties in a manner that was above WORKDAY, INC.'s standard and above the level of performance exhibited by his non-protected counterparts.  Plaintiff has performed each of his duties in a manner which is consistently competent, timely and efficient to a greater extent than Plaintiff's non-protected co-workers.

## FACTUAL AVERMENTS
### Discriminatory Clustering of Plaintiff
### and Other Blacks at the Bottom of Ms. Hauck's
### Group and Unfair Pay in Violation of FEHA

39.    Beginning in or about January 2021, Plaintiff was settling into his new position as a WORKDAY, INC. Senior Counsel on the team of then Director (now Senior Director) Katie Hauck (white female), his direct supervisor.  Ms. Hauck directly reports to Senior Vice President Susan Dahm (white female), who directly reports to Defendant WORKDAY, INC.'s General Counsel and Head of its Legal Compliance & Corporate

Affairs ("LCCA") Team, Chief Legal Officer Rich Sauer (white male).  Ms. Dahm, Ms. Dahm, Mr. Sauer, and Ms. Hauck are also WORKDAY, INC. attorneys.  Ms. Dahm and Mr. Sauer are California residents who work in Defendant WORKDAY, INC.'S headquarters in Pleasanton, California.  The conduct herein attributed to Ms. Hauck, Ms. Dahm and Mr. Sauer as alleged occurred in, and/or was approved and ratified in Pleasanton, California.

40.    Upon information and belief, Ms. Hauck travels to California multiple times per year, at the expense of Defendant WORKDAY, INC., for the purpose of conducting business and otherwise engaging in work-related activities.  Ms. Hauck works constantly with colleagues who are located in California, including her direct supervisor, Ms. Dahm as well as with all of the other WORKDAY, INC. employees and agents named within this First Amended Complaint.

41.    Defendant WORKDAY, INC. began hiring additional attorneys after Plaintiff in or about January 2021 as full-time employees to work under Ms. Hauck:  an Indian American female (hired as an Assistant General Counsel), later a white male (hired as an Assistant General Counsel), and eventually a white female (hired as a Director, Associate General Counsel).

42.    The three Assistant General Counsel on Ms. Hauck's team, including a white female hired prior to Plaintiff, have less professional legal experience than Plaintiff, and none of Ms. Hauck's direct reports have as much supervisory responsibility as he has, nor do they work with as many teams within the company as Plaintiff does.

43.    Plaintiff receives less compensation than all the non-black attorneys who report to Ms. Hauck despite performing at least substantially similar work to these individuals with respect to the (a.) skills, (b.) training, (c.) education, (d.) level of responsibility, and (e.) physical and mental energy required for their jobs.

44.    Notwithstanding, all the non-black attorneys reporting to Ms. Hauck were hired at higher employment levels and paid more compensation than Plaintiff except for one, a white female who was promoted to a higher employment level than Plaintiff, from

Senior Counsel to Assistant General Counsel, and paid more compensation than Plaintiff soon after Plaintiff was hired.

45.     Plaintiff also has more professional legal experience than Ms. Hauck.

46.     Plaintiff and the only other black attorney who reports to Ms. Hauck are at the lower Senior Counsel position.  The lone paralegal who reports to Ms. Hauck is also black.

47.     Defendant WORKDAY, INC., Ms. Dahm, Mr. Sauer and Ms. Hauck participated in, approved, and/or ratified this discriminatory treatment of Plaintiff with respect to his employment level and compensation.

### *Plaintiff's Protected Activity of Submitting a "Career Growth and Continued Success" Plan for Himself to be Promoted Because He Suffered Discrimination*

48.     Within numerous, weekly one-on-one meetings with Ms. Hauck immediately after Defendant WORKDAY, INC. began hiring and/or promoting non-black attorneys who possessed less professional legal experience than Plaintiff, performed substantially similar work to him, but were assigned to higher positions and paid more compensation than Plaintiff, he asked Ms. Hauck why this had been occurring.

49.     Ms. Hauck responded that she had no control over Plaintiff's compensation or job title and had no idea why he was at a lower employment level. Based on Ms. Hauck's response, Plaintiff understood that Plaintiff's compensation and job title were controlled by Ms. Hauck's California-based superiors, Ms. Dahm, Ms. Goldsmith, and Mr. Sauer in the WORKDAY, INC. headquarters located in Pleasanton, California.

50.     Rather than escalating Plaintiff's report of discrimination to her superiors or otherwise correcting this unequal treatment, Ms. Hauck suggested that for Plaintiff to reach equality or parity with the non-black attorneys in her group (who possessed less professional legal experience than Plaintiff, and who performed substantially similar work to him), Plaintiff would need to come up with a "plan" to be promoted—an additional obstacle that Plaintiff's non-black colleagues did not and would not have to overcome.

51.     Disappointed yet undeterred, during the first week in May 2021, Plaintiff shared by email with Ms. Hauck a comprehensive, 10-page, color-coded "Career Growth and Continued Success Plan" which he developed for him to be promoted from Senior Counsel to Assistant General Counsel based on his professional legal experience and vastly expanding role.

52.     Ms. Hauck responded to Plaintiff during their next weekly one-on-one meeting that he would need "at least one year" as Senior Counsel.

53.     When Plaintiff reminded Ms. Hauck during that one-on-one meeting about the assertion Mr. Sauer had made the week prior within his April 23, 2021 "TGIF" Newsletter (which Plaintiff emailed to Ms. Hauck before their meeting to refresh her memory) that the LCCA Team had made several "off-cycle promotions" based on "changed circumstances" "compelling" the Defendant to promote certain (non-black) employees sooner rather than waiting for May 2021, Ms. Hauck admitted that Plaintiff had the requisite professional legal experience and that his role and responsibilities as Senior Counsel had been greatly expanded (which continues presently) sufficiently to justify his promotion.

54.     Nonetheless, Ms. Hauck was unspecific and evasive about what additional criteria Plaintiff would need for a promotion.

55.     Astonishingly, Ms. Hauck then complimented Plaintiff's "Career Growth and Continued Success Plan" document and told him she would give it to one of her other direct reports, a white female, to use.

56.     Rather than escalating Plaintiff's report of discrimination to her superiors or otherwise correcting this unequal treatment, Ms. Hauck addressed the issue by taking Plaintiff's intellectual property from him—a document he created at Ms. Hauck's suggestion just to be treated equally with his non-black colleagues—and giving it to one of Plaintiff's white colleagues.

57.     Defendant WORKDAY, INC. promoted this white female from Senior Counsel to Assistant General Counsel shortly thereafter.

58.     In addition, the Defendants further subjected Plaintiff to harassment and a hostile work environment because, *inter alia*, he engaged in the protected activity of advocating for himself to be promoted and complained about the Defendant's discriminatory treatment by subjecting him to an unequal employment level and pay compared with Plaintiff's non-black colleagues.

*Hiring of Ms. Strelow and Plaintiff's*
*Working with, Receiving Aid from, and Supervising*
*Ms. Strelow, for which Plaintiff Suffered Discrimination, Retaliation,*
*Harassment, and the Creation of a Hostile Work Environment*

59.     In or around May 2021, Plaintiff asked Ms. Hauck if she would hire a person who would report to him and aid with creating and supporting Defendant WORKDAY, INC.'s  U.S. federal and other public sector compliance programs.  Ms. Hauck responded she did not have funding for such a role.

60.     However, Christine ("Chris") Fedrow (white female), who leads the WORKDAY, INC. Integrity Team ("WIT"), informed Plaintiff that WIT had funding for the role.[1]

61.     Plaintiff drafted and provided the position description to Ms. Fedrow; was asked and offered his opinion to Ms. Fedrow concerning an appropriate salary and Restricted Stock Units ("RSUs") grant for the position; participated extensively in the interview process; and served as the "deciding vote" when Ms. Fedrow asked him to choose between the interviewee finalist whom Plaintiff had originally recommended for the role and Christina Strelow (white female), whom Defendant WORKDAY, INC. ultimately hired as the Program Manager for Federal Ethics & Compliance in or about June 2021.

62.     Since Plaintiff was serving as Ms. Strelow's de facto manager/supervisor, at

---

[1] Ms. Fedrow currently serves as WORKDAY, INC.'s Chief Integrity and Compliance Officer and reports to Mr. Sauer, who is at the C-Suite level and reports to Defendant WORKDAY, INC.'s President of the Americas, co-CEOs, and Board of Directors.  Ms. Fedrow, a California resident,  is based in the Pleasanton headquarters  of WORKDAY, INC.

Ms. Fedrow's request Plaintiff also offered feedback (deservedly glowing) during Ms. Strelow's first performance review period in her role.

63.    Plaintiff and Ms. Strelow have worked together tirelessly to create and maintain Defendant WORKDAY, INC.'s U.S. federal and other public sector compliance programs.[2]

64.    Defendant WORKDAY, INC. further subjected Plaintiff to harassment and a hostile work environment because, *inter alia*, Plaintiff advocated for Ms. Strelow to be hired, and then worked with, received aid from, and/or supervised Ms. Strelow— behavior the Defendant, its employees and agents (including but not limited to Ms. Dahm, Ms. Hauck, Ms. Goldsmith and Mr. Sauer) viewed as too ambitious, presumptuous, arrogant, and/or beyond the station of Plaintiff as a disabled black person.

*Plaintiff's Protected Activity of Advocating*

*on Behalf of a Black Woman, for which He Suffered Discrimination,*

*Retaliation, Harassment, and the Creation of a Hostile Work Environment*

65.    In October 2021, a black female, Ashley Brown, MBA, who worked for the Defendant's Finance Team was having problems with her manager, Ann Allen (white female), which Ms. Brown stated were based on race, and she reached out to Plaintiff for help.  Ms. Brown asked Plaintiff if he thought she might be a suitable candidate for an open, interim, non-attorney contracting role which Defendant WORKDAY, INC. had advertised reporting to Ms. Hauck.

66.    Plaintiff knew Ms. Brown as a diligent worker and pleasant person from many of the U.S. federal compliance planning and implementation meetings that Plaintiff

---

[2] Specifically, Plaintiff and Ms. Strelow partner to form the U.S. federal and public sector compliance team.  They both created and maintain the U.S. federal compliance email alias federalcompliance@workday.com.  Plaintiff and Ms. Strelow also created and maintain the Workday Federal Code of Business Ethics, the Defendant's U.S. federal policies, the Defendant' internal U.S. federal compliance "Workspace" page, Defendant's myriad U.S. federal compliance trainings, Defendant's U.S. federal and public-sector compliance reviews including "Revolving Door" reviews, Organizational Conflicts of Interest reviews, Gifts & Entertainment reviews, U.S. federal marketing materials and marketing events reviews, and the Workday Internal Audit Team's U.S. federal escalation process per the U.S. federal mandatory disclosure rule.  Plaintiff and Ms. Strelow also created, drafted, and published a monthly U.S. federal compliance newsletter titled "What's Now and What's Next in U.S. Government Contracting," in addition to other legal compliance efforts.

had hosted daily over a series of months, attended by outside consultants and a large cross-section of Defendant WORKDAY, INC.'S internal functional groups, which Ms. Brown routinely joined as the sole participant on behalf of the Finance Team.

67.    Plaintiff also saw in Ms. Brown's resume that she had extensive, relevant professional U.S. federal contracting experience.

68.    On this basis and at Ms. Brown's request, Plaintiff contacted Ms. Hauck and **confidentially** told her Ms. Brown believed she was having problems with her manager because of her race, which Plaintiff also believed.  Ms. Hauck assured Plaintiff that she would indeed keep this information confidential.

69.    Following this conversation with Ms. Hauck, Plaintiff shared Ms. Brown's resume with Ms. Hauck (and one of Ms. Hauck's other direct reports), inquiring whether Ms. Brown might be interviewed for the open, interim, non-attorney contracting role.

70.    Ms. Hauck revealed to Plaintiff during their next weekly one-on-one meeting that notwithstanding her agreement with Plaintiff to keep the matter confidential, Ms. Hauck had a discussion with Ms. Allen **about** Ms. Brown and based on that conversation alone (which did not even include Ms. Brown), Ms. Hauck decided that Ms. Brown "would not be a good fit."  On this basis, Ms. Hauck refused to interview Ms. Brown for the open, interim, non-attorney contracting role.

71.    Ms. Brown's employment with WORKDAY, INC. ended shortly thereafter.

72.    Ms. Hauck did not report Plaintiff's concern that Ms. Brown was suffering discrimination based upon her race, nor take steps to initiate an investigation of Plaintiff's complaints.

73.    Defendant WORKDAY, INC. also further subjected Plaintiff to harassment and a hostile work environment because, *inter alia*, he engaged in the protected activity of advocating for the internal transfer of a black female whom Plaintiff believed (and Ms. Brown herself believed) had been subjected to racial discrimination by Defendant WORKDAY, INC..

*Plaintiff's Protected Activity of Advocating for Himself to Mr. Sauer,*
*which Mr. Sauer Ignored, and for which He Suffered Discrimination,*
*Retaliation, Harassment, and the Creation of a Hostile Work Environment*

74.    During the first week of January 2022, with Ms. Hauck's approval, Plaintiff met with Mr. Sauer and told him during a Zoom conference call that because of Defendant WORKDAY, INC.'S many legal compliance obligations under U.S. federal, state, and local laws, it would be advisable for LCCA to have an attorney as a legal subject matter expert for general oversight and specific internal monitoring.  Accordingly, Plaintiff recommended to Mr. Sauer that Defendant WORKDAY, INC. should create the role of "Lead or Head Public-Sector Compliance Counsel" as soon as reasonably possible.

75.    Plaintiff also told Mr. Sauer during that meeting, which Ms. Hauck attended, that he (Plaintiff) would be the ideal candidate to fill the role based on his extensive legal professional experience, supervision of Ms. Strelow, cross-functional responsibilities within WORKDAY, INC., continually expanding role and responsibilities, and subject matter expertise.

76.    Mr. Sauer was receptive to Plaintiff's ideas and asked him to provide him (Mr. Sauer) with a formal written document proposing his (Plaintiff's) promotion to "Lead or Head Public-Sector Compliance Counsel," which he provided to Mr. Sauer via email on January 7, 2022.  However, Mr. Sauer chose not to respond to Plaintiff.

77.    Months later, Plaintiff emailed Mr. Sauer and expressed his desire to be included in the Leadership Council on Legal Diversity ("LCLD") Fellows Program, which Defendant WORKDAY, INC. and Mr. Sauer had previously advertised and touted as a means of preparing diverse, high-potential, mid-career attorneys such as Plaintiff with professional and personal development opportunities, leadership training, and relationship-building resources.

