UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTHONY C. HILL,<br><br>Plaintiff,<br><br>v.<br><br>WORKDAY, INC., et al.,<br><br>Defendants. | Case No. 23-cv-06558-PHK<br><br>**ORDER GRANTING-IN-PART AND DENY-IN-PART DEFENDANT WORKDAY, INC.'S MOTION TO DISMISS PLAINTIFF ANTHONY C. HILL'S FIRST AMENDED COMPLAINT**<br><br>Re: Dkt. 58 |

Now before the Court is Defendant Workday, Inc.'s ("Workday") Motion to Dismiss Plaintiff Anthony C. Hill's First Amended Complaint ("FAC"). [Dkt. 58]. After carefully considering the Parties' briefing, all relevant documents, and oral argument of counsel presented at the hearing on this motion, the Court **DENIES-IN-PART** and **GRANTS-IN-PART** Defendant Workday's Motion to Dismiss the First Amended Complaint.

# BACKGROUND

## I.    FACTUAL BACKGROUND

The following factual summary is based on the facts alleged by Plaintiff Hill, as detailed in his First Amended Complaint, except as otherwise noted. [Dkt. 53].

Plaintiff Hill is a Maryland resident. *Id.* at ¶ 1. Plaintiff Hill is "a black male with disabilities" who "has been practicing law as an attorney for approximately 20 years" and, at the relevant time for this matter, worked as in-house counsel for Defendant Workday. *Id.* at ¶13–16.

Defendant Workday is a Delaware corporation organized to do business in the State of California, with its headquarters in Alameda County. *Id.* at ¶ 2. Defendant Workday is headquartered in Pleasanton, California. *Id.* at ¶ 18. Plaintiff Hill began his employment at

United States District Court
Northern District of California

Defendant Workday starting in or around January 2021. *Id.* at ¶ 39.

Plaintiff Hill was hired as an attorney in Defendant Workday's legal department. *Id.* at ¶ 39. Plaintiff Hill's direct supervisor, Director Katie Hauck (who now holds the title of Senior Director), is (and at all relevant times, was) based in New York. *Id.*; *see also* Dkt. 53-1 at ¶ 5 (redline of original Complaint attached as exhibit to FAC). During numerous, weekly one-on-one meetings with Ms. Hauck, Plaintiff Hill discussed Workday's alleged hiring and/or promoting non-black attorneys with less experience than Plaintiff to positions that were higher and received higher compensation. *Id.* at ¶ 48. Ms. Hauck suggested that Plaintiff Hill create a "plan" to be promoted. *Id.* at ¶ 50. Plaintiff Hill created a "Career Growth and Continued Success Plan" for himself to be promoted from Senior Counsel to Assistant General Counsel. *Id.* at ¶ 51. After reviewing the plan, Ms. Hauck complimented Plaintiff Hill on the plan but indicated that Plaintiff would need "at least one year" as Senior Counsel. *Id.* at ¶ 52. Ms. Hauck told Plaintiff Hill that she would give the "Career Growth and Continued Success Plan" to one of her other direct reports, a white female. *Id.* at ¶ 55. Defendant Workday promoted that white female from Senior Counsel to Assistant General Counsel shortly thereafter. *Id.* at ¶ 57.

In or around May 2021, Plaintiff Hill requested that Ms. Hauck hire an individual who would assist Plaintiff Hill with his work. *Id.* at ¶ 59. Ms. Hauck responded that she did not have funding for such a role. *Id.* Christine Fedrow, who leads Defendant Workday's Integrity Team, informed Plaintiff Hill that the Integrity Team had funding for the role. *Id.* at ¶ 60. In June 2021, Christina Strelow, a white female, was hired as the Program Manager for Federal Ethics and Compliance going against Plaintiff Hill's original recommendation. *Id.* at ¶ 61. Plaintiff Hill served as Ms. Strelow's *de facto* manager/supervisor. *Id.* at ¶ 62.

In October 2021, Ashley Brown, a black female working in Defendant Workday's Finance Team, was having issues allegedly relating to race with her manager Ann Allen, a white female. *Id.* at ¶ 65. Ms. Brown sought help from Plaintiff Hill; additionally, she asked Plaintiff Hill if he thought she would be a suitable candidate for an open, interim, non-attorney role who would report to Ms. Hauck. *Id.* Plaintiff Hill contacted Ms. Hauck and confidentially told her that Ms. Brown believed she was having problems with her manager because of her race and inquired about whether Ms.

Brown might be interviewed for the open role. *Id.* at ¶ 68–69.  Subsequently, Ms. Hauck informed Plaintiff Hill that she had spoken to Ms. Allen about Ms. Brown, and Ms. Hauck determined that Ms. Brown "would not be a good fit." *Id.* at ¶ 70  Upon information and belief, Ms. Brown's employment with Workday ended shortly thereafter. *Id.*  Upon information and belief, Ms. Hauck did not report Plaintiff Hill's race-based discrimination concerns. *Id.* at ¶ 72.

During the first week of January 2022, Plaintiff Hill met with Rich Sauer, Defendant Workday's Chief Legal Officer, regarding potentially creating a role titled "Lead or Head Public-Sector Compliance Counsel" to handle Defendant Workday's legal compliance obligations. *Id.* at ¶ 74.  Plaintiff Hill indicated that he would be the ideal candidate for such a role. *Id.* at ¶ 75.  Mr. Sauer was receptive to the initiative and requested that Plaintiff Hill create a formal written document proposing the role. *Id.* at ¶ 76.  Plaintiff Hill provided the formal proposal to Mr. Sauer on January 7, 2022. *Id.*  Mr. Sauer did not respond to Plaintiff Hill. *Id.*  Months later, Plaintiff Hill emailed Mr. Sauer regarding Plaintiff Hill's desire to be included in Defendant Workday's Leadership Council on Legal Diversity Fellows Program. *Id.* at ¶ 77.  Mr. Sauer did not respond to Plaintiff Hill. *Id* at ¶ 78.

In September 2022, Plaintiff Hill made a presentation to Senior Vice President Susan Dahm, Senior Vice President Lisa McFall, and Ms. Hauck, along with various Workday personnel including Mr. Sauer. *Id.* at ¶ 80.  Plaintiff Hill was assisted by Ms. Strelow. *Id.*  At the meeting, Plaintiff Hill recommended that Defendant Workday implement an annual compliance training which Plaintiff Hill had developed. *Id.* at ¶ 82.  Ms. McFall passionately disagreed with Plaintiff Hill's recommendation. *Id.* at ¶ 84.  Mr. Sauer overruled Ms. McFall and requested that Plaintiff Hill work with Ms. McFall and others interested in implementing the annual compliance training. *Id.*  Ms. McFall was visibly angry during this exchange. *Id.* at ¶ 85.

On September 16, 2022,[1] Ms. Hauck and Ms. Dahm (to whom Ms. Hauck directly reports)

---

[1] The Court notes that the Complaint states this event occurred in 2023.  [Dkt. 53 at ¶ 96].  However, in the context of the Complaint, this appears to be an obvious typographical error and the Court construes the Complaint to allege (or intend to allege) that this event occurred in 2022.  *Est. of Hernandez-Rojas v. United States*, No. 11-CV-0522-L DHB, 2013 WL 5353822, at *2 (S.D. Cal. Sept. 24, 2013) (a court may correct a clear typographical error rather than a substantive error).

United States District Court
Northern District of California

demoted Plaintiff allegedly without just cause in retaliation. *Id.* at ¶ 96. The Complaint alleges that "Defendants arbitrarily and capriciously prohibited Plaintiff from working with, receiving aid from, and/or supervising Ms. Strelow[.]" *Id.* at ¶ 97. According to Plaintiff Hill, Ms. Hauck indicated that Ms. Dahm made the decision to demote Plaintiff Hill. *Id.* at ¶ 98. Ms. Hauck and Ms. Dahm indicated a "desire to ensure that 'the resources we are using feel appropriately used and that we aren't over taxing them.'" *Id.* at ¶ 100.

On September 19, 2022, Plaintiff Hill, Ms. McFall, Ms. Fedrow, and Ms. Strelow attended a Zoom conference call regarding the implementation of the annual compliance training. *Id.* at ¶ 87. Before Plaintiff Hill had an opportunity to say anything other than "hello," Ms. McFall stated, "everybody knows that you don't want to work, Anthony!" *Id.* at ¶ 89. Plaintiff Hill responded that the characterization was unfair as evidenced by many recommendations from Defendant Workday leaders. *Id.* at ¶ 90. "Ms. McFall then angrily and loudly doubled down by again impugning [Plaintiff Hill's] work ethic and professional reputation in front of everyone[.]" *Id.* at ¶ 91. After that video call, Plaintiff Hill told Ms. Hauck that "the optics look terrible for Workday" and "the incident appeared racist to me[.]" *Id.* at ¶ 93. Ms. Hauck responded to Plaintiff Hill by saying "OK, I understand." *Id.* at ¶ 94.

On or around October 12, 2022, Plaintiff Hill asked Ms. Strelow for her help on the project "in part, because his disabilities prevent him from doing this work completely on his own." *Id.* at ¶ 102. Ms. Hauck and Ms. Dahm "had been aware of Plaintiff's cognitive and memory challenges since he revealed these issues to them in August 2021, in addition to his other (digestive) disability from chronic diverticulitis, for which Plaintiff has been periodically hospitalized since a 2012 surgery." *Id.* at ¶ 102 n.6.

After delivering the final work product, Ms. Hauck and Ms. Dahm asked Plaintiff Hill "how" he managed to complete the project. *Id.* at ¶ 105. After being dissatisfied with Plaintiff Hill's initial response, Ms. Hauck "then clarified her question by explaining that it was 'actually much more tactical than substantive.'" *Id.* at ¶ 107.