78.    Despite Mr. Sauer's stated "commitment" to, among other things, "model inclusive behaviors, act when confronted with injustice, and foster a safe and brave space

for all," once again Mr. Sauer chose not to respond to Plaintiff.

79.    Defendant WORKDAY, INC.  also further subjected Plaintiff to harassment and a hostile work environment because, *inter alia*, he engaged in the protected activity of advocating to Mr. Sauer for himself to be promoted, internally transferred, receive equal compensation, and/or otherwise receive treatment equal with his non-black colleagues.

### *Ms. McFall's Intimidation, Bullying, Abuse and Harassment of Plaintiff Concerning the Global Annual Training, which the Defendants Ignored*

80.    During the first or second week of September 2022, Plaintiff made a presentation at Mr. Sauer's request, assisted by Ms. Strelow, to Mr. Sauer and his direct reports Ms. Fedrow, Ms. Dahm, Vice President Jorga Jackson, Senior Director Scott Helsinger, and (Defendant) Senior Vice President Ms. McFall.  All of Mr. Sauer's direct reports, like Mr. Sauer, are California residents who work in the Pleasanton headquarters of Defendant WORKDAY, INC.  Ms. Hauck also attended the meeting.  This audience comprised the Defendant's most senior attorneys and compliance professionals.

81.    Plaintiff, Ms. Strelow and Ms. Hauck attended the meeting via Zoom while Mr. Sauer and his direct reports attended the meeting in person from a conference room at WORKDAY, INC.'S  Pleasanton, California headquarters.

82.    During Plaintiff's presentation, he explained the legal criteria he had developed for which WORKDAY, INC. full-time employees and contractors around the world should take the annual U.S. federal ethics and compliance training, a course Plaintiff had developed for the Defendant prior to Ms. Strelow being hired in 2021[3], and Ms. Strelow greatly helped Plaintiff to improve in 2022.

83.    The online training course was estimated to take one hour to complete, could be completed in as many sittings as needed without starting over, and covered

---

[3] Jill Keller (black female), the paralegal who reports to Ms. Hauck, was also instrumental in the creation and successful roll-out of the global 2021 U.S. federal ethics and compliance training, as were many others.

"cradle to grave" U.S. federal government contracting.

84.    Following Plaintiff's presentation to Mr. Sauer and his direct reports, Ms. McFall passionately disagreed with Plaintiff's legal assessment, stating she did not want anyone in her group, which numbered in the hundreds worldwide, to be **mandated** to take the annual U.S. federal ethics and compliance training because she believed they were "too busy" and "suffered from training fatigue."

85.    Nonetheless, Mr. Sauer overruled Ms. McFall during the meeting by saying he agreed with Plaintiff, and that Plaintiff should work with Ms. McFall, Ms. Fedrow and other interested parties on planning and implementing Plaintiff's legal recommendation.

86.    Ms. McFall was visibly incredibly angry during this exchange.

87.    The follow-up planning and implementation Zoom conference call which Mr. Sauer had requested occurred on September 19, 2022, and included Plaintiff, Ms. McFall, Ms. Fedrow and Ms. Strelow.  (Ms. Hauck stated that she was too busy to attend just prior to the meeting.)

88.    Ms. McFall and Ms. Fedrow attended the meeting in person within the WORKDAY, INC. Pleasanton, California headquarters while Plaintiff and Ms. Strelow attended via Zoom.

89.    During the Zoom meeting, after Ms. Fedrow had spoken but before Plaintiff had said anything other than "hello," Ms. McFall (white female) loudly and publicly screamed at him, stating, "everybody knows you don't want to do work, Anthony!"

90.    Plaintiff responded politely, calmly and firmly to Ms. McFall that he thought her insulting characterization of him was "unfair"; that he absolutely did want to do the work, as evidenced by Plaintiff's many recommendations to Ms. Dahm, Mr. Sauer, Ms. McFall and other WORKDAY, INC. leaders about which categories of workers within WORKDAY, INC. should take the training in his opinion based on legal requirements and industry best practices, which he hoped Ms. McFall would abide[4]; but

---

[4] Plaintiff has consistently recommended to Mr. Sauer, Ms. Dahm, Ms. McFall and other leaders that they should take a purposely expansive view of who should complete the U.S. federal compliance and ethics training given that U.S. federal government contracting is a "Strategic Growth Initiative" for the Defendant; the overwhelming majority

that Plaintiff could not and would not make the ultimate decision for Ms. McFall of who in her group would be mandated to take the training course.

91.    Ms. McFall then angrily and loudly doubled down by again impugning Plaintiff's work ethic and professional reputation in front of everyone, repeating the racist stereotype that Plaintiff, as the lone black person in the meeting, was lazy and had a public reputation for not wanting to do his job.[5]

92.    Per the WORKDAY, INC. Code of Conduct and corresponding policies, Plaintiff reported this incident by telling Ms. Hauck about Ms. McFall's abhorrent behavior and treatment of him during their next weekly one-on-one call because Ms. Hauck is Plaintiff's manager.

93.    Plaintiff told Ms. Hauck that "the optics look terrible for Workday" and "the incident appeared racist to me" that Ms. McFall had loudly, cruelly, baselessly, publicly, shamelessly, and repeatedly accused Plaintiff of having a professional reputation (known by "everybody" according to Ms. McFall) for not wanting to work and being "lazy."

94.    Ms. Hauck responded to Plaintiff, saying, "OK, I understand."  However, despite the Defendant's alleged "zero tolerance policy against retaliation," they did not discipline Ms. McFall for her discriminatory, retaliatory, harassing, and hostile statements and treatment of Plaintiff on September 19, 2022.

---

of the workforce is new to U.S. federal government contracting; Defendant WORKDAY, INC.'s current business model is to have certain full-time employees and contractors support commercial, U.S. state, local, educational and U.S. federal contracts simultaneously, and thus the Defendant has no way to prevent unintended spillover of people into U.S. federal; violations of U.S. federal regulations and laws can have significantly negative legal, financial and reputational consequences for Defendant WORKDAY, INC. including extensive fines and penalties, suspension, debarment, third party lawsuits, and even criminal charges; the risks of noncompliance with U.S. federal regulations can also have unintended consequences for the Defendant's business; and it will be difficult to separate Defendant WORKDAY, INC. from future bad actors it employs in the eyes of U.S. federal contracting officers, auditors and investigators if the Defendant does not have a sophisticated U.S. federal ethics and compliance program where its full-time employees and contractors supporting U.S. federal take regular federal training courses, that are tracked, and the attendees' agreement to adhere to the course curriculum is a prerequisite for completion.

[5] See, e.g., https://nmaahc.si.edu/explore/stories/popular-and-pervasive-stereotypes-african-americans (describing laziness or a lack of desire to work as a racist and harmful stereotype commonly attributed to black people); https://nieman.harvard.edu/articles/the-welfare-queen-experiment/ (similar).

95.    To the contrary, the Defendant's managerial and supervisory employees intensified their harassment of Plaintiff and creation of a hostile work environment because, *inter alia*, Plaintiff reported Ms. McFall's discriminatory, retaliatory and repeated public slurs about him to Ms. Hauck.

### *Demoting Plaintiff by Prohibiting Him from Working with, Receiving Aid from, and/or Supervising Ms. Strelow, Constituting Discrimination, Retaliation, Harassment, and the Creation of a Hostile Work Environment*

96.    On September 16, 2023, a few days after Plaintiff had made the legal recommendation in a meeting with which Ms. McFall had publicly and angrily disagreed, Ms. Hauck and Ms. Dahm **demoted** Plaintiff without just cause in retaliation.

97.    Specifically, they arbitrarily and capriciously prohibited Plaintiff from working with, receiving aid from, and/or supervising Ms. Strelow—going so far as to order Plaintiff to delete Ms. Strelow from U.S. federal Zoom call meeting invitations on which she had of course been included although the two had worked together successfully since shortly after Plaintiff wrote Ms. Strelow's position description and advocated for her to be hired.

98.    According to Ms. Hauck, it was Ms. Dahm who had made this decision to demote Plaintiff, and Ms. Hauck was just following her orders.

99.    Ms. Strelow is the programmatic lead for all of Defendant WORKDAY, INC.'S U.S. federal compliance endeavors and was specifically hired by the Defendants to work with, aid, and receive supervision from Plaintiff.

100.    The vague, unspecific, incoherent, and pretextual reason Ms. Hauck and Ms. Dahm gave for demoting Plaintiff by prohibiting him from working with, receiving aid from, and/or supervising Ms. Strelow (and at times also working with Ms. Fedrow) was their desire to ensure that "the resources we are using feel appropriately used and that we aren't over taxing them."

101.    On October 12, 2022, Plaintiff had been working alone for weeks to plan and schedule meetings with stakeholders, and create and edit complex Google slides, Google

sheets, Excel spreadsheets, and search queries within the WORKDAY, INC. application to select the global WORKDAY, INC. employee and contractor audience who would take the annual U.S. federal ethics and compliance training. In addition, Plaintiff was fulfilling his other responsibilities in supporting the Defendant's U.S. federal and other public sector compliance initiatives.

102.    Although Ms. Hauck and Ms. Dahm had demoted Plaintiff and disallowed him from working with Ms. Strelow beginning on or about September 16, 2022, Plaintiff finally asked Ms. Strelow, an expert at coordination and project management, for her help on October 12, 2022, in part, because his disabilities prevented him from doing this work completely on his own.[6]

103.    Indeed, Plaintiff asked Ms. Strelow to help him because creating and maintaining the Defendant WORKDAY, INC'S entire U.S. federal and other public sector compliance infrastructure alone—despite the Defendant having specifically hired Ms. Strelow to work with and assist Plaintiff with this undertaking—was an "overtaxing," impossible, and thus abusive workload for him or for any one person.

104.    Plaintiff tried in vain to do this work single-handedly for more than two weeks to no avail so he finally asked Ms. Strelow for her assistance, which she kindly agreed to, because Plaintiff thought it was much more important to get the work done correctly by collaborating with Ms. Strelow than to not work collaboratively and have the project fail—precisely what Ms. Hauck and Ms. Dahm appeared to have wanted to happen.

105.    After Plaintiff delivered the work Ms. Hauck had asked of him, Ms. Hauck with Ms. Dahm copied on the email asked Plaintiff "how" he had managed to successfully complete the search query in the WORKDAY, INC. tool, which identified and counted the previous year's global employee and contractor training audience for the purpose of mapping the current year's potential training audience.

---

[6] Ms. Hauck and Ms. Dahm had been aware of Plaintiff's cognitive and memory challenges since he revealed these issues to them in August 2021, in addition to his other (digestive) disability from chronic diverticulitis, for which Plaintiff has been periodically hospitalized since a 2012 surgery.

106.    Plaintiff initially misunderstood Ms. Hauck to have asked him "what" his internal search query had produced, and so he answered accordingly.

107.    Dissatisfied with Plaintiff's response, Ms. Hauck then clarified her question by explaining that it was "actually much more tactical than substantive."

108.    Finally understanding the **true** meaning of her question, Plaintiff told Ms. Hauck and Ms. Dahm the truth:  it was Ms. Strelow who had helped him to complete the search query.

109.    Ms. Hauck and Ms. Dahm did not discuss, consider, debate, weigh, quibble over, comment upon, engage with, ponder about, or proffer anything "substantive" in response to Plaintiff's answer or its impact on the annual U.S. federal ethics and compliance training because their true aim was "actually much more tactical than substantive," *i.e.*, to retaliate against Plaintiff by demoting him, ballooning his workload, isolating him, otherwise making his job intolerable, and thus constructively terminating him.

110.    To be sure, Ms. Hauck did not ask Plaintiff to further clarify his answer (as she had initially done) or question the relevance of his admission that he had worked with Ms. Strelow because considering Plaintiff's demotion and their repeated threats and warnings for Plaintiff not to do so over the preceding three and a half weeks, neither Ms. Hauck nor Ms. Dahm needed additional clarification.

111.    Plaintiff had given Ms. Hauck and Ms. Dahm the exact answer they were looking for, which was not "what" Plaintiff's answer had contributed to the project, but rather "how" he had briefly managed to evade their retaliation.

112.    If there was any doubt at that point that Ms. Hauck and Ms. Dahm were furious with Plaintiff on October 12, 2022, upon learning he had continued to collaborate with Ms. Strelow in defiance of his demotion and their repeated, retaliatory threats and warnings, Ms. Hauck (with Ms. Dahm copied) tersely replied, "OK, thanks for the info."

113.    Plaintiff had no apparent recourse and could only just respond, "You're very welcome!" as he at that moment had confirmation that in addition to Ms. McFall, now Ms.

Hauck and Ms. Dahm were also furious with him, similarly looking to undermine him, permanently damage his career and professional standing, and ultimately make it impossible for Plaintiff to be treated equally with his non-black colleagues, or to be considered for any promotion or upward mobility at WORKDAY, INC.

114.    Months earlier, during a one-on-one meeting with Plaintiff discussing additionally vague, unspecific and pretextual barriers to him being promoted to an equal employment level and compensated fairly in comparison with his non-black colleagues, Ms. Hauck revealed that Ms. Dahm had stipulated that for Ms. Hauck to be promoted from Director to Senior Director, Ms. Hauck would need to "be meaner to you guys," meaning Ms. Hauck would need to be more unkind or spiteful to her direct reports, including Plaintiff, to earn a promotion.  Ms. Hauck received a promotion from Director to Senior Director shortly thereafter.

115.    Likewise, despite Defendant WORKDAY, INC'S  unjustifiable refusal to promote Plaintiff and many of its other deserving black employees to appropriate employment levels and compensate them fairly and equally during the period relevant to this First Amended Complaint, it also promoted Ms. Dahm, Ms. McFall, and Mr. Sauer during this period as well.

116.    Due to stress, exhaustion, and trauma associated with this and other disparate, discriminatory, retaliatory, harassing and hostile treatment of him by Defendant WORKDAY, INC.'S employees and agents, Plaintiff was hospitalized in a Maryland medical facility later that evening, October 12, 2022, where he remained through November 10, 2022.

### *Defendant's Misleading of Police Causing Them to Go to Plaintiff's Home, Terrorizing, Traumatizing, Humiliating and Endangering Plaintiff, His Wife and Children*

117.    On the evening of October 12, 2022, a few hours after Ms. Hauck made her foreboding remark "thanking" Plaintiff when he revealed to both her and Ms. Dahm that he had worked with, received aid from and supervised Ms. Strelow (in defiance of his

demotion and their repeated, retaliatory threats and warnings), Plaintiff sent **two emails** from his cellphone to Ms. Hauck before being admitted to inpatient treatment.