On October 12, 2022, Plaintiff Hill was hospitalized in a Maryland medical facility "[d]ue to stress, exhaustion, and trauma associated with this and other disparate, discriminatory, retaliatory,

1    harassing and hostile treatment of him by Defendant [Workday] employees[.]" *Id.* at ¶ 116. Before

2    his hospitalization, Plaintiff Hill sent two emails to Ms. Hauck. *Id.* at ¶ 117. The two emails stated:

3    "'I'm having a medical emergency and am headed to the hospital' followed by, 'I'm in the hospital

4    waiting room now with my wife[,]' respectively." *Id.* at ¶ 118. Additionally, Plaintiff Hill sent an

5    email to Defendant Workday with a completed leave request form "wherein plaintiff commented to

6    Ms. Hauck he would be filing the required family and medical leave certification as soon as he could

7    because he would need to take extended medical leave beyond October 12th since he was being

8    hospitalized but did not know for how long." *Id.* at ¶ 119.

9        On October 13, 2022, Ms. Hauck responded to Plaintiff Hill stating in relevant part:

10       I wanted to pass along a bit of information (in case you need/want it)
11       in response to your comment around FMLA in the time off request
         you submitted last night. If you have any questions regarding FMLA,
12       you can contact Unum (who handles WORKDAY, INC.'s FMLA) at
         866-865-9092. Feel free to also reach out to [the Defendants' HR
13       team] P&P via Service Hub and they can provide additional direction.
         Please don't worry about work and focus on feeling better.

14   *Id.* at ¶ 120. (alteration in original).

15       On October 20, 2022, "Defendants caused police to be sent to Plaintiff's home under the

16   pretense of a so-called 'Workday Wellness Check.'" *Id.* at ¶ 124. Plaintiff Hill's wife, Mrs. Hanadi

17   Hill, "arrived after dark at their Silver Spring, Maryland home with their two sons in tow, then ages

18   13 and 9." *Id.* at ¶ 125. Mrs. Hill was confronted by three squad cars whose lights were flashing.

19   *Id.* The squad cars were full of armed Montgomery County Police Officers. *Id.* Mrs. Hill informed

20   the police officers that Plaintiff Hill was hospitalized at a Maryland medical facility. *Id.* at ¶ 127.

21   Then, the police instructed Mrs. Hill to call the Defendants and inform them of Plaintiff Hill's

22   location. *Id.*

23       The following day Plaintiff Hill was told the news of the police encounter and had a "massive

24   panic attack." *Id.* at ¶ 129. Plaintiff Hill drafted an email for his wife to send to Ms. Hauck and Ms.

25   Dahm stating in relevant part:

26       I want to reassure you that [my husband] Anthony is safe and
27       receiving ongoing medical treatment at a Maryland facility. His
         medical team has estimated that he will need approximately 3 more
28       weeks before he is able to return to work full-time.

*Id.* at ¶ 132.  Ms. Dahm replied, without Ms. Hauck on the email chain:

> Dear Hanadi: Thank you so much for letting us know. We wish our very best to you and Anthony. We have been in contact with our HR team and I am advised that they are in contact with you to support your request. Please do reach out if there is anything further we can do to support you.

*Id.* at ¶ 136.

At some time following the "Workday Wellness Check," Defendant Workday's Human Resources sent the following email to Plaintiff Hill:

> Hope you had a nice weekend! Yes, I can confirm that the Wellness Check was completed on 10/20. We will not be providing any further documentation regarding the decision to conduct a Wellness Check.

*Id.* at ¶ 150.

Plaintiff Hill was discharged from the Maryland medical facility on November 10, 2022. *Id.* at ¶ 116.  Plaintiff Hill took short-term disability and employer-approved medical leave from October 13 through November 22, 2022. *Id.* at ¶143.  After returning to work, Defendant Workday employees began contacting Plaintiff Hill "expressing their concerns and condolences, and saying that they knew where and why Plaintiff had been hospitalized even though Plaintiff never revealed this confidential medical information to these individuals or anyone else." *Id.* at ¶ 139.

Plaintiff Hill's treating physician placed him on a modified work schedule which was communicated to Defendant Workday's Human Resources and Ms. Hauck. *Id.* at ¶ 177.  The modified work schedule was approved and acknowledged by Ms. Hauck. *Id.* at ¶ 178.  However, when Plaintiff Hill returned to work, he discovered Defendants "had made numerous material additions and alterations to [his] job duties[.]" *Id.* at ¶ 161.

On November 28, 2022, Plaintiff Hill had a meeting with Ms. Hauck, Vice President & Head of Corporate Affairs Chandler Morse, and Senior Public Policy Manager Matt Pincus. *Id.* at ¶ 165. During the meeting, Ms. Hauck spoke about a situation in which a client's contracting attorney had to take personal leave for about one month during a negotiation which slowed down the contracting cycle. *Id.* at ¶ 166.  Ms. Hauck said at the meeting "I wish I could just take the month off." *Id.* at ¶ 167.  "Mr. Morse reacted to Ms. Hauck's comment by putting both of his hands over his face and

United States District Court
Northern District of California

saying nothing. Mr. Pincus laughed nervously."[2]  *Id.* at ¶ 171.  Plaintiff Hill was mortified but said nothing and smiled.  *Id.* at ¶ 172.  During the following one-on-one meeting with Plaintiff Hill, Ms. Hauck said to Plaintiff Hill that either Ann Sandor or Ann Speyer, both employees of Defendant Workday, "is always taking leave, I swear!"  *Id.* at ¶ 174.  Plaintiff Hill did not ask Ms. Hauck for clarification about which "Ann" because he believed Ms. Hauck's comment to be generally inappropriate and intentionally hostile towards him since he was coming back from a one-month leave.  *Id*. at ¶ 175.

On January 13, 2023, Ms. Hauck contacted Plaintiff Hill via Slack, a work messaging platform, regarding his attendance at a work meeting.  *Id.* at ¶179.  Ms. Hauck's message fell outside Plaintiff Hill's modified work schedule.  *Id.* at ¶ 177.  Plaintiff Hill responded an hour later, still outside his modified work schedule, that he would not be attending because of his medical leave. *Id.* at ¶ 180.  Ms. Hauck did not respond.  *Id.* at ¶ 181.  Plaintiff Hill reported the incident to Defendant Workday's Human Resources.  *Id.* at ¶ 183.

On January 25, 2023, Plaintiff Hill attempted to take Paid Time Off to address personal issues.  *Id.* at ¶ 193.  Defendant Workday requires employees to obtain managerial approval for their Paid Time Off.  *Id.*  Ms. Hauck demanded that Plaintiff Hill justify why he needed to take Paid Time Off.  *Id.*  Plaintiff Hill responded to Ms. Hauck that the demand made him "very uncomfortable[,]" that he made contingency plans for his work schedule, and that he offered to provide information from his doctors to "Unum" regarding the need to take Paid Time Off.  *Id.* at ¶ 194.  Plaintiff Hill also gave context regarding his work schedule by indicating that he had been working on various Defendant Workday projects starting earlier than 5:30 AM.  *Id.* at ¶ 200.  Plaintiff Hill stated to Ms. Hauck that he had been working on these early morning projects with Vice President Juliana Capata. *Id.*  Plaintiff Hill had not informed any other Defendant Workday employee about his working

---

[2] The Court notes that the Complaint spells the name as "Pinkus".  [Dkt. 53 at ¶ 171].  However, in the context of the Complaint, this appears to be an obvious typographical error and the Court construes the Complaint to allege (or intend to allege) that this person is the same Mr. Pincus previously referenced.  *Est. of Hernandez-Rojas v. United States*, No. 11-CV-0522-L DHB, 2013 WL 5353822, at *2 (S.D. Cal. Sept. 24, 2013) (a court may correct a clear typographical error rather than a substantive error).  The Court also notes that the FAC omits pleading the titles and first names of Mr. Morse, Mr. Pinucs, and Ms. McFall, although their full names and titles are identified in the original Complaint.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    relationship with Ms. Capata and her team. *Id.* ¶ 202. Ms. Hauck did not respond to Plaintiff Hill.

2    *Id.* at ¶ 204. Plaintiff Hill sent Ms. Capata information which she and her team requested that same

3    day. *Id.* ¶ 203.

4          The following day, Plaintiff Hill followed up with Ms. Capata after not receiving a response.

5    *Id.* The follow up did not receive a response. *Id.* at ¶ 204. A day or two later, Plaintiff Hill followed

6    up with Ms. Capata and/or her team. *Id.* at ¶ 205. The second follow up did not receive a response.

7    *Id.*

8          For approximately a weeklong period in late January, Plaintiff Hill visited Defendant

9    Workday's Pleasanton, California, headquarters for various work functions. *Id.* at ¶ 207. During

10   this work trip, Ms. Capata frowned and glared at Plaintiff Hill during an in-person, small group,

11   breakout meeting. *Id.* at ¶ 209. Ms. Capata had previously always been friendly, kind, and talkative

12   to Plaintiff Hill both when meeting in-person and remotely. *Id.*

13         On January 27, 2023, Plaintiff Hill sent an email to Defendant Workday's Human Resources

14   Senior Representative, Lauren Eyler, requesting "immediate reassignment to the Workday Integrity

15   Team[.]" *Id.* at ¶ 215. "Defendants denied Plaintiff's written reasonable accommodation request

16   on March 7, 2023." *Id.* at ¶ 216. The FAC alleges that Plaintiff Hill worked almost exclusively

17   with the Workday Integrity Team. *Id.* at ¶ 217. The FAC alleges that Plaintiff Hill's disabilities,

18   which include "but [are] not limited to, acute anxiety, panic disorder, depression, and Post-

19   Traumatic Stress Disorder[,]" prevented him from working within his current management reporting

20   structure. *Id.* at ¶¶ 17, 219.