118.    Plaintiff's two emails stated: "I'm having a **medical emergency** and am headed to the **hospital**" followed by, "I'm in the **hospital waiting room** now with my **wife[,]"** respectively.

119.    Plaintiff also filled out and sent from his cellphone **a third email**—the online WORKDAY, INC. leave request form—wherein Plaintiff commented to Ms. Hauck he would be filing the required **family and medical leave certification as soon as he could** because he would need to take extended medical leave beyond October 12th since he was being hospitalized but did not know for how long.

120.    Ms. Hauck responded in writing to Plaintiff on October 13, 2022, saying in relevant part:

> I wanted to pass along a bit of information (in case you need/want it) **in response to your comment around FMLA in the time off request you submitted last night**. If you have any questions regarding FMLA, you can contact Unum (who handles WORKDAY, INC.'s FMLA) at 866-865-9092. Feel free to also reach out to [the Defendant's HR team] P&P via Service Hub and they can provide additional direction. **Please don't worry about work and focus on feeling better**.

121.    By October 12, 2022, Plaintiff had clearly and sufficiently satisfied his legal obligation of notifying his employer, Defendant WORKDAY, INC., about his emergency medical condition and immediate need to take medical leave under both California's family and medical leave law, namely § 11091 of the CFRA, and the federal family and medical leave law, the FMLA, which Defendant WORKDAY, INC. correctly recognized and memorialized on October 13, 2022 when Ms. Hauck closed by telling Plaintiff to "[p]lease don't worry about work and focus on feeling better."

122.    There is nothing more California law (nor federal law, for that matter) required of Plaintiff for him to have immediately taken medical leave.

123.    Therefore, the subsequent intrusions by Defendant WORKDAY, INC.

following this email exchange between Plaintiff and Ms. Hauck constituted unlawful interference with his medical leave, as well as retaliation against Plaintiff for exercising his right to take medical leave.

124.    To wit, on the evening of October 20, 2022, a week after Ms. Hauck, Ms. Dahm, and Ms. McFall had been furious with Plaintiff because he engaged in protected activity, the Defendants caused police to be sent to Plaintiff's home under the pretense of a so-called "Workday Wellness Check" as retaliation, and to verify Plaintiff's stated reason for taking family and medical leave, further subjecting Plaintiff to harassment and a hostile work environment.

125.    On the evening of October 20, 2022, Plaintiff's wife arrived after dark at their Silver Spring, Maryland home with their two sons in tow, then ages 13 and 9.  Mrs. Hill had been driving their sons home from their weekly math tutoring session and family pizza dinner when she was confronted by three squad cars, lights flashing, full of armed Montgomery County Police officers parked in the Hills' driveway, which is located at the end of a cul-de-sac in a quiet Washington, D.C.-adjacent bedroom community.

126.    The police, who had initially gone to multiple neighbors' houses searching for Plaintiff, then demanded that Mrs. Hill tell them where her husband was.

127.    Shaken and afraid for herself and her children, Mrs. Hill responded that Plaintiff was hospitalized at a Maryland medical facility, prompting the police to shove the phone number of the "Workday Security Team" in her face, the police instructing Mrs. Hill to call Defendant WORKDAY, INC.'S Security Team in Pleasanton, California and inform them of Plaintiff's location and the reason he had been absent from work "immediately. The telephone number that Mrs. Hill was instructed to call to share this confidential medical information and otherwise confirm Plaintiff's medical leave was to the WORKDAY, INC. headquarters in Pleasanton, California.

128.    Mrs. Hill **did so under duress because the police**, who were operating as unaware agents of Defendant WORKDAY, INC. **directed her to do so**.

129.    On the afternoon of October 21, 2022, a staff person in the medical facility

where Plaintiff was receiving treatment approached him and asked, "you Anthony?" Plaintiff answered, "yes." The staff person then said, "police are at your house, man." At that moment, Plaintiff had a massive panic attack which mimicked symptoms of a cardiac arrest as he experienced chest pains and could not breathe.

130.    Plaintiff also had no way to call his wife or anyone because of the medical facility's strict policy prohibiting patients from having contact with outside persons, including family members, until the 15th day of inpatient treatment.

131.    Plaintiff then frantically searched for and located his Clinical Case Manager, Kristin Anderson-Clouse. Ms. Anderson-Clouse tried to calm Plaintiff and allowed him to use her office phone to call his wife, who explained that the "Workday Wellness Check" had occurred at their home the prior evening.

132.    Ms. Anderson-Clouse then helped Plaintiff's wife draft an email, which Mrs. Hill sent to Ms. Hauck and Ms. Dahm **together**, stating in relevant part:

> I want to **reassure** you that [my husband] Anthony is safe and receiving ongoing medical treatment at a Maryland facility. His medical team has estimated that he will need approximately 3 more weeks before he is able to return to work full-time.

133.    Mrs. Hill communicated two important points within her October 21, 2022 email to Ms. Hauck and Ms. Dahm: first, she used the word "reassure" about her husband because she knew (as both Ms. Hauck and Ms. Dahm did) that on October 12, 2022, Plaintiff had **already assured** Defendant WORKDAY, INC. (in writing) that his wife had taken him to the hospital because he was experiencing a medical emergency for which he would immediately be taking medical leave, and Plaintiff would promptly be submitting the required certification, which the Defendant WORKDAY, INC. acknowledged (in writing) on October 13, 2022.

134.    And second, although Defendant WORKDAY, INC. had forced Mrs. Hill to produce Plaintiff's confidential medical information the prior evening by misusing police to extract it from her, Mrs. Hill nonetheless did not repeat details to Ms. Hauck and Ms.

Dahm within her October 21st email about the specific medical facility where her husband was receiving inpatient treatment, nor about his underlying medical condition.

135.    Mrs. Hill withheld this information in her email to Ms. Hauck and Ms. Dahm because both she and Plaintiff had very much wanted to keep Plaintiff's confidential medical information confidential, a legally protected right regardless of whether one does or does not belong to any legally protected class, but which Defendant WORKDAY, INC. unlawfully stole from Plaintiff.

136.    After strangely removing Ms. Hauck from the email chain, Ms. Dahm then proceeded to gaslight Mrs. Hill, replying:

Dear Hanadi: **Thank you so much for letting us know**. We wish our very best to you and Anthony. **We have been in contact with our HR team and I am advised** that they are in contact with you to support your request. Please do reach out if there is anything further we can do to support you.

137.    Ms. Dahm made no mention of the "Workday Wellness Check" within her email to Mrs. Hill despite having orchestrated this cruel and needless intervention at the Hill home, in collaboration with Ms. Dahm's fellow California-based colleagues, less than 24 hours earlier.

138.    Because of Ms. DAHM's admitted "contact with [the Defendant's] HR team" concerning Plaintiff following the "Workday Wellness Check" which she, Ms. Hauck, Ms. Goldsmith, Mr. Sauer and others needlessly caused at his home the night before Defendant WORKDAY, INC. and its employees and agents: (a.) unlawfully intruded into Plaintiff's private and personal affairs; (b.) were "advised" about and therefore unlawfully obtained and used Plaintiff's confidential medical information; (c.) unlawfully disclosed this unauthorized information to and between Ms. Dahm, Ms. Hauck, Ms. Goldsmith, Mr. Sauer and other agents and employees of Defendant WORKDAY, INC.; as well as (d.) to countless unknown third parties.

139.    When Plaintiff returned to work from inpatient treatment on November 22, 2022, various WORKDAY, INC. employees began contacting him, expressing their

concerns and condolences, and saying that they knew where and why Plaintiff had been hospitalized even though Plaintiff had never revealed this confidential medical information to these individuals, or anyone else. Defendant WORKDAY, INC., through its employees and agents, unlawfully obtained, used and disclosed this confidential medical information about Plaintiff between themselves, and to other unauthorized parties.

140. In addition to this legal duty (now breached by Defendant WORKDAY, INC.) to protect Plaintiff's privacy rights and his confidential medical information, California law also requires employers like the Defendants to allow employees at least "15 calendar days" to supply complete medical certification under the CFRA, as does federal law (under the FMLA).

141. Due to the discrimination, retaliation, harassment, and hostile work environment to which Defendant WORKDAY, INC. had previously subjected Plaintiff, he had been anxious and worried about compliance with family and medical leave laws when he was admitted to the medical facility. Nonetheless, the doctors, nurses and administrative staff assured Plaintiff that he should not be concerned because of these legal protections.

142. The medical facility where Plaintiff was receiving treatment informed him that it would supply the required family and medical leave certification to Unum well within 15 days, which it did.

143. Plaintiff took short-term disability and employer-approved medical leave from October 13, 2022, to November 22, 2022.

144. Defendant WORKDAY, INC. acknowledged in writing that they knew Plaintiff was on approved family and medical leave and would soon be supplying the required certification, but still harassed and retaliated against Plaintiff by sending law enforcement agents of the state armed with lethal authority and guns to his residence to conduct a sham "Workday Wellness Check" one week later in order to verify the reason Plaintiff had given for taking medical leave; unlawfully obtain, use and disclose

confidential medical information about Plaintiff; invade his property and privacy; and otherwise punish him because, *inter alia*, Ms. Dahm, Ms. McFall and Ms. Hauck were furious with Plaintiff for engaging in protected activity.

145.    This is indefensible in a civilized society.  The conduct is especially reprehensible given that Defendant WORKDAY, INC.'s C-Suite leaders, in addition to Mr. Sauer,  Ms. Dahm, Ms. McFall and Ms.  Hauck knew the contentious and fraught state of relations between black people in the U.S. and law enforcement at the time. Defendant WORKDAY, INC. had of course held a publicized 2020 company-wide forum focusing on racial issues closely following public "protests over police brutality against Black Americans" following the murder of George Floyd, which was covered by media outlets, and yet Defendant WORKDAY, INC. , through its employees and agents,  and intentionally weaponized law enforcement against Plaintiff and his family in an effort to cause them to be fearful for their safety.[7]

146.    The Defendant's weaponization of law enforcement and punitive invasion of Plaintiff's privacy and property in this manner caused Plaintiff and his family great emotional distress during an especially distressing time, particularly since Plaintiff's boys—from whom Plaintiff had never been away for an extended period, and whom he could not contact by strict rule until October 27, 2022—had never been subject to any encounters with law enforcement.

147.    Moreover, neighbors witnessed officers at the Hills' home (and their own homes as well) patrolling their neighborhood at night, lights flashing, searching high and low for Plaintiff as if he were a fugitive from justice, a runaway to be brought to heel, or valuable WORKDAY, INC. livestock to be tracked and recovered by an armed police force.  This was extremely disempowering, dehumanizing, subjugating, painful, humiliating, and traumatizing to Plaintiff, Mrs. Hill, and their children—a family that has tried to "play by the rules."

---

[7] See, e.g., https://www.cnn.com/2019/10/19/us/wellness-check-police-shootings-trnd/index.html; see also https://www.nytimes.com/2020/07/06/nyregion/amy-cooper-false-report-charge.html; https://www.washingtonpost.com/investigations/interactive/2022/police-shootings-mental-health-calls/.

148.    By misleading the police and causing them to go to Plaintiff's home on the night of October 20, 2022—which is **potentially a crime** under California law, as well as the laws of every other jurisdiction where the parties to this action reside and work[8], and is therefore outrageous conduct beyond the bounds of human decency—Defendant WORKDAY, INC. endangered the lives of Mrs. Hill, their two sons, the police, and the community in which the Hills have owned their home for over 15 years.

149.    This needless event with life and death consequences could have ended in tragedy.

150.    In a feeble attempt to conceal the gross misconduct, of its employees and agents, Defendant WORKDAY, INC. said the following about its "Workday Wellness Check" in a subsequent email to Plaintiff from Workday HR Senior Representative Lauren Eyler, a California resident who works in Defendant WORKDAY, INC.'s Pleasanton, California headquarters:  :

> Hope you had a nice weekend! Yes, I can confirm that the Wellness Check was completed on 10/20. **We will not be providing any further documentation regarding the decision to conduct a Wellness Check**.

151.    To be clear, **the only documentation** Defendant WORKDAY, INC. has produced at all about its "Workday Wellness Check" is this cryptic email (above) merely confirming the date **when** it happened, which raises many more **material questions** than any it answers.

152.    For example, Defendant WORKDAY, INC. refuses to give any information about **why** it did this to Plaintiff and his family, only that it is  nominally responsible, offhandedly trying to shift blame from more senior, white WORKDAY, INC. employees and agents who were responsible,  to a new hire in HR who had never even met Plaintiff, Jazsmine Gordon, by saying Ms. Gordon decided to conduct the "Workday Wellness

---

[8] See Md. Code, Crim. Law § 9-501 ("A person may not make, or cause to be made, a statement, report, or complaint that the person knows to be false as a whole or in material part, to a law enforcement officer of the State… with intent to deceive and to cause an investigation or other action to be taken as a result of the statement, report, or complaint"); Cal. Penal Code § 148.3 (stating that knowingly reporting or causing a false report to be made to police that an "emergency" exists is a crime punishable by up to 1 year in jail and a $1000 fine); NY Penal Law § 240.50 (similar).

Check" completely on her own.  (Ms. Gordon started her job at WORKDAY, INC. a mere two months before the "Workday Wellness Check" occurred.)

153.    Senior Workday HR representative Ms. Eyler (white female) pointed the finger squarely at Ms. Gordon (black female), telling Plaintiff that her Workday HR colleague was the sole WORKDAY, INC. employee responsible for the "Workday Wellness Check" before suddenly stopping herself, apologizing, retracting her statement, blaming Ms. Gordon, and explaining that her WORKDAY, INC. superiors, who include the Defendants, would not permit her to discuss the matter with Plaintiff (when Ms. Eyler and Plaintiff met via Zoom on March 7, 2023).

154.    This explanation is incredible.

155.    Defendant WORKDAY, INC. also will not tell Plaintiff **what** misinformation its employees and agents provided to the Montgomery County (Maryland) Police to cause multiple officers loaded into three squad cars to go to his home and his neighbors' homes on the evening of October 20, 2022—an Orwellian misuse of law enforcement as unwitting pawns of the "Workday Security Team" in furtherance of the Defendant WORKDAY, INC.'S  discrimination, retaliation, hostile work environment and harassment campaign against Plaintiff.

156.    Defendant WORKDAY, INC. also refuses to officially name anyone **who** participated in their decision to conduct their "Workday Wellness Check."