21         Plaintiff Hill spoke to Ms. Eyler in March 2023. *Id.* at ¶ 163. During this meeting, Ms.

22   Eyler stated that "she attributed the changing of the essential job functions for Plaintiff's position

23   without having engaged in the interactive process as a 'simple mistake' and dismissed it as 'not a

24   big deal.'" *Id.* Further regarding the communications from Ms. Hauck outside of Plaintiff Hill's

25   modified schedule, Ms. Eyler "dismissed the significance" stating that "you have so many schedules

26   that [Ms. Hauck] probably just got confused." *Id.* at ¶ 184. Further, Plaintiff Hill asked Ms. Eyler

27   why Ms. Hauck "had chosen not to acknowledge or indicate in any way to him that she had asked

28   Plaintiff to attend the work meeting while he was on medical leave by mistake or 'just got confused'

8

if that is in fact what happened, Ms. Eyler asked Plaintiff, 'how do I know that you didn't do anything to [alter] the Slack message?'" *Id.* at ¶ 184. (alteration in original). Plaintiff responded that he had not altered the conversation, to which Ms. Eyler responded that "well then [Ms. Hauck] was probably just busy." *Id.* at ¶ 185. (alteration in original).

During March 2023, Ms. Eyler stated to Plaintiff Hill that Jazmine Gordon, a Workday Human Resource employee, was the sole Workday employee responsible for the "Workday Wellness Check" "before suddenly stopping herself, apologizing, attempting to retract her statement, and explaining that her Workday, Inc. superiors, who include the Defendants, would not permit her to discuss the matter with Plaintiff[.]" *Id.* at ¶ 153.

Additionally, Ms. Eyler stated that Defendant Workday's "anonymous" mandatory weekly surveys regarding "employment experience" acted as both a "sword and a shield" "in retaliating against Plaintiff and other similarly situated members of their workforce for engaging in protected activity." *Id.* at ¶ 230. Ms. Eyler explained the surveys act as a "shield" when she and other Defendant Workday Human Resource professionals review individuals' past positive survey responses to "shield" Defendants and their management from negative complaints. *Id.* at ¶ 231. In doing so, Ms. Eyler explained that this practice allows Defendant Workday Human Resources to "attack the veracity of the employee complaint and/or complainant." *Id.* Ms. Eyler also revealed that Defendant Workday's Human Resource department does not afford "any added credibility or 'weight' to complaints made by Defendant Workday, Inc., employees, including Plaintiff, who in the past have refused to answer" the weekly surveys or who in the past have answered the surveys with negative response. *Id.* at ¶ 232. Ms. Eyler informed Plaintiff Hill that Defendant Workday's Human Resources "had fully and fairly investigated his claims and concluded that they all lacked merit." *Id.* at ¶ 259.

On March 16, 2023, "Defendants (through Ms. Gordon) invited Plaintiff to an unplanned meeting with Ms. Hauck to occur that afternoon for Plaintiff 'to get reset and aligned with [his] manager moving forward.'" *Id.* at ¶ 260. (alteration in original). "Plaintiff politely replied to the Defendants' meeting request, asking Ms. Gordon to 'please invite Chris Fedrow' because Plaintiff did not 'feel comfortable' or safe 'meeting with just' Ms. Hauck 'alone' considering his persistent

9

United States District Court
Northern District of California

1   'medical limitations' and 'given the circumstances.'"  *Id.* at ¶ 251.  Plaintiff Hill's request was

2   rejected, and Ms. Gordon stated that "Chris Fedrow is not your People Leader and it would be

3   inappropriate for her to join, however I will be joining the call with you."  *Id.* at ¶ 265.  Plaintiff Hill

4   requested that the meeting be postponed so he could retain legal counsel.  *Id.* at ¶ 269.  Ms. Gordon

5   responded by stating that: "(a.) 'cooperating in being managed is an essential function of [his]

6   role[;]' (b.) his request to delay the meeting until he could retain legal counsel was actually a

7   'refus[al] to attend the meeting[;]' and consequently (c.) Plaintiff would 'be placed on paid

8   administrative leave effective immediately' until Plaintiff stopped his 'unacceptable' 'refusal to be

9   managed by [Ms. Hauck].'"  *Id.* at ¶ 271. (alteration in original).

10  On March 21, 2023, Ms. Gordon informed Plaintiff about his paid administrative suspension.

11  *Id.* at ¶ 273.  Five weeks later, Plaintiff Hill's paid administrative leave stopped without explanation

12  from Defendants.  *Id.* at ¶ 277.  At some point prior to Plaintiff Hill's paid administrative leave, Ms.

13  Hauck sent an email to her entire team thanking individuals by name for their hard work over the

14  previous year.  *Id.* at ¶ 188.  Plaintiff Hill was not included in the list of individuals thanked in Ms.

15  Hauck's email.  *Id.* at ¶ 189.

16  Plaintiff Hill never received a single, formal negative performance review or evaluation

17  since he was hired.  *Id.* at ¶ 241.  Plaintiff Hill received numerous positive written acknowledgments

18  celebrating his work.  *Id.* at ¶ 242

19  On May 1, 2023, Plaintiff Hill went on approved disability and medical leave.  *Id.* at ¶ 271.

20  At the beginning of his employment, Plaintiff Hill negotiated a compensation package which

21  included $200,000 in Restricted Stock Units ("RSUs") over four years as deferred compensation,

22  with a 40% to 60% refresher of Plaintiff's initial stock grant annually.  *Id.* at ¶ 234.  In 2022, Plaintiff

23  Hill received an RSU refresher grant of approximately 23% of his initial stock grant.  *Id.* at ¶ 236.

24  The delta between the 23% grant and the 40% to 60% overall stock refresher originally promised to

25  Plaintiff Hill equals a loss of between $40,000–$60,000 in additional compensation annually.  *Id.* at

26  ¶ 238.  Plaintiff Hill raised the discrepancy with Ms. Hauck, who said she would speak to her

27  superiors regarding the issue.  *Id.* ¶ 237.  Ms. Hauck later told Plaintiff Hill that, based on the

28  conversation she had with her superiors, Plaintiff Hill needed to accept the RSU refresher grant he

had received. *Id.* Plaintiff Hill was awarded only approximately half of the annual bonus payment "which medium to high-performing Defendant Workday, Inc. employees like Plaintiff were promised by the company[.]" *Id.* at ¶ 240. Plaintiff Hill's counsel "asked the Defendants on his behalf twice to explain his unjustifiably low 2022 bonus award, the Defendants initially stated that Plaintiff 'needs to speak with [Ms. Hauck]' to get an answer." *Id.* at ¶ 243. Afterwards, "Defendants refused to answer the question at all." *Id.* Plaintiff received no RSU refresher from Defendants in 2023. *Id.* at ¶ 239. The FAC alleges that the lack of an RSU refresher resulted in an additional economic loss of between $160,000 and $240,000. *Id.*

## II.    PROCEDURAL BACKGROUND

On December 11, 2023, Plaintiff Hill filed a Complaint against Defendants Workday, Susan Dahm, Lisa McFall, and Katie Hauck. [Dkt. 1]. On January 11, 2024, Defendant Workday filed a Motion to Dismiss the Complaint; on January 26, 2024, Defendant Susan Dahm filed a Motion to Dismiss the Complaint; on March 5, 2024, Defendants Lisa McFall and Katie Hauck filed a Motion to Dismiss the Complaint. [Dkts. 12, 23, and 35]. On June 14, 2024, the Court held a hearing on the motion to dismiss after which the Court granted the Motion to Dismiss and granted Plaintiff Hill leave to file an amended complaint. [Dkt. 61].

On May 17, 2024, Plaintiff Hill filed the instant First Amended Complaint ("FAC") solely against Defendant Workday alleging the following causes of action:

(1) Race Discrimination in Violation of the Fair Employment and Housing Act (California Government Code § 12900 *et seq.*) ("FEHA");

(2) Disability Discrimination in Violation of FEHA;

(3) Retaliation in Violation of FEHA;

(4) Harassment in Violation of FEHA;

(5) Failure to Maintain a Discrimination and Harassment Free Work Environment in Violation of FEHA;

(6) Failure to Engage in the Interactive Process and Provide Reasonable Accommodations in Violation of both FEHA and the California Family Rights Act ("CFRA");

(7) CFRA Interference and Retaliation;

(8) Retaliation in Violation of California Labor Code § 1102.5;

(9) Promissory Fraud under California Civil Code §§ 1572, 1709, and 1710;

(10) Intentional Infliction of Emotional Distress ("IIED"); and

(11) Violation of the California Confidentiality of Medical Information Act ("CMIA"), California Civil Code § 56 *et seq.*

*See* Dkt. 53.

On May 31, 2024, Defendant Workday filed the instant Motion to Dismiss the FAC. [Dkt. 58]. June 14, 2024, Plaintiff Hill filed an opposition to the Motion to Dismiss. [Dkt. 62]. On June 21, 2024, Defendant Workday filed a reply to Plaintiff Hill's opposition. [Dkt. 66].

On October 25, 2024, the Court held a hearing and heard oral arguments from the Parties on the Motion to Dismiss the FAC. [Dkt. 79]. At the hearing, the Parties requested to file supplemental briefing on certain issues relating to the extraterritoriality issue. *Id.* The Court orally granted the Parties' request. *Id.* On November 1, 2024, Defendant Workday filed its supplemental brief in support of its motion to dismiss. [Dkt. 83]. On November 8, 2024, Plaintiff Hill filed his response to Defendant Workday's supplemental brief. [Dkt. 86].