157.     Additionally, the Defendants Defendant WORKDAY, INC. will not give information about **how** a staff member at the medical facility where Plaintiff was a patient somehow knew on October 21, 2022 that police had been at Plaintiff's home the prior evening if the Defendants  did its employees and agents  not know that (or where) Plaintiff had been admitted had not unlawfully obtained, used and disclosed Plaintiff's confidential medical information; ; they Defendant WORKDAY, INC. will not explain why a hospital employee that person revealed this information to Plaintiff in such a nonchalant, irresponsible and callous manner; nor will the Defendants Defendant WORKDAY, INC. explain why its employees and agents intruded into Plaintiff's private

property and personal activities, unlawfully obtained Plaintiff's confidential medical information, and used and disclosed that information without Plaintiff's written authorization to Defendant DAHMMs. Dahm, Defendant HAUCKMs. Hauck, Ms.. Goldsmith, Mr. Sauer, Defendant MCFALLMs. McFall, and countless other unauthorized parties.

158. At its core, the actual purpose for the mockingly named "Workday Wellness Check," **which the Defendant WORKDAY, INC. now seems intent on covering up**, was to further harm Plaintiff because Ms. Dahm, Ms. McFall and Ms. Hauck were furious with him for engaging in legally protected activity.

159. Mrs. Hill, her children, Plaintiff's confidential medical information, the Hills' neighbors, the public, the Montgomery County Police, and the law itself were all just unimportant collateral damage to Defendant WORKDAY, INC.in achieving this discriminatory and retaliatory objective.

### *Changing Plaintiff's "Essential Job Functions" While He Was on Leave Without Engaging in the Interactive Process, Compounding the Discrimination, Retaliation, Harassment, and Hostile Work Environment He Suffered*

160. Sometime between October 13, 2022 and November 22, 2022, while Plaintiff was on short-term disability and employer-approved medical leave, Defendant WORKDAY, INC. Changed the "essential job functions" for his position.

161. When Plaintiff returned to work, he discovered that while Plaintiff was hospitalized, Defendant WORKDAY, INC. had made numerous material additions and alterations to Plaintiff's job duties without engaging in the interactive process as required by California law for employees who need reasonable accommodations.

162. The additions and alterations to Plaintiff's job duties were implemented and/or ratified by Plaintiff's supervisors at the WORKDAY, INC. headquarters in Pleasanton, California.

163.    When Plaintiff spoke to Ms. Eyler in March 2023, she attributed the changing of the essential job functions for Plaintiff's position without having engaged in the interactive process as a "simple mistake" and dismissed it as "not a big deal."

164.    Defendant WORKDAY, INC. participated in, approved and/or ratified this harassment of Plaintiff and creation of a hostile work environment.

*Retaliation Against Plaintiff After He Returned from Leave*
*by Repeatedly Disparaging People Who Take Personal Leave,*
*Compounding the Discrimination, Retaliation, Harassment,*
*and Hostile Work Environment He Suffered*

165.    Plaintiff's first meeting after returning from leave included Ms. Hauck, Mr. Morse, and Mr. Pincus as attendees, and occurred on or about November 28, 2022.

166.    Mr. Morse, Mr. Pincus, Ms. Hauck, and Plaintiff have a weekly call during which they discuss U.S. federal issues affecting the Defendant's business, and so Plaintiff's month-long absence from those weekly meetings (while he was on short-term disability and employer-approved medical leave from October 13, 2022 to November 22, 2022) would have been evident to Mr. Morse and Mr. Pincus.

167.    Ms. Hauck said the following during the Zoom meeting call: "I wish I could just take the month off."

168.    Ms. Hauck, a WORKDAY, INC. contract attorney, told Plaintiff, Mr. Morse, and Mr. Pincus that she had been representing WORKDAY, INC. in a contract negotiation with a WORKDAY, INC. client.

169.    The attorney representing the WORKDAY, INC. client with whom Ms. Hauck had been negotiating took personal leave for about one month during the negotiation, slowing down the contracting cycle.

170.    Because Defendant WORKDAY, INC. measures Ms. Hauck's productivity in large part by how quickly she can successfully negotiate and "close" its contracts (so that WORKDAY, INC. can "recognize" and publicly report the anticipated revenue),

according to Ms. Hauck, the fact that this attorney had taken extended personal leave during the contract negotiation process had frustrated Ms. Hauck.

171.    Mr. Morse reacted to Ms. Hauck's comment by putting both of his hands over his face and saying nothing.  Mr. Pinkus laughed nervously.

172.    Plaintiff was mortified but also said nothing and simply smiled.

173.    Ms. Hauck then ended the meeting by asking Plaintiff if he had anything to say, to which Plaintiff responded that he did not.

174.    During their next weekly one-on-one meeting after her disparaging comment about individuals who take leave, Ms. Hauck said to Plaintiff that either Ann Sandor or Ann Speyer (both are WORKDAY, INC. employees) "is always taking leave, I swear!"

175.    Plaintiff did not respond or ask Ms. Hauck for clarification about which "Ann" she had been referring because he believed Ms. Hauck's comment to be generally inappropriate, and specifically (and intentionally) hostile towards him considering that Plaintiff had recently returned to work after approximately one-month of leave.

176.    Defendant WORKDAY, INC. participated in, approved and/or ratified this harassment of Plaintiff and creation of a hostile work environment.

### *Interference with Plaintiff's CFRA Rights, Retaliation,*
### *Harassment and Bullying of Plaintiff for Attempting to Exercise*
### *those Rights, by Pressuring Him to Work During a Medically Excused Absence*

177.    Before returning to work after his employer-approved medical leave, Plaintiff's treating physician placed him on a modified work schedule.  Plaintiff's WORKDAY, INC. and Unum-approved, modified work schedule was Tuesdays - all day, Thursdays - all day, and Mondays, Wednesdays, and Fridays from 2 PM to 5:30 PM Eastern, until further notice.

178.    Plaintiff had communicated to Workday HR and Ms. Hauck his employer-approved work schedule in writing the weekend prior to returning to work, which Ms. Hauck acknowledged by email.

179.    On Friday, January 13, 2023, when Plaintiff was on leave dealing with medical issues, Ms. Hauck purposely interfered with Plaintiff's family and medical leave by contacting him at 11 AM via Slack messenger and asking if he planned to attend a work meeting being run by Ms. Dahm that had just begun.

180.    When Plaintiff saw Ms. Hauck's Slack message an hour later, he responded that he was not going to the WORKDAY, INC. meeting because he was on medical leave.

181.    Ms. Hauck, per her now predictable pattern, never acknowledged or indicated in any way that she had asked Plaintiff to attend the work meeting and interfered with his medical leave by mistake.  Rather, **she chose to say nothing to Plaintiff in response**.

182.    Ms. Hauck's silence was deafening and spoke loudly, further proof of not only Defendant WORKDAY, INC. continuing interference with Plaintiff's family and medical leave rights, but also their discrimination, retaliation, harassment, and creation of a hostile work environment toward Plaintiff for exercising those rights.

183.    After Plaintiff reported this incident to Workday HR in January 2023, and subsequently spoke with Ms. Eyler about it in March 2023, Ms. Eyler dismissed its significance, rationalizing that "you have so many schedules that [Ms. Hauck] probably just got confused."

184.    When Plaintiff asked Ms. Eyler why Ms. Hauck had chosen not to acknowledge or indicate in any way to him that she had asked Plaintiff to attend the work meeting while he was on medical leave by mistake or "just got confused" if that is in fact what happened, Ms. Eyler asked Plaintiff, "how do I know that you didn't do anything to [alter] the Slack message?"

185.    Plaintiff composed himself following Ms. Eyler's baseless accusation, politely pushing back and explaining to Ms. Eyler that he had not altered the Slack messenger conversation with Ms. Hauck, to which Ms. Eyler responded, "well then [Ms. Hauck] was probably just busy."

186. Defendant WORKDAY, INC. participated in, approved and/or ratified this harassment of Plaintiff and creation of a hostile work environment.

### Publicly Excluding Plaintiff from Group Acknowledgement and Praise, Compounding the Discrimination, Retaliation, Harassment, and Hostile Work Environment He Suffered

187. Ms. Hauck's silence was also deafening and spoke loudly when she sent an email to her entire team, including Plaintiff, thanking her direct reports for their hard work over the previous year (sent after Plaintiff had returned to work following his extended family and medical leave).

188. Within that email, Ms. Hauck thanked members of her team by name and described one or more of their work accomplishments over the previous year.

189. Conspicuously, the only person on her team whom Ms. Hauck did not thank, acknowledge, or even mention at all within her "thank-you" email, sent to Plaintiff and Ms. Hauck's other direct reports, was Plaintiff.

190. This was a blatant, cruel, purposeful, and—unfortunately, given Ms. Hauck's history of hostility towards Plaintiff—predictable act of public shaming by omission whereby Ms. Hauck tried and succeeded at shunning, ostracizing and humiliating Plaintiff in the presence of his colleagues.

191. Ms. Hauck, operating in her official capacity as a Senior Director and Defendant WORKDAY, INC.'S agent and employee, negligently, recklessly, intentionally, willfully, and maliciously injured Plaintiff's professional reputation by unambiguously and unmistakably communicating to her direct reports that unlike all of them, Plaintiff had accomplished nothing at work in calendar year 2022.

192. Defendant WORKDAY, INC. participated in, approved and/or ratified this harassment and creation of a hostile work environment.

### Retaliation Against Plaintiff by Refusing to Approve His Paid Time Off Request, Ruining His Reputation, and Preventing Him from Working with the Corporate Legal Team

193.    On January 25, 2023, Plaintiff tried to take Paid Time Off ("PTO") for the day to address personal issues, a process at WORKDAY, INC. which requires managerial approval.  Ms. Hauck demanded for Plaintiff to justify why he needed to take PTO, and then inappropriately attempted to coerce Plaintiff's "attendance" of his scheduled work meetings for the day instead of the PTO he had requested.

194.    After two years of having quietly and passively endured continuous discrimination, retaliation, harassment, and a hostile work environment by Defendant WORKDAY, INC.'S  employees and agents, Plaintiff finally asserted himself, letting Ms. Hauck know by email that:  (a.) her inappropriate demand and attempted coercion made him "VERY uncomfortable[;]" while still (b.) explaining to her what contingency plans he had made for his scheduled work meetings prior to requesting PTO; and (c.) even offering "[i]f need[ed] to provide information from [his] **doctors** to Unum" specifying the private and confidential medical reasons for his PTO request.

195.    Plaintiff had not attempted to take Sick Leave on January 25th because he was not in fact sick, but instead had an unexpected though necessary medical procedure appointment which had just become available early that morning, prompting Plaintiff to take PTO.

196.    Since "unexpected medical appointment" was not an available option within the online WORKDAY, INC. leave request form, Plaintiff cleared up any possible resulting confusion by explaining that his leave request was for private medical reasons, the specifics of which (again) Plaintiff would have been happy to "provide" from his "**doctors** to Unum" had Ms. Hauck and/or Ms. Dahm (who both knew Plaintiff was on partial medical leave and a modified work schedule at the time) requested.

197.    Moreover, Plaintiff was especially concerned with keeping his confidential medical information confidential, particularly given the prior unauthorized intrusions by Ms. Hauck, Ms. Dahm, Ms. Goldsmith, Mr. Sauer,  Ms. McFall and others into his confidential medical affairs and private property in connection with their "Workday Wellness Check," the details of which Defendant WORKDAY, INC. continues to withhold.

198.    This reasonable accommodation request was legally protected activity by Plaintiff.

199.    **Ms. Hauck again chose to respond to Plaintiff by not responding to him**, rehashing her spiteful, well-worn, hostile, and retaliatory tactic.  Notably, Ms. Hauck also would not approve Plaintiff's PTO request.

200.    Furthermore, Plaintiff had also told Ms. Hauck within his January 25th email that he had been working that morning on various WORKDAY, INC. projects earlier than 5:30 AM (before Plaintiff even knew he needed to take PTO), including providing information that WORKDAY, INC. Vice President Juliana Capata (white female), who is also an attorney, and her Corporate Legal team had requested from Plaintiff necessary to produce the Defendant's annual 10-K statement.

201.    Ms. Capata is a resident of California who works at the WORKDAY, INC. Pleasanton, California headquarters.  Ms. Capata's Corporate Legal Team members also live and work in California.

202.    Importantly, Plaintiff had **only told Ms. Hauck about his working with Ms. Capata and the Corporate Legal team, no one else.**

203.    After providing Ms. Capata and her team with the information they had requested from him, Plaintiff followed up by email the next day and asked if the information he provided was sufficient.

204.    Ms. Capata and her team did not respond to Plaintiff's status request email.

205.    A day or two later, Plaintiff again requested a status update and feedback on the information he had provided and again Ms. Capata and her team refused to respond to Plaintiff's (second) status request email.

206.    While Plaintiff had become all too accustomed to Ms. Hauck's hostile and retaliatory refusal to answer his valid questions, this punitive silence was unusual for Ms. Capata and the Defendant's Corporate Legal team.

207.    For approximately one weeklong period in late January, early February 2023, Plaintiff and Ms. Hauck separately traveled to WORKDAY, INC.'S Pleasanton, California

headquarters for work at the expense of WORKDAY, INC., as did the other members of Ms. Hauck's team.  Throughout this period, when Plaintiff was in California for work, he attended WORKDAY, INC. meetings, summits, presentations, breakout sessions, working meals with colleagues and other work functions.

208.    These Pleasanton, California work events at Defendant WORKDAY, INC.'s headquarters included Ms. Hauck and all of her direct reports, California-residents Ms. Dahm, Ms. Capata, Ms. Fedrow, Ms. Jackson, and Ms. McFall, in addition to Ms. Strelow, Mr. Morse, Mr. Pincus, and many others. During this work trip to Defendant WORKDAY, INC.'s Pleasanton, California headquarters, Ms. Capata frowned and glared at Plaintiff in an in-person, small group, breakout meeting although in the past she had always been friendly, kind, and talkative to Plaintiff in person and via Zoom.

209.    It was clear to Plaintiff at that moment that Ms. Hauck had asked Ms. Capata (and by extension the Defendant's entire California-based Corporate Legal team) not to work with Plaintiff as further retaliation because he had engaged in protected activity. During this work trip to Defendant WORKDAY, INC.'s Pleasanton, California headquarters, Ms. Capata frowned and glared at Plaintiff in an in-person, small group, breakout meeting although in the past she had always been friendly, kind, and talkative to Plaintiff in person and via Zoom.

210.    It was also clear that Ms. Capata, by subsequently making abhorrent statements about Plaintiff to his colleagues on or about January 25, 2023, had caused significant injury to Plaintiff's personal and professional reputation, (in California) including but not limited to causing the Defendant WORKDAY, INC.'S entire Corporate Legal team, who report to Ms. Capata, to shun Plaintiff, refuse to work with him, or even be bothered to respond to his emails.