## LEGAL STANDARD

The Rule 12(b)(6) standards on a motion to dismiss are well-known and not subject to dispute for the instant motion. "The Rule 12(b)(6) standard requires a complaint to 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2000)). Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citing *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)).

Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a

United States District Court
Northern District of California

1    complaint, they must be supported by factual allegations." *Id.* at 679.  In analyzing a motion to

2    dismiss under Rule 12(b)(6), courts "do not accept any unreasonable inferences or assume the truth

3    of legal conclusions cast in the form of factual allegations." *Ileto v. Glock Inc.*, 349 F.3d 1191, 1200

4    (9th Cir. 2003).

5    A pleading must "contain either direct or inferential allegations respecting all the material

6    elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562

7    (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  In other words,

8    the allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon

9    which it rests." *Id.* at 555.

10    Failure to adequately plead grounds for the extraterritorial application of state law constitutes

11    a failure to state a claim on the merits, and is not merely a subject matter jurisdiction defect.  *Cf.*

12    *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 253–54 (2010) (failure to show

13    extraterritorial reach of securities law is a failure to state a claim under Rule 12(b)(6), not a subject

14    matter jurisdiction issue); *Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1143–1145 (N.D. Cal.

15    2011) (analyzing extraterritorial application of Copyright Act under Rule 12(b)(6) and not as a

16    subject matter jurisdiction issue: "statutory limitations should presumptively be treated as elements

17    of the claim instead of as jurisdictional requirements unless Congress explicitly provides

18    otherwise.") (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006)).

## DISCUSSION

20    Defendant Workday's motion raises two general categories of bases for dismissal: (I)

21    whether Plaintiff has adequately pled sufficient facts to allege extraterritorial application of

22    California law for the causes of action asserted under California statutory and common law; and (II)

23    whether Plaintiff has adequately stated a claim for the causes of action under the applicable Federal

24    Rules of Civil Procedure (Rule 12(b)(6) and, as to the fraud claim, Rule 8).

25    I.    **EXTRATERRITORIAL APPLICATION OF CALIFORNIA LAW**

26        A.    **Plaintiff's FEHA and CFRA Causes of Action (First to Seventh Causes of Action)**

27    The fundamental question in this case is whether Plaintiff Hill, admittedly a citizen and

United States District Court
Northern District of California

13

United States District Court
Northern District of California

resident of Maryland, is entitled to the extraterritorial application of California laws to him and his employment.  As summarized above, the first seven causes of action are asserted under the California FEHA and CFRA, which both provide legal protections for employees under California law.  The analysis for the extraterritorial application of California law for the purposes of the CFRA is identical to the analysis for the FEHA.  *Sexton v. Spirit Airlines, Inc.*, No. 21-cv-00898-TLN (AC), 2023 WL 1823487, at *3 (E.D. Cal. Feb. 8. 2023).

California courts "presume the Legislature did not intend a statute to be 'operative, with respect to occurrences outside the state … unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history.'"  *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011) (quoting *Diamond Multimedia Sys. Inc. v. Superior Court*, 19 Cal. 4th 1036, 1059 (1999)); *N. Alaska Salmon Co. v. Pillsbury*, 174 Cal. 1, 4 (1916).  While "the FEHA imposes no residency requirement on either the employer or the person aggrieved and limitation based on where the conduct occurred[,]" "the majority of courts in California and other jurisdictions have found that the extraterritorial application of FEHA is determined by the situs of both [(1)] employment and [(2)] the material elements of the cause of action, opposed to residence of the employee or the employer." *Russo v. APL Marine Servs., Ltd.*, 135 F. Supp. 3d 1089, 1094 (C.D. Cal. 2015), *aff'd*, 694 F. App'x 585 (9th Cir. 2017) (collecting cases).

### 1. Situs of Employment

In an extraterritoriality analysis, the situs of employment consists of the employee's "principal place of work," the employee's "definite base of operations," or the "location where the employee's work holds a substantial connection to."  *Sexton*, No. 21-cv-00898-TLN (AC), 2023 WL 1823487, at *3 (quoting *Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 777 (N.D. Ill. 2020)).

Plaintiff Hill is (and at all times relevant, was) a resident of Maryland and owns a Maryland home – and when he was in need of extended hospitalization, he went to a hospital in Maryland. [Dkt. 53 at ¶¶ 1, 116].  Indeed, the FAC asserts subject matter jurisdiction based on diversity of citizenship and avers that at all times relevant Plaintiff Hill is a citizen of Maryland.  *Id.* at ¶ 8.  The FAC does not allege that Plaintiff Hill worked anywhere in California; does not allege that Plaintiff

1   Hill worked in an office located in any other State; does not allege that Workday has offices in
2   Maryland; and does not describe Plaintiff's work in connection to any geographic location. Plaintiff
3   started employment at Workday in or about January 2021. *Id.* at ¶ 39. The Court is cognizant that
4   COVID-19 stay-at-home orders were just barely beginning to ease around January 2021 as vaccines
5   started becoming available and remote work from home was still the norm for most white collar
6   workers at this time. *See, e.g.,* Richard Proctor, *Remember when? Timeline marks key events in*
7   *California's year-long pandemic grind*, Cal Matters (July 31, 2023),
8   https://calmatters.org/health/coronavirus/2021/03/timeline-california-pandemic-year-key-points/.
9   Even viewing the FAC in the light most favorable to Plaintiff, it is clear from the pleading that
10  Plaintiff Hill worked remotely as an employee of Defendant Workday, and that he lived and worked
11  in Maryland rather than California. The situs of Plaintiff Hill's employment was Maryland.

12                    **2.  Situs of the Material Elements of the Claims**

13          For the extraterritoriality analysis, the situs of the material elements of the cause of action
14  factor examines whether or not the Complaint establishes a substantial connection of the situs of
15  legally relevant events to California. *Sexton*, No. 21-cv-00898-TLN (AC), 2023 WL 1823487, at
16  *4. To determine whether a party has established a substantial connection of the situs of legally
17  relevant events to California, courts look to the "location of where the core of the alleged wrongful
18  conduct occurred." *Id.* "The Ninth Circuit has analyzed this factor by evaluating whether the core
19  of the claim, such as termination decision, occurred within California." *Id.* (citing *English v. Gen.*
20  *Dynamics Mission Sys. Inc.*, 808 F. App'x 529, 530 (9th Cir. 2020)). "In evaluating similar wrongful
21  termination cases, California courts have emphasized the location of where the termination decision
22  was made as a crucial element of the claim because this decision gives rise to the liability of the
23  conduct." *Id.* (citing *English*, 8080 F. App'x at 530); *accord Guillory v. Princess Cruise Lines, Ltd.*,
24  2007 WL 102851, at *4 (Cal. App. 2nd Dist. Jan. 17, 2007) (unpublished).

25          The FAC only alleges transitory or minor connections to California for the material elements
26  of the causes of action. The FAC's only relevant allegations of Plaintiff interacting with Workday
27  employees in-person in California stem from Plaintiff's travel from Maryland to California for a
28  one-week "summit" at Workday's headquarters. [Dkt. 53 at ¶207]. The FAC's only relevant

pleading of a material event during that one-week business trip is the allegation that his boss, Ms. Hauck, allegedly colluded at that time with another employee, Ms. Capata, to ostracize Plaintiff Hill, ruin his reputation, and prevent him from working with colleagues.  [Dkt. 53 at ¶ 209].  Even coupled with the allegation that Ms. Capata "sneered" at Plaintiff Hill during that trip to California, the pleading is not sufficiently consequential to shift the situs of material elements to California. This one-week trip to California is particularly diminished in materiality in comparison with the months of the entire remainder of Plaintiff's tenure at Workday, when he worked and interacted with colleagues remotely while working from Maryland and while being supervised by his direct supervisor based in New York.  Fundamentally, the one-week trip to California is insufficient to constitute a significant aggregation of alleged events occurring in California.  *Drolla*, 2004 WL 2750328, at *4.

With regard to the actions Plaintiff Hill characterizes as a demotion (the decision that he stop supervising Ms. Strelow), those pleadings are insufficient to shift the situs of material events to California.  *See* Dkt. 53 at ¶¶ 96–116.  First, the pleading refers to these actions as a demotion, but do not allege a reduction in pay, a reduction in title, or hierarchy within the corporate structure. Under the FEHA, California courts recognize the distinction that "adverse action affecting 'terms, conditions, or privileges of employment' (actionable) is contrasted with changes that merely displease the employee (not actionable)."  *Horsford v. Board of Trustees of Cal. State Univ.*, 132 Cal. App. 4th 359, 373 (Cal. App. 5th Dist. Aug. 31, 2005).  Construing the Complaint in the light most favorable to Plaintiff, the alleged inability to work with Ms. Strelow resulted in a greater burden on Plaintiff Hill to complete his work tasks and thus the allegations taken as true materially affected the conditions of Hill's employment and were reasonably likely to impair a reasonable employee's job performance.  The FAC alleges that both Ms. Hauck (based in New York) and Ms. Dahm demoted Plaintiff.  [Dkt. 53 at ¶ 96].  The FAC alleges that "[a]ccording to Ms. Hauck, it was Ms. Dahm who made this decision to demote Plaintiff, and Ms. Hauck was just following her orders."  *Id.* at ¶ 98.  Notably, the Complaint nowhere pleads the location of Ms. Dahm's office or work location at the time, and does not explain in any further detail where Ms. Dahm made this decision.  The Complaint's general pleading that Ms. Dahm works in Workday's headquarters in

California is undercut by the pleading that her conduct either "occurred in, and/or was approved and ratified in Pleasanton, California." [Dkt. 53 at ¶ 39]. By pleading in the alternative ("and/or"), the Complaint inherently admits that Ms. Dahm's conduct may ***not*** have occurred in California. As pled, Ms. Dahm's demotion decision may have occurred outside California, and there is no pleading of any facts as to whether that decision was ratified or approved by anyone in California. Further, the FAC alleges that Ms. Hauck, based in New York, was following the orders which resulted in Plaintiff's demotion and details over multiple paragraphs her actions (with no allegation that Ms. Dahm herself took any of the actions resulting in the demotion). *See* Dkt. 53 at ¶¶ 105–116 (describing emails between Plaintiff and Ms. Hauck). Even viewed favorably for Plaintiff, the pleading is insufficient to shift the situs of material events to California.