211.    Unreasonably refusing to approve Plaintiff's PTO request, further ostracizing him, ruining his reputation, and preventing him from working with colleagues because of Plaintiff's legally protected activity was the latest salvo in the Defendant's continuing campaign of harassment and hostility against Plaintiff.

212.    Ms. Hauck and Ms. Capata, who are both 2019 Fellows of the Leadership Council on Legal Diversity representing Defendant WORKDAY, INC., had no justification for discriminating, retaliating, harassing or creating a hostile work environment which, in this instance, forced Plaintiff to reach out to both Ms. Fedrow and Ms. Jackson (black female), and, at their urging, Workday HR about the issues, simply to be able to take personal leave for the day (some four hours after Plaintiff had submitted his PTO request).

213.    Plaintiff has taken less PTO on average than Ms. Hauck or any other member of her team.

214.    Upon information and belief, the Defendants participated in, approved and/or ratified this harassment of Plaintiff and creation of a hostile work environment.

### *Refusing to Engage in the Interactive Process and Unjustifiably Denying Plaintiff's Reasonable Accommodation Request to Transfer to the Workday Integrity Team*

215.    Two days later, on January 27, 2023, Plaintiff sent an email to Ms. Eyler and Workday HR requesting his "immediate reassignment to the Workday Integrity Team (with whom Plaintiff works most closely), which Chris Fedrow leads."

216.    Without ever engaging in the legally required timely, good faith interactive process, Defendant WORKDAY, INC. denied Plaintiff's written reasonable accommodation request on March 7, 2023.

217.    Defendant WORKDAY, INC.'S  denial was without justification or explanation and made even though Plaintiff works almost exclusively with WIT, and a fellow WORKDAY, INC. regulatory and compliance attorney (white male) currently works within WIT, as does Ms. Strelow.  (This regulatory and compliance attorney is a California resident who works in Defendant WORKDAY, INC.'s Pleasanton, California headquarters.)

218.    Plaintiff can perform the essential functions of his job with this reasonable accommodation.

219.    Plaintiff's disabilities prevent him from working within his current management reporting structure.

220.    This is so, *inter alia*, because Defendant WORKDAY, INC., through its employees and agents, has  have terrorized and traumatized Plaintiff by:  (a.) purposely and perhaps criminally calling police to Plaintiff's home to intrude into his property and privacy as retaliation; (b.) endangering his family, neighbors and even the police; (c.) whom the Defendants intentionally misled; before (d.) trying to hide this gross misconduct; which (e.) Defendant WORKDAY, INC. has continuously refused to explain or even address; (f.) exacerbating Plaintiff's myriad disabilities (including, but not limited to, acute anxiety, panic disorder, depression, and Post-Traumatic Stress Disorder, and chronic diverticulitis.

221.    The well-pled facts within this First Amended Complaint and Defendant WORKDAY, INC.'S misconduct in this regard, at a minimum, cannot reasonably be characterized as standard oversight of job performance, minor or relatively trivial adverse actions or conduct, or ordinary tribulations of the workplace, such as the sporadic use of abusive language, jokes, and occasional teasing.

222.    This is not normal misconduct.  Rather, as a matter of the fundamental principles of public policy, Defendant WORKDAY, INC.'S misconduct as alleged herein "was severe enough [and/or] pervasive enough to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees."

223.    It is for this reason that under California law, Defendant WORKDAY, INC. was legally obligated to have engaged in the interactive process and grant Plaintiff's written reasonable accommodation request for his "immediate reassignment to the Workday Integrity Team" in good faith—protecting Plaintiff from further harassment, abuse, and hostility perpetrated by his current management reporting structure—which Defendant WORKDAY, INC. refused to do, resulting in additional injuries to Plaintiff.

224.    Defendant WORKDAY, INC.  participated in, approved and/or ratified this harassment of Plaintiff and creation of a hostile work environment.

*Compounding the Discrimination, Retaliation,*

*Harassment, and Hostile Work Environment Plaintiff Suffered*

*With the Peakon Software-Generated Mandatory Weekly Survey*

225.     Defendant WORKDAY, INC. bought software company Peakon in 2021 for $700 million.   Defendant WORKDAY, INC. makes its workforce, including Plaintiff, answer Peakon software-generated survey questions about their employment experience at WORKDAY, INC. every week.

226.     Plaintiff reasonably feared retaliation for honestly answering the survey questions.  Plaintiff's fear of retaliation was a result of the hostile and retaliatory treatment to which Defendant WORKDAY, INC. had previously subjected him, coupled with the fact that whenever Plaintiff's survey responses expressed opposition to discrimination and/or retaliation by Defendant WORKDAY, INC.'S employees or agents , which is legally protected activity, Defendant WORKDAY, INC. treated him more harshly as a consequence.

227.     Despite professing that employee survey responses are anonymous, and that individuals should answer honestly without fear of retaliation, upon information and belief, Defendant WORKDAY, INC.became aware of Plaintiff's workplace discrimination and retaliation claims made in the form of survey responses and further retaliated against him on this basis.

228.     Since Plaintiff has not wanted to lie in answering the mandatory WORKDAY, INC. survey questions but he has also feared retaliation from Defendant WORKDAY, INC. for telling the truth, in mid-to-late 2022, Plaintiff stopped his legally protected activity of honestly reporting Defendant WORKDAY, INC.'S discrimination and retaliation via his survey responses and began consistently refusing to answer survey questions related to manager conduct altogether.

229.     Instead, Plaintiff has routinely responded to the follow-up WORKDAY, INC. survey question asking "why" he has refused to answer individual questions about manager conduct by selecting "other" as his response.

230.    When Plaintiff spoke to Ms. Eyler in March 2023, she let slip that Defendant WORKDAY, INC. uses the supposedly "anonymous" mandatory weekly survey as both a "sword and a shield" in retaliating against Plaintiff and other similarly situated members of their workforce for engaging in protected activity.  (This is in addition to Ms. Hauck's and Ms. Dahm's retaliation against Plaintiff for having honestly answered weekly survey questions identifying discriminatory and retaliatory managerial conduct toward Plaintiff— survey questions which are clearly not "anonymous" despite Defendant WORKDAY, INC. public assurances to the contrary.)

231.    Whenever a WORKDAY, INC. employee makes a good faith complaint to Workday HR about their manager, Ms. Eyler confirmed that she and other Workday HR professionals review that individual's past positive survey responses to "shield" Defendant WORKDAY, INC.and its management from negative employee complaints and to attack the veracity of the employee complaint and/or complainant.

232.    On the other hand, Ms. Eyler revealed that Defendant WORKDAY, INC. does not afford any added credibility or "weight" to complaints made by WORKDAY, INC. employees, including Plaintiff, who in the past have refused to answer mandatory weekly WORKDAY, INC. survey questions about their managers, or have answered such questions with negative responses about the Defendants or their management.

233.    Defendant WORKDAY, INC. participated in, approved and/or ratified this harassment of Plaintiff and creation of a hostile work environment.

***Compounding the Discrimination, Retaliation,***
***Harassment, and Hostile Work Environment Suffered by Refusing***
***to Issue RSUs Promised to Plaintiff in Writing and Cutting His Bonus by 50%***

234.    In addition to his normal base salary and the opportunity to earn a targeted yearly bonus, Plaintiff negotiated $200,000 in RSUs over four years with a 40% to 60% refresher of Plaintiff's initial stock grant annually.

235.    RSUs are "deferred compensation," not a bonus.

236.    Plaintiff received an RSU refresher grant of approximately 23% of his initial stock grant in 2022.

237.    When Plaintiff raised this issue with Ms. Hauck, she responded that she would speak to Ms. Dahm and her other California-based superiors about his concern. Ms. Hauck later said to Plaintiff during their next weekly one-on-one meeting that she had in fact spoken to her superiors and based on that conversation, Plaintiff needed to accept the RSU refresher grant he had received.

238.    The delta between the 23% RSU refresher grant that Plaintiff received from Defendant WORKDAY, INC. in 2022 and the 40% to 60% overall stock refresher annually promised to him in writing equals a loss to Plaintiff of between $40,000-$60,000 in additional compensation **every year**.

239.    Plaintiff has received **no RSU refresher from the Defendants in 2023 or 2024**, which is an additional economic loss of between $160,000 and $240,000 added confirmation of Defendant WORKDAY, INC. continuing discrimination, retaliation, harassment, and creation of a hostile work environment toward Plaintiff for having engaged in protected activity.

240.    Additionally, for 2022, Defendant WORKDAY, INC. only awarded Plaintiff approximately half of the annual bonus payment which medium to high-performing WORKDAY, INC. employees like Plaintiff were promised by the company (paid in or about April 2023).

241.    Plaintiff has never received a single, formal negative performance review or evaluation from Defendant WORKDAY, INC. since he was hired, and so there is no legal justification for this substandard bonus award.

242.    To the contrary, Plaintiff has received numerous positive written acknowledgments celebrating his work from Ms. Strelow (who referred to Plaintiff as a "mentor"), Ms. Fedrow, and other WORKDAY, INC. employees publicly posted within the company's internal portal viewable to the more than 12,500 WORKDAY, INC. employees and consultants worldwide.

243.    When Plaintiff's prior counsel asked Defendant WORKDAY, INC. on his behalf **twice** to explain his unjustifiably low 2022 bonus award, the Defendant initially stated that Plaintiff "needs to speak with [Ms. Hauck]" to get an answer.  Following that, Defendant WORKDAY, INC. refused to answer the question at all.

244.    Plaintiff was on approved medical leave at the time and could not ask Workday HR this question himself.

245.    Defendant WORKDAY, INC.'S refusal to explain or justify Plaintiff's substandard bonus award for calendar year 2022 (totaling many thousands of dollars) is additional confirmation of their continuing discrimination, retaliation, harassment, and the creation of a hostile work environment toward Plaintiff for having engaged in protected activity.

246.    Defendant WORKDAY, INC. participated in, approved and/or ratified this harassment of Plaintiff and creation of a hostile work environment.

### Ms. Dahm's Reflexive and Habitual Disbelieving of Plaintiff Unless a White Person Has Verified His Statement, or Ignoring Plaintiff Altogether, Compounding the Discrimination, Retaliation, Harassment, and Hostile Work Environment Suffered

247.    During a weekly-occurring Zoom meeting following Plaintiff's return from inpatient treatment that included Ms. Dahm, Ms. Hauck, and Ms. Hauck's direct reports, Plaintiff answered Ms. Dahm's question to the group about whether a U.S. federal contract could be invalidated if signed by a high-level U.S. federal official who was not expressly empowered to "bind" the U.S. government and sign its contracts.

248.    Plaintiff answered Ms. Dahm's question in the affirmative, stating that indeed such a contract would be legally void because only U.S. federal contracting officers possess this authority.

249.    Replying to Plaintiff's answer, Ms. Dahm made a disbelieving facial-expression and emphatically said to the group, "that **can't** be true!"

250.     Ms. Dahm then chuckled dismissively, completely disregarding Plaintiff and the answer he had given.  Ms. Dahm engaged in this discriminatory and retaliatory behavior toward Plaintiff while she was working in California during a meeting that Plaintiff attended via Zoom.

251.     It was only when Ms. Hauck and the Director, Associate General Counsel who reports to Ms. Hauck (both white females) together affirmed Plaintiff's answer that Ms. Dahm said she then believed it to be true.

252.     Furthermore, prior to his hospitalization in 2022, Plaintiff had forwarded multiple emails to Ms. Dahm "speaking up" and seeking assistance from her regarding what he believed to be especially troubling conduct by Ms. Hauck.

253.     Plaintiff has not received a single response nor witnessed any action from Ms. Dahm.

254.     In early 2021, Plaintiff had eagerly joined WORKDAY, INC. as a respected attorney in his field—respect he earned through hard work and a penchant for relationship-building established over his successful legal career.  Plaintiff has without question added value to WORKDAY, INC.

255.     As an example, during the last week in February 2023, Plaintiff spoke **during his free time on Defendant WORKDAY, INC.'s behalf** on a panel at a legal conference in Laguna Niguel, California that featured other prominent global corporations and their attorneys.  Plaintiff was invited to speak at the conference by the Government Contracts Group Co-Chair (a friend) of the international law firm Crowell & Moring.

256.     As he wrote by email to Ms. Fedrow and key members of WIT when he excitedly returned from presenting (and learning) at Crowell & Moring's conference, Plaintiff had gained valuable "insights into how similar companies [to WORKDAY, INC.] are approaching public-sector compliance"—knowledge Plaintiff planned to share to improve WORKDAY, INC.

257.    This is but one of many examples of why Defendant WORKDAY, INC.'S continuing practice of ignoring, undervaluing, undermining, publicly shaming, ostracizing, traumatizing, and harassing Plaintiff is not only illegal, but it is also irrational and counterproductive to the Defendants considering Plaintiff's contributions (and the contributions of other black WORKDAY, INC. employees) to Defendant WORKDAY, INC.

258.    Defendant WORKDAY, INC. participated in, approved and/or ratified this creation of a hostile work environment.

*Placing Plaintiff on Administrative Leave Without Just Cause,*
*Compounding the Discrimination, Retaliation,*
*Harassment, and Hostile Work Environment Suffered*

259.    On March 7, 2023, Ms. Eyler informed Plaintiff that Workday HR had fully and fairly investigated his claims and concluded that they all lacked merit.

260.    On March 16, 2023, Defendant WORKDAY, INC. (through Ms. Gordon) invited Plaintiff to an unplanned meeting with Ms. Hauck to occur that afternoon for Plaintiff "to get reset and aligned with [his] manager moving forward."

261.    Plaintiff politely replied to Defendant WORKDAY, INC.'S  meeting request, asking Ms. Gordon to "please invite Chris Fedrow" because Plaintiff did not "feel comfortable" or safe "meeting with just" Ms. Hauck "alone" considering his persistent **"medical limitations"** and "given the circumstances."

262.    Defendant WORKDAY, INC. knew Plaintiff was on approved partial medical leave and a modified work schedule at the time.

263.    This reasonable accommodation request was legally protected activity by Plaintiff, especially considering his injuries made worse by the Defendant's continuing refusal to explain to Plaintiff why, among other things, they unlawfully disclosed Plaintiff's confidential medical information, invaded Plaintiff's property and privacy, and weaponized their "Workday Wellness Check" and law enforcement against Plaintiff's

wife, children, neighbors, and local police officers for no legitimate reason—misconduct the Defendants now seem actively engaged in covering up.