Further and more significantly, the FAC does not expressly plead the location where Plaintiff Hill's termination decision was made. The Complaint only specifically alleges that Plaintiff was "constructively terminated" with regard to the First Cause of Action under FEHA, and makes no other reference to termination for the other FEHA and CFRA causes of action (other than the general incorporation by reference of the entire preceding paragraphs of the Amended Complaint). [Dkt. 53 at ¶ 282]. For the Second through Seventh Causes of Action, there is no express pleading that Plaintiff's termination (even a constructive termination) is at issue, and thus implicitly admits that the location of his termination is not a relevant factor for these causes of action. The incorporation by reference of the entire preceding paragraphs of the Amended Complaint into these later causes of action, without expressly referencing the alleged constructive termination, does not adequately put Defendant on notice that the alleged constructive termination is relevant to those causes of action. *Reed v. Reliant Life Shares* LLC, No. 2:23-CV-08577-SB-AGR, 2024 WL 2104385, at *15 (C.D. Cal. Apr. 5, 2024). For the First Cause of Action, the fact that Plaintiff's direct supervisor Ms. Hauck worked and lived in New York is particularly significant. [Dkt. 53-1 at ¶ 5]. The Complaint's allegations that Plaintiff was constructively terminated are all based on how Ms. Hauck supervised Plaintiff Hill's workload and resources, and there is no pleading that Ms. Dahm (even assuming she was at the time working in California) or anyone else in California, was involved in those actions. [Dkt. 53 at ¶¶ 101–114 (detailing actions by and conversations with Ms. Hauck)].

United States District Court
Northern District of California

17

United States District Court
Northern District of California

Plaintiff Hill has attempted to plead connections to California by repeatedly pleading conclusorily that Defendant Workday "participated in, approved, occurred in, and/or ratified this harassment of Plaintiff." *See, e.g.*, Dkt. 53 at ¶¶ 164, 176, 186, 192, 214, 224, 233, 246, 258, and 279. Conclusory pleading is insufficient because a Complaint must plead sufficient facts, and not bald conclusions. *Iqbal*, 556 U.S. at 678. Because the Court previously dismissed the original Complaint on the grounds of a lack of sufficient pleading to support extraterritorial application of California law, Plaintiff has been on notice of the need to cure that defect in this amended Complaint. *Hill v. Workday, Inc.*, 2024 WL 3012802 at *8–10 (N.D. Cal. June 14, 2024). Instead of pleading sufficient facts to show why the California statutes here should apply extraterritorially, the FAC relies on rote, non-specific allegations of "approvals" or "ratifications" in California of Ms. Hauck's actions. Such general pleading has been held to be insufficient to overcome an extraterritoriality issue because the lack of identifying the individuals involved in the approvals or ratifications, where they worked at the time, and when they made these approvals or ratifications is insufficient to adequately plead a nexus with California. *Gonsalves v. Infosys Techs., LTD.*, 2010 WL 1854146 at *6 (N.D. Cal. May 6, 2010) ("the thrust of plaintiff's complaint is that [defendant] Infosys personnel in California, including Infosys executives, attorneys and human resources employees, instituted, approved, ratified, affirmed and/or implemented the discriminatory policies that were expressed by Infosys' chairman and that ultimately led to plaintiff's injuries. These allegations are extremely general in nature…. He [plaintiff] merely makes a formulaic, conclusory, blanket recitation of 'ratification. Plaintiff, as a non-resident, may not pursue claims under FEHA without averring a factual nexus between Infosys' California-based activities and the alleged discriminatory conduct.") (citation omitted).

Even when the FAC pleads specific actions by specific Workday employees, the FAC uses alternative language to state that the conduct either "occurred in" California "and/or was approved and ratified" by unidentified Workday employees in California. *See, e.g.*, Dkt. 53 at ¶¶ 39, 47. The FAC does not plead how actions by Ms. Hauk (based in New York) could have occurred in California, and does not plead any facts as to how, whether, or when any of her actions were "approved" or "ratified" by anyone identified at Workday in California. Courts have held such non-

specific pleading of actions by other personnel to be insufficient. *See Dodd-Owens v. Kryphon, Inc.*, 2007 WL 420191 at *2–3 (N.D. Cal. Feb. 5, 2007) ("While the FAC appears to assert that the corporate officers named in the allegations ratified or participated in the challenged conduct, it only implies that they were employed in California and does not identify what actions, if any, they took in California. If California-based employees participated in or ratified the alleged tortious conduct, the complaint must so state with specificity so that the Court can determine if these actions are sufficient to state a claim under FEHA."). Fundamentally, the FAC does not allege sufficient facts (as opposed to mere conclusions) that any significant aggregation of material elements of Plaintiff's causes of action occurred or were sufficiently ratified by identified persons in California.

Accordingly, the Court **GRANTS** Defendant Workday's Motion to Dismiss with respect to the First through Seventh Causes of Actions predicated on the FEHA and the CFRA with **PREJUDICE**.

### B.    Plaintiff's Cause of Action Under California Labor Code § 1102.5

As with the FEHA and the CFRA, the issue for the Eighth Cause of Action is whether Plaintiff Hill (a resident of Maryland who works remotely from Maryland for a California-based company) is entitled to the protections of California Labor Code § 1102.5. Courts have identified several factors which are relevant to determine whether the California Labor Code is appropriately applied extraterritorially for an out-of-state plaintiff: (1) the employer's citizenship, (2) the employee's state of residence, and (3) whether/how much the employee worked in California. *Vidrio v. United Airlines, Inc.*, No. CV15-7985 PSG (WRWX), 2017 WL 1034200 (C.D. Cal. Mar. 14, 2017), *rev'd and remanded sub nom. Ward v. United Airlines, Inc.*, 986 F.3d 1234 (9th Cir. 2021) (holding Labor Code section 2802 does not apply extraterritorially for plaintiff who worked remotely from her home in Iowa against her California employer); *Weinberg v. Valeant Pharms. Int'l*, No. 8:15-CV-01260-KES, 2017 WL 6543822 (C.D. Cal. Aug. 10, 2017), *aff'd sub nom. Weinberg v. Valeant Pharms. N. Am., LLC*, 765 F. App'x 328 (9th Cir. 2019) (denying summary judgment because the only evidence of Plaintiff's connection to California was that Plaintiff "worked on a number of financial and infrastructure systems based in California, New Jersey, and Canada."). Here, while Workday is based in California, Plaintiff is a resident and citizen of

1    Maryland and only worked in California for one week total.  The balance of factors here, taken in

2    total, do not support the extraterritorial application of the California Labor Code.

3         Unlike the FEHA analysis discussed above, the test for extraterritorial application of the

4    California Labor Code is not explicitly framed as a two-element "situs" test.  Thus, as with many

5    areas of the law, the Court examines the issue here based on application of analogous precedent

6    (discussed above) as guidance for the contours of the test for the extraterritorial application of the

7    California Labor Code.  In light of the applicable legal standards, Plaintiff Hill's FAC does not

8    sufficiently allege facts to overcome the presumption against the extraterritorial application of the

9    California Labor Code.  Plaintiff Hill's allegations are much more analogous to those cases which

10   have rejected extraterritorial application of California's Labor Code.  Like the Plaintiffs in *Shook*,

11   236 F. Supp. 3d 1165, and *Campagna*, No. 08-cv-02488-EJD, 2012 WL 1565229, Plaintiff Hill does

12   not allege that he primarily worked in California (and indeed he admits that he lives in Maryland

13   and, as discussed above, the FAC at best indicates that he worked remotely from his home office in

14   Maryland).  [Dkt. 53 ¶ 1].  Indeed, Plaintiff Hill only alleges one instance when he travelled to

15   California for work, and that was for a short period of time for a one-week company "summit".  *Id.*

16   at ¶ 207.

17        California courts have neither rejected nor expressly adopted the FEHA extraterritoriality

18   test for purposes of the California Labor Code.  The Parties here have suggested that the FEHA

19   extraterritoriality analysis should apply to the California Labor Code.  Because the FEHA

20   extraterritoriality analysis is at least illustrative of the defects in Plaintiff's attempts to claim the

21   benefits of California law, in addition to the extraterritoriality analysis under the California Labor

22   Code discussed above, the Court incorporates by reference its analysis of the extraterritoriality issue

23   under the FEHA as persuasive.  All the factors showing why Plaintiff has failed to plead an adequate

24   basis for finding situs of employment and situs of material elements under the FEHA are

25   analogously relevant and support the conclusion that Plaintiff has failed to show that the California

26   Labor Code should be applied extraterritorially.  "Plaintiff has cited no legal precedent to justify

27   extending FEHA's jurisdictional reach to individuals who make business trips to and manage clients

28   in California." *Gonsalves*, 2010 WL 1854146 at *5.  For all the reasons discussed herein, the Court

United States District Court
Northern District of California

20

1   finds that Plaintiff Hill has not overcome the presumption against extraterritorial application of

2   California law and has not satisfied the test for extraterritorial application of the California Labor

3   Code.

4       As with the FEHA claim, the Court previously dismissed the California Labor Code claim

5   in the original complaint for failure to allege a basis for extraterritorial application of that law, and

6   thus Plaintiff Hill has been on notice of the need to plead more robustly to cure those defects. *Hill*,

7   2024 WL 3012802 at *10–11.  Indeed, the averments in the FAC are not materially or substantively

8   different from those in the original Complaint and are insufficient pleadings for the same reasons.