264.    Defendant WORKDAY, INC.'Ss acts and omissions to this end have caused Plaintiff trauma, depression, extreme anxiety, post-traumatic stress disorder, and outright panic, including at the thought of meeting with Ms. Hauck, Ms. Goldsmith, Ms. Sauer Ms. Dahm, Ms. McFall, and/or Workday HR alone.

265.    Ms. Gordon then rejected Plaintiff's request to invite the Defendant's own Chief Integrity and Compliance Officer, Ms. Fedrow, to the meeting (as a bystander or nonparticipant), stating:

**Chris Fedrow is not your People Leader and it would be inappropriate for her to join**, however I will be joining the call with you.

266.    Basic common sense and evidence belie the notion that Ms. Gordon flatly rejected Plaintiff's request to invite Ms. Fedrow after calling it "inappropriate" without being instructed to do this by Ms. Dahm, Ms. Hauck, Ms. Goldsmith, Mr. Sauer, Ms. McFall and/or other WORKDAY, INC. leaders who are also complicit in causing, *inter alia*, the "Workday Wellness Check."

267.    Defendant WORKDAY, INC.'S clear conflict of interest in this regard is in actuality "inappropriate," a conflict of interest for which they must be held to account.

268.    Also, since according to Ms. Eyler's dubious, retracted claim that her own WORKDAY, INC. HR colleague, Ms. Gordon, is the only person responsible for the "Workday Wellness Check," Ms. Gordon, more than anyone else, has a clear conflict of interest here too.

269.    It is for these reasons—including Plaintiff's stated "medical limitations"— that once Ms. Gordon rejected his request to have a respected, senior, seemingly neutral WORKDAY, INC. party free of any discernible conflict of interest and above reproach at the meeting, Plaintiff asked to "kindly … postpone" the meeting until he could retain "legal counsel" who would "be in touch very soon."

270.    This was also legally protected activity by Plaintiff, who had repeatedly and consistently complained to Defendant WORKDAY, INC. about the discrimination, retaliation, harassment, and hostile work environment he suffered because of their various acts and omissions of its employees to no avail.

271.    Plaintiff's "kindly"-worded question about possible postponement of the meeting, reminder about his "medical limitations," and his need to retain "legal counsel" were apparently a bridge too far—viewed as insubordinate and unreasonable by the Defendant—because it prompted them to instruct Ms. Gordon to aggressively instruct Plaintiff that:  (a.) "cooperating in being managed is an essential function of [his] role[;]" (b.) his request to delay the meeting until he could retain legal counsel was actually a "refus[al] to attend the meeting[;]" and consequently (c.) Plaintiff would "be placed on paid administrative leave effective immediately" until Plaintiff stopped his "unacceptable" "refusal to be managed by [Ms. Hauck]."

272.    Plaintiff had never refused to be managed by anyone but had only requested to be reassigned to WIT on January 27, 2023, which is legally protected activity and a request Defendant WORKDAY, INC. of course denied on March 7, 2023.

273.    Ms. Gordon informed Plaintiff about his punitive (paid) administrative suspension during a March 21, 2023 Zoom conference call in which she read aloud verbatim from an email to her (drafted by her superiors at Defendant WORKDAY, INC.'s Pleasanton, California headquarters) which Ms. Gordon would send to Plaintiff later that afternoon.  The meeting included one other person from Workday HR who, like Ms. Gordon, Plaintiff had also never met before.

274.    Despite Defendant WORKDAY, INC.'S relatively few black employees and self-proclaimed "Black diversity problem," the other meeting attendee—who never spoke during the meeting and therefore whose presence seemed odd to Plaintiff—like Ms. Gordon and Plaintiff, was also black.

275.    The Defendant's forced placement of Plaintiff on paid administrative leave meant he was:  (a.) locked out of all WORKDAY, INC. accounts; (b.) racially segregated

from colleagues, except for two black individuals, Ms. Gordon and the other black meeting attendee, whom Plaintiff was instructed were to be his only WORKDAY, INC. points of contact "until further notice;" (c.) further stripped of respect and dignity; (d.) once again ostracized; and (e.) robbed of the basic human right to contribute or otherwise work at all in his chosen (and hard-earned) profession for an unspecified duration.

276.    Defendant WORKDAY, INC.'S suspension and punishment of Plaintiff for the "sin" of: (a.) politely, though unsuccessfully, asking for Ms. Fedrow to join as an honest, silent broker in an unexpected meeting as a reasonable accommodation request; then (b.) asking (still ever politely) for a meeting postponement in order to retain legal counsel; to (c.) temporarily delay the meeting with colleagues who may have committed actual crimes against him, his family, the police, and the public at large by causing police to go to Plaintiff's home (and their neighbors' homes) for no legitimate reason; and who then (d.) seemingly tried to cover up the likely illegal "Workday Wellness Check," is definitionally harassment and the creation of a hostile work environment by Defendant WORKDAY, INC.

277.    When the Defendants **without explanation reversed itself and ended Plaintiff's paid administrative leave** about five weeks later, while still refusing to address the many unanswered questions and circumstances underlying the so-called "Workday Wellness Check," Plaintiff's fragile health problems significantly worsened and forced him to once again use disability leave to address his myriad health challenges.

278.    Plaintiff has been on disability and approved medical leave since May 1, 2023.  Prior to joining WORKDAY, INC. in early 2021, Plaintiff had never once taken disability leave at any time during his entire, two-decade legal career.

279.    Defendant WORKDAY, INC. participated in, approved and/or ratified this harassment of Plaintiff and creation of a hostile work environment.

## FIRST CAUSE OF ACTION

## RACE DISCRIMINATION IN VIOLATION OF

## THE FAIR EMPLOYMENT AND HOUSING ACT

## GOVERNMENT CODE § 12900 *et seq.*

280.    Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this First Amended Complaint.

281.    The actions of Defendant WORKDAY, INC., as described in this Complaint, constitute unlawful discrimination on the basis of Plaintiff's race, black.

282.    As a result of the unlawful and discriminatory conduct of Defendant WORKDAY, INC., *inter alia*: Plaintiff was hired at a lower employment level and paid less compensation than his non-black co-workers despite performing substantially similar work to them; Plaintiff was unfairly denied a promotion which he sought to reach equality or parity with these non-black co-workers; Plaintiff has been publicly screamed at by senior management and subjected to racially harmful and stereotypical slurs, while his non-black co-workers have not been subjected to such mistreatment; Plaintiff has been punished for advocating for a black woman whom Plaintiff revealed to his superiors had said she faced racial discrimination from a WORKDAY, INC. manager; Plaintiff has been unfairly demoted; Plaintiff has been micro-managed by his superiors more frequently than his non-black co-workers, including being prevented from working with co-workers and having his reputation ruined by senior management; Plaintiff has been denied perks and privileges that are afforded to his non-black co-workers; Plaintiff has been unfairly disbelieved, ignored and ridiculed, including at meetings by senior management, while his non-black co-workers have not been subjected to such mistreatment; Plaintiff has been unjustifiably administratively suspended by senior management while his non-black co-workers have not been subjected to such mistreatment and Plaintiff has been constructively terminated.

283.    This discrimination by Defendant WORKDAY, INC. creates a hostile, intimidating, and oppressive work environment for Plaintiff, whereby the conditions of his employment are adversely altered.  Moreover, the discrimination impedes Plaintiff's progress and the enjoyment of his employment with Defendant WORKDAY, INC.  The discriminatory work environment exists on a continuing and ongoing basis up to the present.

284.     Defendant knew or should have known about the discriminatory work environment and conduct against Plaintiff but did nothing to prevent or stop the discrimination.

285.     Defendant WORKDAY, INC.'s discrimination, as described in this Complaint, violates the Fair Employment and Housing Act as promulgated in Government Code § 12940 *et. seq.* and other statutes which prohibit discrimination in employment.

286.     Plaintiff has exhausted his administrative remedies by timely filing a charge of discrimination with the CDR which has issued to Plaintiff a right to sue letter permitting him to file this lawsuit against Defendant WORKDAY, INC..

287.     As a direct and proximate result of Defendant WORKDAY, INC.'s discrimination, Plaintiff has sustained and will continue to suffer damages in an amount within the jurisdiction of this Court, the exact amount to be proven at trial.  Such damages include but are not limited to:

        a. loss of salary and other valuable employment benefits;

        b.   prejudgment interest and interest on the sum of damages at the legal rate; and

        c.   other consequential damages, including damages for shame, humiliation, mental anguish, and emotional distress caused by Defendant WORKDAY, INC.'s conduct.

        d.   Attorney's fees and costs in prosecuting this lawsuit, pursuant to Government Code § 12965 (b).

<u>**SECOND CAUSE OF ACTION**</u>

**DISABILITY DISCRIMINATION IN VIOLATION OF**

**THE FAIR EMPLOYMENT AND HOUSING ACT**

**GOVERNMENT CODE § 12900 *et seq.***

288.     Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this Complaint.

289.    This action is brought pursuant to FEHA, California Government Code § 12900 *et seq.*, including §§ 12940(a) and 12940(h) – (k) prohibiting, *inter alia*, discrimination against a person in the terms, conditions, or privileges of employment on the basis of the person's disability.

290.    Plaintiff is subject to disparate treatment and a hostile working environment by Defendant WORKDAY, INC. because of Plaintiff's mental disabilities.    More specifically, as a result of such disabilities, Plaintiff is subjected to the unlawful conduct and other similar conduct which has caused Plaintiff to be mistreated, discriminated against, harassed, and treated in a harmful, unfair, inequitable, less favorable, and disparate manner than Plaintiff's non-disabled counterparts due to disability.    Such treatment is engaged in intentionally and with specific intent to be demeaning, derogatory and harmful to Plaintiff because of Plaintiff's disabilities.    In addition to the unlawful conduct alleged herein, Plaintiff has been a victim of, subjected to and exposed to in the workplace, but not limited to, the following due to Plaintiff's disabilities:

      a.    Plaintiff has been subjected to negative/disparaging comments about Plaintiff's work performance, medical leave, and other matters as a result of Plaintiff's disabilities;

      b.    Plaintiff has been falsely accused of poor performance, not wanting to work, and subjected to unfair and baseless disciplinary action and adverse employment actions;

      c.    Plaintiff has been generally subjected to greater scrutiny in Plaintiff's work and has received disparaging and untrue comments about his performance which are inaccurate and false due to Plaintiff's disabilities. Also, Plaintiff has been more closely monitored, micro-managed and falsely commented about by WORKDAY, INC. senior management to the point where it has adversely affected his productivity, created a hostile work environment for Plaintiff due to Plaintiff's disabilities, and due to no legitimate or lawful motivating factors.    WORKDAY, INC. policies

have been applied toward Plaintiff in a more harsh and unfair manner as compared to other employees.

d. Plaintiff has been pressured to attend work meetings when Defendant WORKDAY, INC.knew Plaintiff was out on approved medical leave or on partial medical leave and a modified work schedule.

e. Plaintiff's privacy and property have been invaded by the Defendants to verify Plaintiff's stated reason for taking medical leave during Plaintiff's leave period when Defendant WORKDAY, INC. misled police and caused them to go to Plaintiff's home illegitimately;

f. Plaintiff had been administratively suspended for five weeks because he asked to delay a meeting with Defendant WORKDAY, INC.'s employees and agents who had subjected Plaintiff to hostile work environment harassment and otherwise grossly injured him, but were not disciplined, until Plaintiff could retain legal counsel (as a reasonable accommodation request) and after he cited his "medical limitations," following one month of inpatient medical treatment and while Plaintiff was still on partial medical leave;

g. Plaintiff and other protected employees are generally disfavored as compared to non-disabled employees who have lesser qualification, educational accomplishments, and performance;

h. Other similar conduct occurs on a daily basis in the WORKDAY, INC. work environment in such a regular, ongoing, open, and notorious manner so as to create a culture of hostility, unfair treatment, devaluing, disdain, and contempt toward Plaintiff due to Plaintiff's disabilities. The totality of the foregoing circumstances have created an environment which is objectively and subjectively offensive to any reasonable employee/and or to any reasonable person who is not prejudiced against protected employees.

291.    As a result of the conduct alleged herein, the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe and pervasive so as to alter the conditions of Plaintiff's employment and create an abusive working environment.

292.    Plaintiff suffered from severe emotional and physical disabilities including but not limited to depression, anxiety, panic disorder, chronic diverticulitis, and post-traumatic stress disorder which affected Plaintiff's life functions and activities, including work, and which were known to Defendant WORKDAY, INC.  and its managerial employees.  Instead of supporting Plaintiff through an interactive process, Defendant WORKDAY, INC. mistreated Plaintiff and used his disabilities to falsely treat him as if he were uncooperative, unable to follow instructions, and/or insubordinate.  Plaintiff is extremely qualified to perform his job duties with reasonable accommodation.  Plaintiff sought but has been denied a good faith interactive process and reasonable accommodation. In fact, Defendant WORKDAY, INC. has demeaned and exacerbated Plaintiff's disabilities by, among other things, unreasonably causing police to go to Plaintiff's home when he was out on medical leave simply to confirm his whereabouts; pressuring Plaintiff to attend work meetings while he was on approved medical leave and partial medical leave; and having its senior management officials spreading rumors about Plaintiff's confidential medical information among themselves, and to countless (yet) unknown third parties. Defendant WORKDAY, INC. engaged in the hostile, retaliatory and unlawful conduct alleged above because of Plaintiff's disabilities.  In lieu of supporting and accommodating Plaintiff during his disabilities, Plaintiff has been subjected to a hostile working environment and retaliation at WORKDAY, INC.

293.    The conduct alleged herein has been targeted and uniquely applied to Plaintiff because of Plaintiff's disabilities.  Plaintiff's disabilities are a substantial and determining factor in Defendant WORKDAY, INC.'s decision to engage in the harassing, retaliatory and unlawful conduct alleged herein on an ongoing, almost daily basis throughout Plaintiff's employment with Defendant WORKDAY, INC..  Such conduct

permeates the workplace in such a manner that it substantially affects Plaintiff's ability to perform his job functions and causes injuries and damages to Plaintiff as alleged herein. Such conduct is specifically prohibited by FEHA, including §§ 12940(a) and 129409(h) – (k) of the California Government Code.