9   The FAC failed to cure the pleading defects, by relying on conclusory allegations which are not

10  sufficient.  *Iqbal*, 556 U.S. at 678.

11      Accordingly, the Court **GRANTS** Defendant Workday's Motion to Dismiss with respect to

12  the Eighth Cause of Action under the California Labor Code with **PREJUDICE**.

13      **C.    Plaintiff's 10th Cause of Action:  Intentional Infliction of Emotional Distress**

14      The central issue for Plaintiff Hill's 10th cause of action for intentional infliction of

15  emotional distress is again whether Plaintiff (a Maryland resident who worked from Maryland) can

16  assert a claim under California tort law against a California corporation.  [Dkt. 53].  The general

17  presumption against extraterritorial application of California law applies here, as with other causes

18  of action.  *Sullivan*, 51 Cal. 4th at 1207.

19      As with the California Labor Code, the California courts have not expressly reduced the test

20  for extraterritorial application of California tort law to a specified set of factors (unlike for

21  extraterritoriality inquiries under the FEHA).  Even though California state courts have not defined

22  the explicit contours of the standard for extraterritorial application of intentional infliction of

23  emotional distress under California substantive law, precedent is instructive that there must exist a

24  recognizable nexus between the alleged harm and the State of California.  *Sullivan*, 51 Cal. 4th at

25  1207.

26      Here, Plaintiff Hill does not sufficiently allege a nexus between the alleged harms that

27  constitute intentional infliction of emotional distress and the state of California.  The gravamen of

28  allegations constitute: (1) the alleged discriminatory remarks made during a September 19, 2022,

United States District Court
Northern District of California

21

virtual videoconference which Plaintiff attend from his Maryland workspace, *see* dkt. 53 at ¶ 94; (2) Defendant Workday allegedly conducting a wellness check which caused Maryland police officers to appear at Plaintiff Hill's Maryland home, *id.* at ¶124, and (3) Ms. Capata frowning and glaring at Plaintiff Hill during one of the in-person meetings when Plaintiff was in California for the one-week business trip, *id.* at ¶ 208.  Even viewing the FAC in the light most favorable to Plaintiff, the facts demonstrate that all the injury suffered by Plaintiff occurred in Maryland (other than the sneering and any other negative interactions during the one-week trip to California) and the specifically complained-of wellness check occurred in Maryland.  As discussed above, all the actions by Plaintiff's direct supervisor occurred in New York, and their impacts were felt in Maryland.  These facts, even taken in the aggregate in light of the remainder of the FAC, do not rise to a level sufficient to overcome the presumption against the extraterritorial application of California law.  *Sullivan*, 51 Cal. 4th at 1207.

Because California courts have neither rejected nor expressly adopted the FEHA extraterritoriality test for purposes of California tort law (particularly for intentional infliction of emotional distress), the Court incorporates by reference its analysis of the extraterritoriality issue under the FEHA as at least illustrative and analogously persuasive.  As discussed above and for the same reasons, the Court finds that the Plaintiff has not overcome the presumption against extraterritorial application of California law and has not satisfied the FEHA two-element situs test for extraterritorial application of California substantive law for intentional infliction of emotional distress.  Thus, the conclusions and factors which led to the conclusion for lack of extraterritoriality for the FEHA causes of action are supportive of the analysis and conclusion for this tenth cause of action.  Accordingly, the Court finds insufficient basis for the extraterritorial application of California substantive law for intentional infliction of emotional distress.

As with the preceding causes of action, the Court previously dismissed the intentional infliction of emotional distress cause of action in the original complaint for failure to allege a basis for extraterritorial application of California tort law, and thus Plaintiff Hill has been on notice of the need to plead more robustly to cure those defects as well.  *Hill*, 2024 WL 3012802 at *10–11.  Indeed, the averments in the FAC are not materially or substantively different from those in the

United States District Court
Northern District of California

1    original Complaint and are insufficient pleadings for the same reasons.  The FAC failed to cure the

2    pleading defects, by relying on essentially the same allegations previously found to be insufficient.

3    *Iqbal*, 556 U.S. at 678.

4        Accordingly, the Court **GRANTS** the Defendants' Motions to Dismiss with respect to the

5    Tenth Cause of Action for intentional infliction of emotional distress under California tort law with

6    **PREJUDICE**.

7    **A.    Plaintiff's 11th Cause of Action under the California CMIA**

8        Plaintiff Hill's eleventh cause of action alleges violations of the California Confidentiality

9    of Medical Information Act (CMIA) pursuant to California Civil Code § 56, *et seq*.  [Dkt. 53 at ¶¶

10    383–393].  The central issue again is whether Plaintiff (a Maryland resident who worked from

11    Maryland) has sufficiently pled a basis to assert a claim under California's CMIA extraterritorially.

12    The general presumption against extraterritorial application of California law applies here, as with

13    other causes of action.  *Sullivan*, 51 Cal. 4th at 1207.

14        As with the California Labor Code and intentional infliction causes of action, the California

15    courts have not expressly reduced the test for extraterritoriality inquiries under the CMIA to a

16    specific two-factor test.  Even though California state courts have not defined the explicit contours

17    of the standard for extraterritorial application of the CMIA, precedent is instructive that there must

18    exist a recognizable nexus between the alleged harm and the State of California.  *Sullivan*, 51 Cal.

19    4th at 1207.

20        Here, Plaintiff does not sufficiently allege a nexus between California and the alleged

21    conduct which is asserted to violate the CMIA.  The gravamen of the allegations for this cause of

22    action center on the wellness check and Plaintiff's medical conditions.  Specifically, the FAC alleges

23    violations of CMIA because (1) Defendant Workday allegedly conducted a wellness check which

24    caused ***Maryland*** police officers to appear at Plaintiff Hill's ***Maryland*** home, dkt. 53 at ¶ 125, (2)

25    Plaintiff, Plaintiff's wife, and his family felt the impacts of the wellness check while they were all

26    in Maryland, dkt. 53 at ¶¶ 125–127; (3) there were emails between Defendant Workday's employees

27    and Plaintiff Hill's wife (in Maryland) concerning his medical issues, *id*. at ¶¶ 132–136, and (4)

28    there were communications from other unidentified Defendant Workday employees to Plaintiff

(located in Maryland) indicating that they knew about his then-medical issues and hospitalization, *id.* at ¶ 139. While the FAC alleges that Workday employees in California initiated the request for the wellness check, the FAC does not allege facts sufficiently to show that initiating the wellness check implicated any use of Plaintiff's confidential medical information. Plaintiff had previously informed his supervisor that he was experiencing medical issues and would require medical care at a hospital. *Id.* at ¶ 118–119.

The FAC instead focuses on the intrusiveness of the wellness check itself, which occurred in Maryland. *Id.* at ¶¶ 125–131. Further, the pleading as to communications from other Workday employees which generally mentioned Plaintiff's health and medical issues do not themselves contain confidential medical information, again particularly because Plaintiff had previously informed other Workday personnel at to his need for medical attention. Indeed, Plaintiff bases his disability discrimination causes of action on an affirmative allegation that Workday and his supervisors knew of his emotional and physical disabilities. [Dkt. 53 at ¶ 292]. The Court finds that the facts, as alleged for this cause of action and even taken in the aggregate with the remaining allegations in the FAC, do not sufficiently rise to a level which overcomes the presumption against the extraterritorial application of California law. *Sullivan*, 51 Cal. 4th at 1207.

Even though California state courts have not defined the explicit contours of the standard for the extraterritorial application of California law (particularly CMIA claims), again because of the illustrative and analogous persuasiveness of the analysis, the Court incorporates by reference its analysis of the extraterritoriality issue under the FEHA. And, as discussed above, for the same reasons, the Court finds that Plaintiff Hill has not overcome the presumption against extraterritorial application of California substantive law for his CMIA cause of action.

As with the preceding causes of action, the Court previously dismissed the CMIA cause of action in the original complaint for failure to allege a sufficient basis for extraterritorial application of this California statutory regime, and thus Plaintiff Hill has been on notice of the need to plead more robustly to cure those defects as well. *Hill*, 2024 WL 3012802 at *10–11. Indeed, the averments in the FAC are not materially or substantively different from those in the original Complaint and are insufficient pleadings for the same reasons. The FAC failed to cure the pleading

defects, by relying on essentially the same allegations previously found to be insufficient. *Iqbal*, 556 U.S. at 678.

Accordingly, the Court **GRANTS** the Defendants' Motions to Dismiss with respect to the Eleventh Cause of Action under the California CMIA with **PREJUDICE**.