294.   Plaintiff notified Defendant WORKDAY, INC. of the unlawful conduct which imposes an obligation on it to have (a.) conducted a fair and reasonable investigation into his complaints, (b.) notified Plaintiff of the outcome of such investigation, and (c.) taken appropriate remedial measures based thereupon.  Defendant WORKDAY, INC. has failed and refused to do so and instead has elected to ratify, condone, deny, and even cover up the unlawful conduct when Defendant WORKDAY, INC. knows Plaintiff's complaints to be true.  In addition to the manifest discriminatory intentions of Defendant WORKDAY, INC., and its officers, directors, executives, managing agents, etc., Defendant WORKDAY, INC.'s failures and refusals to engage in proper training, supervision, hiring, background checking and other proper human resources functions has contributed to the hostile and discriminatory work environment that Plaintiff has been subjected to during Plaintiff's employ.

295.   Plaintiff has exhausted his administrative remedies by filing a timely charge of discrimination and harassment with the CRD.  The CRD issued to Plaintiff a right to sue letter permitting him to file a private lawsuit against the Defendants named herein.

296.   As a direct, foreseeable, legal, actual and proximate result of Defendant WORKDAY, INC.'s discriminatory acts and the unlawful and retaliatory conduct alleged herein, Plaintiff has suffered and continues to suffer substantial losses in earnings, job benefits, quality of life, goodwill; and has suffered and continues to suffer humiliation, ridicule, contempt, embarrassment, severe mental and emotional distress, damage to Plaintiff's reputation, discomfort and other damages, the precise amount of which will be proven at trial.  In each instance, Defendant WORKDAY, INC. has failed and refused to (a.) take reasonable steps to prevent harassment, (b.) utilize the procedures put in place by WORKDAY, INC. to purportedly address allegations of discrimination, harassment and

retaliation; and (c.) allow Plaintiff to engage in the stated procedures and policies of WORKDAY, INC. which theoretically would have prevented some of the harassment, discrimination, retaliation and conduct alleged herein and disrupted and terminated the policies and processes stated by WORKDAY, INC. which may have otherwise minimized the same.

297.    Further, because the wrongful acts against Plaintiff have been carried out, and authorized by Defendant WORKDAY, INC.'s directors, officers and/or managing agents, acting with malice, oppression or fraud, or have been deliberate, willful and in conscious disregard of the probability of causing injury to Defendant WORKDAY, INC., as reflected by the actions as described earlier in this First Amended Complaint, Plaintiff seeks punitive damages against Defendant WORKDAYT, INC. named herein  in order to deter them from such and similar conduct in the future.

298.    As a direct and proximate result of Defendant WORKDAYT, INC.'S discrimination, Plaintiff suffers and will continue to suffer damages in an amount within the jurisdiction of this Court, the exact amount to be proven at trial.  Such damages include but are not limited to:

      a.  loss of salary and other valuable employment benefits;

      b.  prejudgment interest and interest on the sum of damages for shame, humiliation, mental anguish, and emotional distress caused by the conduct of the Defendant;

      c.  other consequential damages, including damages for shame, humiliation, mental anguish, and emotional distress caused by the conduct of Defendant WORKDAYT, INC.

      d.  Attorney's fees in prosecuting this lawsuit, pursuant to Government Code § 12965(b).

## THIRD CAUSE OF ACTION

## RETALIATION IN VIOLATION OF

## THE FAIR EMPLOYMENT AND HOUSING ACT

# GOVERNMENT CODE § 12900 *et seq*.

299.    Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this First Amended Complaint.

300.    The actions of Defendant WORKDAY, INC., as described in this First Amended Complaint, constitute Race Discrimination and Retaliation and Disability Discrimination and Retaliation on the basis of Plaintiff's complaints of Race Discrimination and Disability Discrimination, as well as racially insensitive and offensive behavior in the workplace.

301.    The retaliation by Defendant WORKDAYT, INC. creates a hostile, intimidating, and oppressive work environment.   Moreover, the retaliation impedes Plaintiff's progress and the enjoyment of his employment with WORKDAY, INC.   The hostile work environment exists on a continuing and ongoing basis up to the present.

302.    Defendant WORKDAY, INC. knows (or should have known) of the hostile work environment and conduct against Plaintiff but has done nothing to prevent or stop the retaliation.

303.    Defendant WORKDAY, INC.'s retaliation as described in this First Complaint violates the Fair Employment and Housing Act as promulgated in Government Code § 12940 *et. seq*. as well as  other statutes which prohibit retaliation in employment.

304.    Plaintiff has exhausted his administrative remedies by timely filing a charge of discrimination with the CDR which has issued to Plaintiff a right to sue letter permitting him to file this lawsuit against Defendant WORKDAYT, INC.

305.    As a direct and proximate result of Defendant WORKDAY, INC.'s retaliation, Plaintiff has sustained and will continue to suffer damages in an amount within the jurisdiction of this Court, the exact amount to be proven at trial.   Such damages include but are not limited to:

      a.   loss of salary and other valuable employment benefits;

      b.   prejudgment interest and interest on the sum of damages at the legal rate; and

c.  other consequential damages, including damages for shame, humiliation, mental anguish, and emotional distress caused by Defendant's conduct.

d.  Attorney's fees in prosecuting this lawsuit, pursuant to Government Code § 12965 (b).

## FOURTH CAUSE OF ACTION

## HARASSMENT IN VIOLATION OF FEHA

## GOVERNMENT CODE § 12900 *et seq.*

306.    Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this First Amended Complaint.

307.    As detailed above, Plaintiff was repeatedly subjected to unwanted harassment and the creation of a hostile work environment by Defendant WORKDAY, INC.S, most senior legal and compliance management officials.  This continuing harassment and hostile work environment has taken the form of, *inter alia*, refusal to approve a reasonable leave request, unjustified demotion, derogatory public comments, the dangerous and unlawful weaponization of law enforcement against a black family (which could have ended tragically), ostracization from working with colleagues, unjustified suspension, the unauthorized use and disclosure of Plaintiff's confidential medical information, and violations of fundamental privacy rights.

308.    This harassment occurred because of Plaintiff's race and/or disabilities.  This harassment has also affected the terms, conditions, and/or privileges of Plaintiff's employment at WORKDAY, INC. insofar as it has created a pervasive atmosphere of disrespect, ridicule, insult, discriminatory animus, and a threatening environment to which no employee should have to be subjected.

309.    Defendant WORKDAY, INC. knew about the harassment and hostile work environment, yet did not take any action to prevent or stop it, including by refusing to discipline the perpetrators of the harassment, refusing to promote and/or reassign Plaintiff

after being informed of the harassment, and even conspiring to cover-up their gross misconduct.

310.     Defendant WORKDAY, INC. actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of wages, loss of benefits, mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering, and damages to his personal and professional reputations, justifying an award including but not limited to damages for emotional distress, compensatory, punitive and consequential damages against the Defendant, as well as attorney's fees and costs.

311.     Given that Defendant WORKDAY, INC. has continued to subject Plaintiff to a hostile work environment despite prior complaints, clearly an award of compensatory damages will not be sufficient to bring an end to their conduct and therefore injunctive relief is necessary to finally bring an end to years of misconduct and to prevent Plaintiff from incurring irreparable harm.

312.     Plaintiff has exhausted his administrative remedies by timely filing a charge of discrimination with the CRD which has issued to Plaintiff a right to sue letter permitting him to file this lawsuit against Defendant WORKDAY, INC.

313.     As a direct and proximate result of Defendant WORKDAY, INC.'s retaliation, Plaintiff has sustained and will continue to suffer damages in an amount within the jurisdiction of this Court, the exact amount to be proven at trial.  Such damages include but are not limited to:

      a.  loss of salary and other valuable employment benefits;

      b.  prejudgment interest and interest on the sum of damages at the legal rate; and

c.  other consequential damages, including damages for shame, humiliation, mental anguish, and emotional distress caused by Defendant's conduct.

d.  Attorney's fees in prosecuting this lawsuit, pursuant to Government Code § 12965 (b).

///

///

///

**FIFTH CAUSE OF ACTION**

**FAILURE TO MAINTAIN DISCRIMINATION AND HARASSMENT FREE WORK ENVIRONMENT IN VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT GOVERNMENT CODE § 12940 (k)**

314.   Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this First Amended Complaint.

315.   California Government Code § 12940 (k) prohibits an employer from failing to take all reasonable steps necessary to prevent discrimination and harassment in the workplace.

316.   Defendant WORKDAY, INC. was at all relevant times an employer within the meaning of California Government Code § 12926 (d) and as such had a duty to take all reasonable steps necessary to prevent discrimination and harassment in the workplace.

317.   Through the acts described fully above, Defendant WORKDAY, INC. violated California Government Code § 12940 (k) because it failed to take all reasonable steps necessary to prevent discrimination and harassment in the workplace.

318.   The failure of Defendant WORKDAY, INC. to take reasonable steps to prevent discrimination and harassment has caused Plaintiff to sustain substantial losses in earnings and job benefits.

319.   Plaintiff has complained about the harassment and discrimination that he has endured as a result of his race and disabilities to no avail.  In fact, in response to Plaintiff's legitimate complaints of harassment and discrimination, Plaintiff's work environment became increasingly more hostile.

320.   Plaintiff has exhausted his administrative remedies by timely filing charges of discrimination with the CRD which has issued to Plaintiff a right to sue letter permitting him to file this lawsuit against Defendant WORKDAY, INC.

321.   As a direct, foreseeable, and proximate result of Defendant's willful, knowing, and intentional failure to take all reasonable steps necessary to prevent discrimination and harassment, Plaintiff has suffered and continues to suffer humiliation, embarrassment, mental anguish, emotional distress, and discomfort, all to his damage, the precise amount of which will be proven at trial.   Such damages include but are not limited to:

    a.   loss of salary and other valuable employment benefits;

    b.   prejudgment interest and interest on the sum of damages at the legal rate; and

    c.   other consequential damages, including damages for shame, humiliation, mental anguish, and emotional distress caused by Defendant's conduct.

    d.   Attorney's fees in prosecuting this lawsuit, pursuant to Government Code § 12965 (b).

<u>**SIXTH CAUSE OF ACTION**</u>

**FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS AND PROVIDE REASONABLE ACCOMMODATIONS IN VIOLATION OF FEHA AND THE CFRA**

332.   Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this First Amended Complaint.

333.    As detailed above, physicians and qualified medical professionals have determined Plaintiff to have impairments that substantially limit one or more of his major life activities.

334.    Namely, Plaintiff has been diagnosed with anxiety, clinical depression, post-traumatic stress disorder, chronic diverticulitis, and panic disorder. These impairments that result in cognitive and memory issues, among other problems, substantially limiting one or more of his major life activities, and in connection to which Plaintiff had been hospitalized in a Maryland medical facility from October 12, 2022 to November 10, 2022.

335.    Plaintiff was and is able to perform the essential functions of his position with reasonable accommodations for cognitive and memory issues.

336.    Plaintiff repeatedly requested accommodations consistent with the recommendations of his doctors and qualified medical professionals.  These requests for accommodation were reasonable.

337.    Despite knowledge of Plaintiff's conditions, Defendant WORKDAY, INC. refused to engage in the interactive process or provide the accommodations Plaintiff asked for that were directly related to his conditions on numerous occasions.

322.    As a direct and proximate result of Defendant WORKDAY, INC.'s unlawful conduct, Plaintiff suffers and will continue to suffer damages in an amount within the jurisdiction of this Court, the exact amount to be proven at trial.  Such damages include but are not limited to:

      a.  loss of salary and other valuable employment benefits;

      b.  prejudgment interest and interest on the sum of damages at the legal rate; and

      c.  other consequential damages, including damages for shame, humiliation, mental anguish, and emotional distress caused by Defendant's conduct.

      d.  Attorney's fees in prosecuting this lawsuit, pursuant to Government Code § 12965 (b).

## SEVENTH CAUSE OF ACTION

**CFRA INTERFERENCE AND RETALIATION IN VIOLATION OF**

**GOVERNMENT CODE § 12945.1** *et seq.*

338.    Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this First Amended Complaint.

339.    Plaintiff is an eligible employee under the CFRA, Cal. Gov. Code § 12945.1 *et seq.*

340.    Plaintiff had been employed by the Defendant for at least 12 months and worked for more than 1250 hours in the 12 months before the start of his family and medical leave.

341.    Defendant WORKDAY, INC., a private California employer with more than five employees, is an employer in accordance with the CFRA.

342.    Defendant WORKDAY, INC. interfered with Plaintiff's rights established under the CFRA.

343.    The CFRA provides eligible employees with up to 12 work weeks of medical leave during any 12-month period for a serious health condition.

344.    Because Plaintiff suffered from a physical and/or mental illness, injury, or impairment that involved inpatient care in a hospital or residential health care facility for approximately one month, he meets the definition for "serious health condition" pursuant to the CFRA.

345.    Defendant WORKDAY, INC., through its officials, agents, employees, assigns, and all other persons acting in concert or participating with them, sought to discourage, interfere with and/or deny Plaintiff's CFRA family and medical leave rights, as well as retaliate against Plaintiff for having engaged in the protected activity of exercising his CFRA family and medical leave rights.

346.    Defendant WORKDAY, INC. did so, *inter alia*, by attempting to compel Plaintiff to attend work meetings when it knew Plaintiff was out on approved medical leave and/or on partial medical leave; misleading the Montgomery County (Maryland) Police Department, causing police officers to go to Plaintiff's home to verify Plaintiff's stated

reason for taking medical leave during Plaintiff's leave period; and administratively suspending Plaintiff for five weeks because he asked to delay a meeting with the Defendants until he could retain legal counsel (as a reasonable accommodation request) following one month of inpatient medical treatment, after Plaintiff cited his "medical limitations," and while Plaintiff was still on partial medical leave.

347.    Further, upon information and belief, Defendant WORKDAY, INC. violated, *inter alia*, the CFRA by having their employees, agents, and management officials disclose why and where Plaintiff was hospitalized without authorization, misusing Plaintiff's confidential data, and otherwise intruding into Plaintiff's personal activities and property.

348.    Defendant WORKDAY, INC.'s  interference and retaliation in violation of the CFRA was a gross interference or restraint on Plaintiff's legal rights.

349.    These extreme and outrageous actions resulted in humiliation and severe emotional distress to Plaintiff, causing him to undergo therapy, physical symptoms as described, and medical interventions.

350.    Such extreme and outrageous acts against Plaintiff go beyond all possible bounds of decency and are utterly intolerable in a civilized community.