## II.    NINTH CAUSE OF ACTION FOR PROMISSORY FRAUD

### A.    Extraterritoriality – Promissory Fraud

As with the preceding causes of action, the issue for this Ninth Cause of Action is whether Plaintiff Hill (a resident of Maryland who was employed to work remotely from Maryland for a California-based company) has pled a sufficient basis to assert a cause of action promissory fraud under the California Civil Code §§ 1572, 1709, and 1710. The general presumption against extraterritorial application of California statutory law applies here, as with other causes of action. *Sullivan*, 51 Cal. 4th at 1207. As with the non-FEHA causes of action, the California courts have not expressly reduced the test for extraterritoriality for promissory fraud causes of action to a specific two-factor test. Even though California state courts have not defined the explicit contours of the standard for extraterritoriality for promissory fraud, precedent is instructive. *Id.*

In *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1127–32 (N.D. Cal. 2014), the court denied a motion to dismiss, on extraterritoriality grounds, a cause of action for fraud under California's Unfair Competition Law (UCL), California Business & Professions Code § 17200. The plaintiff in *Ehret* asserted that the underlying unlawful business practice was alleged fraud under California Civil Code §§ 1572, 1709, 1710, and 1750, and thus the holding in *Ehret* is closely analogous to the cause of action here. *Id.* at 1127. In *Ehret*, the court recognized the California Supreme Court's holding that California "the presumption against extraterritoriality 'applies to the UCL in full force.' Simply put, 'the UCL does not apply to actions occurring outside of California that injure non-residents.'" *Id.* at 1130 (quoting *Sullivan*, 51 Cal. 4th at 1207; citation omitted). The *Ehret* court noted however that

> the critical question presented by Plaintiff's complaint is whether application of the UCL and CLRA in the circumstances alleged actually entails an extraterritorial application of those statutes. Multiple courts—including the California Supreme Court in *Sullivan*—have permitted the application of California law where the plaintiffs' claims were based on alleged misrepresentations that were disseminated

United States District Court
Northern District of California

from California.

*Ehret*, 68 F. Supp. 3d at 1130.

The *Ehret* opinion thus explained that, in UCL cases involving alleged misrepresentations, the focus is on defendant's alleged conduct and whether or not the allegedly wrongful conduct occurred in and emanated from California, rather than on the plaintiff's damages. *Id.* at 1130–31 (collecting cases denying motions to dismiss UCL causes of action involving allegations of misrepresentations on extraterritoriality grounds). Applying these legal standards, the *Ehret* opinion denied the motion to dismiss because the complaint there "provided sufficient factual allegations from which the Court can plausibly infer that [defendant] Uber's alleged gratuity misrepresentations emanated from California" and "that, for purposes of the motion to dismiss, application of the UCL and CLRA in these circumstances would not constitute extra-territorial application of these statutes[.]" *Id*. at 1132.

Similarly instructive is the employment dispute discussed in *Leibman v. Prupes*, No. 14-cv-09003-CAS, 2015 WL 3823954, at *7 (C.D. Cal. June 18, 2015), where the court denied a motion to dismiss several common law claims under California law, including a claim for fraud in the inducement. The *Leibman* court first recognized that "[u]nder California law, the relevant inquiry for whether a state law is being applied extraterritorially is not the location of employment or where the contract was formed, but rather whether 'the conduct which gives rise to liability . . . occurs in California.'" *Id.* at *7 (collecting cases). The employer (Leibman) admitted that "the actions which gave rise to liability—that is, the alleged breach—occurred in California. By Leibman's own admission, he was a California resident managing his business from within the state at the time of [employee] Prupes's termination, and his emails to Prupes originated in California. Put another way, the alleged 'core decision' to wrongfully terminate Prupes and breach the contract was made in California." *Id.* (citations omitted). Most significantly for the instant case, the *Leibman* court noted that "'California has a clear and substantial interest preventing fraudulent practices in this state and a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices, and for that reason has a legitimate interest in extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California.'" *Id.* (quoting *Norwest Mortg.,*

United States District Court
Northern District of California

*Inc. v. Superior Court*, 72 Cal. App. 4th 214, 224 (1999)).

Applying these legal standards to the promissory fraud cause of action as amended in the FAC, the Court notes that this cause of action does more than merely rely on the fact that his employment contract was formed under California law. As summarized above, the gravamen for this cause of action focuses not merely on the locus of Plaintiff's employment contract, but relies on detailed allegations concerning Defendant's actions taken in California with regard to administering and granting Plaintiff's stock options, stock refreshers, and bonuses.

First, the FAC alleges that, prior to Workday, Plaintiff was employed by Accenture Federal Services ("AFS") for six years. [Dkt. 53 at ¶ 16]. The FAC alleges that he relied on certain representations made by Workday to conclude his employment with AFS and start working for Workday. *Id.* at ¶¶ 367–369. The FAC alleges that he relied on oral and written representations made by Workday through its representative, Senior Talent Acquisition Partner Kimberly La Rosa. *Id.* at ¶ 369–370. The FAC alleges that this Senior Talent Acquisition Partner, Ms. La Rosa, is a California resident who lives and works in California and that she held herself out as having full authority to bind Defendant Workday. *Id.* at ¶¶ 370–71. The FAC alleges that, as part of the terms of his employment, Plaintiff negotiated both a normal base salary and the opportunity to earn a targeted yearly bonus, plus a deferred compensation component consisting of $200,000 in Restricted Stock Units (RSUs) to be issued over four years, coupled with an annual 40% to 60% refresher of his initial stock grant. *Id.* at 48. The FAC quotes his employment offer letter, which issued from Ms. La Rosa in California and which set forth the terms of Plaintiff's initial RSU grant which was to vest over four years. *Id.* at ¶ 362. The FAC alleges that the employment letter also set forth terms for the "percentage range of RSU 'refreshers," their disbursement schedule over a four-year period, and Plaintiff's "opportunity for a conditional 'performance' bonus." *Id.* at ¶ 360.

Plaintiff alleges that, in 2022, he only received an RSU refresher grant of approximately 23% of his initial stock grant. *Id.* at ¶¶ 236–238. In the FAC, Plaintiff Hill alleges that when Plaintiff Hill first raised the issue of the RSU refresher discrepancy with his direct supervisor Ms. Hauck, she spoke to her supervisor Ms. Dahm and other superiors and, based on that conversation, she told Plaintiff that he needed to accept his RSU refresher grant. *Id.* at ¶ 237. The FAC alleges

that Plaintiff received no RSU refresher grants in 2023 or 2024. *Id.* at ¶ 239. Courts have recognized that, typically in industry, a stock "option is actually granted by the board of directors[.]" *Zilincik v. Tesla, Inc.*, 2022 WL 909323 at *8 (Cal. Ct. App. 1st Dist. March 29, 2022). While the FAC does not identify by name the other superiors involved in the discussions about Plaintiff's RSU refresher grant, viewed in light most favorable to Plaintiff, the FAC reasonably indicates that decisions on stock options and grants were made at Workday's headquarters in California (and thus the decision to issue Plaintiff a lower than expected RSU refresher took place in, emanated from, and was implemented in California). Because the focus for a fraud claim is the defendant's conduct, the Court finds that the FAC contains sufficient allegations of conduct occurring in and emanating from California regarding Plaintiff's RSU refresher grant to conclude that extraterritorial application of California law to this RSU-based allegation of promissory fraud is not grounds to dismiss.

The FAC further alleges that Workday awarded Plaintiff Hill "approximately half of the annual bonus payment which it promised to award and did in fact award similarly situated medium to high-performing WORKDAY, INC. employees for calendar year 2022." *Id.* at ¶¶ 240, 366. The FAC alleges that "Plaintiff has never received a single, formal negative performance review or evaluation from Defendant WORKDAY, INC. since he was hired, and so there is no legal justification for this substandard bonus award." *Id.* at ¶ 241. While a closer question, the FAC's pleading regarding Workday recruiter Ms. La Rosa's representations (emanating from California) regarding the terms of his annual bonus and the FAC's allegations concerning the comparison of Plaintiff's bonus with other California-based employees are (taken in the light most favorable to Plaintiff) sufficient to conclude that this element of the promissory fraud cause of action do not require extraterritorial application of California law.

Accordingly, the Court finds that the FAC's allegations supporting the Ninth Cause of Action for promissory fraud under California Civil Code §§ 1572, 1709, and 1710 does not implicate improper extraterritorial application of California law.

## B. Rule 9(b) – Promissory Fraud

Plaintiffs asserting a cause of action for fraud must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir.

2009).  Rule 9(b) provides: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b), the "complaint must 'identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false.'"  *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (quoting *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)).  "For corporate defendants, a plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written."  *Flowers v. Wells Fargo Bank, N.A.*, 2011 WL 2748650, at *6 (N.D. Cal. July 13, 2011).

"The California Civil Code recognizes causes of action for 'fraudulent deceit,' a type of 'misrepresentation tort[].'"  *PetConnect Rescue, Inc. v. Salinas*, 656 F. Supp. 3d 1131, 1178 (S.D. Cal. 2023) (citing *Metro. Bus. Mgmt., Inc. v. Allstate Ins. Co.*, 282 F. App'x 544, 546 (9th Cir. 2008); Cal. Civ. Code §§ 1572, 1709–10).  "The elements of fraudulent deceit are (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or 'scienter'); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage."  *PetConnect Rescue*, 656 F. Supp. 3d 1131, 1178 (S.D. Cal. 2023) (citing *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997), *as modified* (July 30, 1997)).

Here, the FAC pleads sufficient facts to support a cause of action of promissory fraud under Rule 9(b).  Plaintiff Hill identifies by name and title several specific Workday employees who participated in the alleged promissory fraud.  As detailed above, the FAC identifies Workday recruiter Ms. La Rosa as the individual who made the initial representations regarding Plaintiff's compensation package, including the terms of his RSU grant, his RSU refresher grants, and bonus structures.  [Dkt. 53 ¶¶ 369–371].  The FAC alleges that Ms. La Rosa held herself out as having "full authority to bind Defendant WORKDAY, INC."  *Id*. at ¶ 371.