351.    Defendant WORKDAY, INC.'s  actions were without just cause or excuse.

352.    As a direct and proximate result of Defendant WORKDAY, INC.'s unlawful conduct, Plaintiff suffers and will continue to suffer damages in an amount within the jurisdiction of this Court, the exact amount to be proven at trial.  Such damages include but are not limited to:

      a.  loss of salary and other valuable employment benefits;

      b.  prejudgment interest and interest on the sum of damages for shame, humiliation, mental anguish, and emotional distress caused by the conduct of the Defendants;

    c.   other consequential damages, including damages for shame, humiliation, mental anguish, and emotional distress caused by the conduct of Defendants.

    d.   Attorney's fees in prosecuting this lawsuit, pursuant to Government Code § 12945.1 *et seq.*

## EIGHTH CAUSE OF ACTION

## RETALIATION IN VIOLATION OF LABOR CODE § 1102.5

353.    Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this First Amended Complaint.

354.    At all relevant times, Labor Code § 1102.5 was in effect and was binding on Defendant WORKDAY, INC.  This statute prohibits Defendant WORKDAY, INC. from retaliating against any employee, including Plaintiff, for raising complaints of illegality.

355.    Plaintiff repeatedly raised complaints of illegality while he worked for WORKDAY, INC., and Defendant WORKDAY, INC. retaliated against him by discriminating against him, harassing him, and taking adverse employment actions, including but not limited to: demoting him; ruining his reputation and causing co-workers not to want to work with him; causing police to be sent to his residence to verify Plaintiff's stated reason for taking emergency medical leave; and administratively suspending him.

356.    As a proximate result of Defendant WORKDAY, INC.'s willful, knowing, and intentional violations of Labor Code § 1102.5, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to his damage in a sum according to proof.

357.    As a result of Defendant WORKDAY, INC.'s adverse employment actions against Plaintiff, Plaintiff has suffered general and special damages in sums according to proof.

358.    Defendant WORKDAY, INC.'s misconduct was committed intentionally, in a malicious, oppressive, fraudulent manner, entitling Plaintiff to punitive damages against Defendant WORKDAY, INC..

359.    In addition, Plaintiff is entitled to recovery of his attorney's fees and costs as a result of Defendant WORKDAY, INC.'s violation of Labor Code § 1102.5.

360.    As a direct and proximate result of Defendant WORKDAY, INC.'s unlawful conduct, Plaintiff suffers and will continue to suffer damages in an amount within the jurisdiction of this Court, the exact amount to be proven at trial.  Such damages include but are not limited to:

a.  loss of salary and other valuable employment benefits;

b.  prejudgment interest and interest on the sum of damages for shame, humiliation, mental anguish, and emotional distress caused by the conduct of the Defendants;

c.  other consequential damages, including damages for shame, humiliation, mental anguish, and emotional distress caused by the conduct of the Defendants.

d.  Attorney's fees in prosecuting this lawsuit, pursuant to Labor Code § 1102.5.

## NINTH CAUSE OF ACTION
### PROMISORY FRAUD
### CIVIL CODE § 1572, 1709 AND 1710

359.    Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this First Amended Complaint.

360.    On or about December 15, 2020, Defendant WORKDAY, INC. presented a signed offer letter to Plaintiff which contained the essential terms of employment under California law, including:  Plaintiff's job title, starting salary, dollar amount of deferred compensation in the form of RSUs, percentage range of RSU "refreshers," their disbursement schedule over a four-year period, Plaintiff's start date, and his opportunity for a conditional "performance" bonus.

361.     Pursuant to the definite terms set forth therein, Defendant WORKDAY, INC. would employ Plaintiff and compensate him with a salary and deferred compensation in the form of RSUs "contingent upon: (i) [Plaintiff's] execution of the Defendant's Proprietary Information and Inventions Agreement along with [his] execution of this letter within three (3) days; (ii) [Plaintiff's] consent to, successful completion of, and passing of all applicable background checks; and (iii) [Plaintiff's] presentation of satisfactory documentary evidence of [his] identity and authorization to work in the U.S. within three (3) days of [his] date of hire."

362.     Regarding RSUs, Defendant WORKDAY, INC. stipulated that it would pay Plaintiff a base salary plus "40% to 60% of new hire grants" in RSUs as deferred compensation.  Specifically, Defendant WORKDAY, INC. stated:

> [Y]ou will be granted restricted stock units (RSUs) of the Company's Class A Common Stock with an approximate value of $200,000.00. The number of shares will be determined by dividing the USD value above by the trailing simple moving average stock price of Workday Class A common stock for the 20 day period immediately preceding the Date of Grant. You will vest in these shares at the rate of 1/4 of the RSU shares after 12 months of continuous service from your vesting start date, then in equal quarterly installments of 1/16th of the total RSU shares, fully vesting in 4 years from your vesting start date. Your vesting start date will be the 15th of the month your RSU grant is approved.

363.     Prior to his start date Plaintiff promptly signed and returned the offer letter to Defendant WORKDAY, INC. indicating his acceptance within three days of receipt, subsequently also signed and returned the Proprietary Information and Inventions Agreement, successfully completed the background check, and presented appropriate documentation to Defendant WORKDAY, INC. indicating his identity and authorization to work within the U.S.

364.     Notwithstanding, Defendant WORKDAY, INC. only awarded Plaintiff a 23% stock refresher of Plaintiff's initial stock grant for calendar year 2022.

365.    Defendant WORKDAY, INC. did not award Plaintiff a stock refresher for calendar year 2023 2024.

366.    And Defendant WORKDAY, INC. awarded Plaintiff approximately half of the annual bonus payment which it promised to award and did in fact award similarly situated medium to high-performing WORKDAY, INC. employees for calendar year 2022.

367.    The oral and written representations made by Defendant WORKDAY, INC. to Plaintiff regarding RSUs for calendar year 2022, 2023 and 2024, respectively, and bonus for calendar year 2022, were false at the time they were made, Defendant WORKDAY, INC. knew they were false, and they were made for the purpose of inducing Plaintiff to conclude his gainful employment with AFS and begin his current employment with Defendant WORKDAY, INC.

368.    At the time Defendant WORKDAY, INC. made these false representations to Plaintiff, Plaintiff was ignorant of the true facts and believed Defendant WORKDAY, INC.'s representations to be true.

369.    Plaintiff in fact relied on the representations by ending his employment with AFS and working at WORKDAY, INC. in his current employment.  Plaintiff's reliance was reasonable in that the false representations were made to him orally and in writing by Defendant WORKDAY, INC., and specifically through its representative Kimberly La Rosa.

370.    Ms. La Rosa is a California resident who works at Defendant WORKDAY, INC.'s Pleasanton, California headquarters,.

371.    Ms. La Rosa held herself out as a WORKDAY, INC. Senior Talent Acquisition Partner with full authority to bind Defendant WORKDAY, INC. to the express and implied terms in the offer letter, on behalf of Defendant WORKDAY, INC., and with its knowledge and without objection by Defendant WORKDAY, INC.

372.    If Plaintiff had known the true facts he would not have acted as he did and specifically, would not have concluded his employment with AFS and begun employment with Defendant WORKDAY, INC.

373.    As a direct and proximate result of the fraud engaged in by Defendant WORKDAY, INC., Plaintiff has been damaged in an amount to be determined at the time of trial.

374.    Defendant WORKDAY, INC. and its co-conspirator and aider and abettor, Ms. La Rosa, engaged in despicable conduct and acted with willful, reckless, and conscious disregard of the rights of Plaintiff, and in doing the things alleged herein were guilty of oppression and malice, causing significant injuries to Plaintiff.

375.    Accordingly, Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial, as well as attorney's fees and costs.

## TENTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

376.    Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this First Amended Complaint.

377.    As detailed above, the Defendant's actions, conducted through their employees and agents, directed at Plaintiff, have been extreme and outrageous, and included, *inter alia*, pervasive acts of discrimination, harassment, retaliation, and a hostile work environment based on Plaintiff's race and/or disabilities; weaponization of police officers against his family and neighbors merely to confirm Plaintiff's stated reason for taking emergency medical leave; repeated false accusations made loudly, publicly, and intimidatingly of laziness and having a public reputation for not wanting to work; as well as the refusal of supervisors and Workday HR to address such behavior or to assist Plaintiff when help was requested and needed, putting his health and job at risk.

378.    These extreme and outrageous actions resulted in humiliation and severe emotional distress to Plaintiff, causing him to undergo therapy, physical and mental injuries as described, and medical interventions.

379.    Such extreme and outrageous acts against Plaintiff go beyond all possible bounds of decency and are utterly intolerable in a civilized community.

380.    The Defendant's actions were without just cause or excuse.

381.    Ms. DAHM, Ms. MCFALL, Ms. HAUCK and each of them, at all times herein were the agents and employees of WORKDAY, INC. and in doing these things hereafter alleged were acting within the course and scope of their employment and agency and with permission and consent of WORKDAY, INC..

382.    The above-described acts of the Defendants and each of them, were outrageous, intentional, unlawful, malicious, and committed for the express purpose of causing Plaintiff to suffer increased humiliation, mental anguish, emotional and physical distress.  The conduct of each of these Defendants in confirming and ratifying this conduct was done with the knowledge that Plaintiff would suffer great physical and emotional distress, and was committed with a wanton and reckless disregard for the consequences to Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages against the individual Defendants in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION
### VIOLATIONS OF CMIA
### CIVIL CODE § 56 *et seq.*

383.    Plaintiff restates and incorporates by this reference as if fully set forth herein within the preceding paragraphs of this First Amended Complaint.

384.    Defendant WORKDAY, INC.'S headquarters are in Pleasanton, California where WORKDAY, INC.'S human resources department is based and operates.  Plaintiff's confidential medical and leave information is transmitted to and maintained by the human resources personnel in Defendant WORKDAY, INC.'S corporate headquarters.

385.    CMIA requires Defendant WORKDAY, INC. to safeguard the security and confidentiality of the individually identifiable medical information of employees, including Plaintiff, and the use and/or disclosure of such confidential medical information without proper written authorization.

386.    On or about October 20, 2022, Defendant WORKDAY, INC. unlawfully gained possession of Plaintiffs' confidential medical information, including but not limited

to his health insurance information; medical record numbers; patient account numbers; reasons for his hospitalization; name and location of his inpatient medical provider; and/or clinical information such as physician name, date(s) of service, medical records, and/or treatment information.

387.    Even after Defendant WORKDAY, INC. unlawfully obtained Plaintiff's confidential medical information, pursuant to CMIA, the Defendants still had a continuing duty to exercise reasonable care in preserving the confidentiality of this information subject to the requirements and mandates of the Act.

388.    Defendant WORKDAY, INC. breached their duty of care at all times relevant to this First Amended Complaint, when it obtained, used, disclosed, and/or knowingly permitted its employees or agents to obtain, use or disclose Plaintiff's confidential medical information because Plaintiff did not sign a document authorizing, or otherwise authorize, Defendant WORKDAY, INC to do so.

389.    For example, in connection with their "Workday Wellness Check," Defendant WORKDAY, INC. breached this duty of care on or about October 20, 2022 when Plaintiff's confidential medical information was shared with Montgomery County law enforcement officers.  Defendant WORKDAY, INC. also breached this duty of care when they shared Plaintiff's confidential medical information with Plaintiff's colleagues at WORKDAY, INC.,

390.    At all times relevant to this First amended Complaint, including on October 20, 2022 and thereafter, Defendant WORKDAY, INC.  and/or its unknown agents and employees negligently, recklessly, willfully, intentionally, and with malice of forethought, stored Plaintiff's confidential medical information in an unencrypted form and/or manner that did not preserve the confidentiality of the information, and otherwise negligently, recklessly, willfully, intentionally, and with malice of forethought, chose to misuse and/or disclose the confidential medical information, or failed to protect and preserve the confidentiality of Plaintiff's confidential medical information in their possession against disclosure and/or release, including but not limited to, by failing to conduct and require

adequate employee education and training, failing to adequately review and revise information security, failing to have adequate information security, and failing to have adequate privacy policies and procedures in place, as required by CMIA.

391.   Due to the Defendant's and/or their agents' and employees' creation, maintenance, preservation, and/or storage of Plaintiffs' confidential medical information in their computer network and in the Defendant's email accounts, which Defendant WORKDAY, INC conducted negligently, recklessly, willfully, intentionally, and with malice of forethought, Defendant WORKDAY, INC. allowed Plaintiffs' confidential medical information to be accessed, viewed, disclosed and/or released by Ms. Dahm, Ms. Hauck, Ms. McFall, Ms. Eyler, Ms. Goldsmith, Mr. Sauer, Ms. Gordon,  and/or other unauthorized persons acting in concert with and/or under the direction of co-Defendant WORKDAY, INC. on or about October 20, 2022 and thereafter, without ever obtaining an authorization from Plaintiff within the meaning of CMIA.

392.   As a direct and proximate result of Defendant WORKDAY, INC.'S negligent, reckless, willful, intentional, and malicious above-described conduct in violation of CMIA, Plaintiff has suffered damages from the unauthorized use, disclosure and/or release of his confidential medical information, including but not limited to physical pain, mental anguish, loss of enjoyment, loss of quality of life, fright, shock, indignity, mortification, nervousness, embarrassment, apprehension, inconvenience, anxiety, depression, humiliation, damage to personal and professional reputations, PTSD, emotional distress, and pain and suffering.

393.   Plaintiff is entitled to nominal, compensatory and punitive damages in an amount to be proven at trial, as well as attorney's fees and costs for each violation under CMIA.

WHEREFORE, PLAINTIFF ANTHONY C. HILL PRAYS FOR JUDGMENT AGAINST THE DEFENDANTS NAMED HEREIN AS FOLLOWS:

A.   For economic damages according to proof;

B.    For general, special, and incidental damages and amounts for emotional distress according to proof;

C.    For prejudgment interest and interest on the sum of damages awarded to the maximum extent permitted by law;

D.    For an injunction against age, gender, disability and race-based harassment, discrimination, and retaliation in the future;

E.    Creation of a Court supervised policy against disability and race-based harassment, discrimination, and retaliation;

F.    Imposition of periodic reporting requirements on the company;

G.    For reasonable attorneys' fees and costs of suit herein incurred pursuant to Government Code § 12965 (b), Labor Code § 1102.5, Civil Code § 56.35, and CFRA;

H.    For punitive damages; and

I.    For such other and further relief as the Court deems proper.

DATED:  May 17, 2024          **LAW OFFICE OF MICHAEL J. CURLS**

                                    ***/s/ Nichelle D. Jordan***
                                    By:  Nichelle D. Jordan,
                                    Attorneys for Plaintiff
                                    ANTHONY C. HILL

**PLAINTIFF ANTHONY C. HILL DEMANDS A JURY TRIAL.**

DATED:  May 17, 2024          **LAW OFFICE OF MICHAEL J. CURLS**

                              By:_____***/s/ Nichelle D. Jordan***
                                    Nichelle D. Jordan, Attorneys for
                                    Plaintiff ANTHONY C. HILL