The FAC further alleges that Ms. Hauck, his direct supervisor at Workday, spoke directly with Plaintiff Hill regarding his concerns about his RSU refresher grant and bonus discrepancy.  *Id*. The FAC alleges that Ms. Hauck consulted her superiors, including specifically Ms. Dahm, and that

1  (based on those conversations) Ms. Hauck relayed to Plaintiff that he must accept the lower-than-

2  expected RSU refresher grant.  *Id*. at ¶ 237.

3      With regard to Plaintiff Hill's bonuses, the FAC identifies again Workday recruiter Ms. La

4  Rosa as the individual who communicated the terms of his annual bonus.  *Id.* at ¶¶ 369–371.  The

5  FAC alleges generally that Plaintiff Hill's direct supervisor Ms. Hauck, and her supervisor Ms.

6  Dahm, as well as Chief Legal Officer Mr. Sauer, as the individuals involved in the alleged

7  discriminatory treatment of Plaintiff Hill with regard to his compensation.  *Id.* at ¶ 47.  The FAC

8  alleges that, when Plaintiff Hill raised his concerns about his compensation with his direct supervisor

9  Ms. Hauck, he understood based on Ms. Hauck's response that his compensation was controlled by

10  her superior Ms. Dahm, as well as Chief Legal Officer Mr. Sauer and a Workday employee named

11  Ms. Goldsmith.  *Id.* at ¶ 49 (apparently Ashley Goldsmith is head of Workday HR, *see* Dkt. 53-1 at

12  ¶ 41).

13      The FAC thus identifies the specific individuals within Defendant Workday's hierarchical

14  structure, identifies the representations they made and actions they took (or the responsibilities they

15  had), and includes allegations that they acted with apparent or actual authority on behalf of

16  Workday.  With regard to the RSU refresher, the FAC identifies the specific communication from

17  Workday recruiter Ms. La Rosa and date of the employment offer letter setting forth terms for the

18  RSU refreshers, the date of the lower-than-expected RSU refresher grant in 2022, the specific

19  conversations between Plaintiff Hill and his supervisor Ms. Hauck regarding his compensation, and

20  the fact that no refreshers were granted in 2023 or 2024.  With regard to the annual bonus issue, the

21  FAC identifies the specific communication from recruiter Ms. La Rosa and date of the employment

22  offer letter setting for the alleged terms of the bonus, the fact that the lower-than-expected bonus

23  was awarded for 2022, and the specific conversations between Plaintiff Hill and his supervisor Ms.

24  Hauck regarding his compensation.  The allegations of specific discrepancies between the promised

25  and actual compensation fulfill Rule 9(b)'s requirement to allege "what is false or misleading about

26  the purportedly fraudulent statement, and why it is false," by detailing precisely how the

27  misrepresented compensation terms materially deviated from Defendant Workday's initial

28  assurances.  *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013).  Thus, the FAC

satisfies Rule 9(b)'s standard by identifying the parties who conveyed the allegedly fraudulent information, their authority to speak on behalf of the corporation, and their role in perpetuating the alleged misrepresentations. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

Plaintiff Hill claims that the initial representations about his compensation—specifically, the terms of the RSU refresher and bonus structure—were made before he accepted his position with Defendant Workday, Inc., as part of the recruitment process led by Workday recruiter Ms. La Rosa. [Dkt. 53 at ¶ 369]. Subsequent to his employment, Plaintiff Hill raised the issue of the reduced RSU refresher grant in 2022 with Ms. Hauck, who allegedly responded in a follow-up weekly one-on-one meeting that she had discussed the matter with her superiors, confirming that Plaintiff Hill would need to accept the 23% refresher grant rather than the 40–60% initially promised. *Id.* at ¶ 237. This sequence specifies when these alleged misrepresentations were made, as well as when Defendant Workday reinforced them through its representatives' responses in 2022 and beyond. By situating these key events in time, the complaint aligns with Rule 9(b)'s requirement to specify "when" the fraudulent conduct occurred, further supported by Plaintiff's ongoing economic losses in 2023 and 2024 from the absence of additional RSU grants. *Kearns*, 567 F.3d at 1124.

The "where" element of Plaintiff's fraud claim specifies the locations and communication channels through which the alleged misrepresentations were conveyed, supporting Rule 9(b)'s requirement for particularity. Plaintiff alleges that initial representations about his compensation, including RSU refresher grants and bonus structures, were made by Workday recruiter Ms. La Rosa, who worked out of Defendant Workday, Inc.'s headquarters in Pleasanton, California. [Dkt. 53 ¶¶ 370–371]. Later discussions regarding the RSU refresher grant allegedly took place during Plaintiff's regular weekly one-on-one meetings with Ms. Hauck, held via Defendant Workday's internal communication channels, as she addressed Plaintiff's concerns about his compensation after speaking with her superiors. *Id.* at ¶ 237. Additionally, Defendant Workday's internal employee portal, accessible to over 12,500 employees, was used to publicly post positive feedback on Plaintiff Hill's work, thus identifying another communication channel related to Plaintiff Hill's annual bonus. *Id.* at ¶ 242. By detailing these specific locations and internal communication methods, the FAC aligns with Rule 9(b)'s "where" requirement, demonstrating that Workday's alleged

1    misrepresentations and responses were issued through formal, traceable channels at its California

2    headquarters.  *Kearns*, 567 F.3d at 1124.

3          The "how" element in Plaintiff Hill's fraud claim specifies the means by which Defendant

4    Workday, Inc.'s alleged misrepresentations induced Plaintiff Hill's reliance, resulting in economic

5    harm.  Plaintiff Hill claims that Workday recruiter Ms. La Rosa, representing Defendant Workday

6    with apparent authority, initially made promises regarding his compensation package that included

7    the terms of his RSU refresher rate, leading Plaintiff Hill to accept employment and terminate his

8    prior position. [Dkt. 53 ¶¶ 369, 372].  When Plaintiff Hill later received a refresher grant of only

9    23%, he raised this discrepancy with Ms. Hauck, who, after discussing it with her superiors,

10   informed Plaintiff he must accept the reduced RSU refresher without further adjustment.  *Id*. at ¶

11   237.  Plaintiff Hill's ongoing reliance on these misrepresentations allegedly led to substantial

12   financial losses: he allegedly experienced a deficit in RSU grants totaling between $160,000 and

13   $240,000 over two years, as well as a reduced 2022 bonus, despite positive feedback and a lack of

14   any formal negative performance evaluations.  *Id*. at ¶¶ 238–239, 241–242.  These allegations

15   illustrate "how" Plaintiff Hill was allegedly misled into relying on Defendant Workday's

16   compensation representations, resulting in the alleged financial harm, as required to meet Rule

17   9(b)'s heightened pleading standard by explaining "how" the fraud was executed and why it was

18   detrimental.  *Salameh*, 726 F.3d at 1133.

19         Additionally, the facts as alleged raise a permissible inference of requisite intent (scienter)

20   by Defendant Workday.  For instance, the fact that Plaintiff Hill received only a 23% RSU refresher

21   grant—despite an alleged promise of a 40–60% grant in his employment letter—is a concrete

22   discrepancy that Defendant Workday representatives should have been aware of at the time of the

23   lower-then-expected refresher grant.  Certainly, Workday was made actually aware of the alleged

24   discrepancy when Plaintiff Hill's concerns were escalated by his supervisor Ms. Hauck to her

25   superiors, and when they allegedly instructed her to tell Plaintiff that he must accept the reduced

26   RSU refresher.  [Dkt. 53 ¶¶ 237–238].  The FAC therefore expressly pleads knowledge on the part

27   of Workday regarding these alleged discrepancies.  And the FAC's allegations regarding Workday's

28   responses to Plaintiff Hill's concerns are sufficient to raise a permissible inference of scienter for

United States District Court
Northern District of California

1    purpose of Rule 9(b)'s pleading standard.

2        Similarly, the FAC's allegations are sufficient to raise a permissible inference of Workday's

3    intent to induce reliance.  The initial representations of the value of the annual RSU refresher and

4    bonus structure were made during the recruitment process, dkt. 53 at ¶¶ 359–374.  The recruitment

5    process is inherently designed to secure a candidate's acceptance of an employment offer.  The FAC

6    sufficiently indicates that the recruitment process here was intended to induce reliance on the part

7    of Plaintiff Hill.  The FAC alleges that Plaintiff Hill negotiated his overall compensation package,

8    including financial terms that Plaintiff Hill sought to obtain, and thus the FAC sufficiently indicates

9    that the employment terms were viewed as favorable and inherently intended to induce Plaintiff Hill

10   to rely on the stated terms to leave his previous employment.  *Id.* at ¶¶ 234–235, 369.

11       Accordingly, and for all the reasons discussed herein, the Court **DENIES** Defendant

12   Workday's Motion to Dismiss the Ninth Cause of Action for promissory fraud on the grounds of

13   extraterritoriality and under Rule 9(b).  The Court notes that the issue of choice of law was not raised

14   by the instant motion, was not briefed, and therefore the Court makes no rulings or findings on that

15   issue.  *Cf. DMI v. Medical Security Card Co.*, 2013 WL 12171848 at *4 (N.D. Cal. Oct. 3, 2013).

## CONCLUSION

17       For the reasons discussed herein and for the reasons discussed on the record at the Motion

18   to Dismiss hearing, Defendant Workday's Motion to Dismiss is **GRANTED IN PART** and

19   **DENIED IN PART**.

20       This **RESOLVES** Dkt. 58.

22   **IT IS SO ORDERED.**

23   Dated:  March 28, 2025

_____
PETER H. KANG
United States Magistrate Judge