1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3       Before The Honorable Peter H. Kang, Magistrate Judge

4

5  ANTHONY C. HILL,                )
                                   )
6           Plaintiff,             )
                                   )
7  vs.                             )    No. C 23-06558-PHK
                                   )
8  WORKDAY, INC., et al.,          )
                                   )
9           Defendants.            )
   _____)
10
                                   San Francisco, California
11                                 Tuesday, August 12, 2025

12

   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13            RECORDING 1:10 - 1:49 = 39 MINUTES

14

   APPEARANCES:
15

   For Plaintiff:
16                                 ANTHONY C. HILL, PRO SE
                                   5 Kaywood Court
17                                 Silver Spring, Maryland 20905

18  Former Plaintiff Counsel:
                                   Webb Law Group, APC
19                                 10509 Vista Sorrento Parkway
                                   Suite 450
20                                 San Diego, California 92121
                            BY:    KATHERINE E. CERVANTES
21  For Defendants:
                                   Orrick, Herrington &
22                                   Sutcliffe, LLP
                                   400 Capitol Mall, Suite 3000
23                                 Sacramento, California 95814
                            BY:    JULIE A. TOTTEN, ESQ.
24

25          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

2

1  For Defendants:

2                                Orrick, Herrington &
                                   Sutcliffe, LLP
3                                405 Howard Street
                                 San Francisco, California
                                   94105
4                                KAYLA D. GRUNDY, ESQ.

5  Transcribed by:               Echo Reporting, Inc.
                                 Contracted Court Reporter/
6                                Transcriber
                                 echoreporting@yahoo.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

<u>Tuesday, August 12, 2025</u>                                    <u>1:10 p.m.</u>

2                       P-R-O-C-E-E-D-I-N-G-S

3                            --oOo--

4            THE CLERK:  Your Honor, now calling civil matter

5    23-6558, Hill versus Workday, Inc., et al.

6        Counsel, please approach the lectern and state your

7    appearances for the record, beginning with the Plaintiff.

8            MS. GRUNDY:  I'm the Defendant.  I followed the

9    sign right here.  If you would like us to switch, I'm happy

10   to.

11           THE CLERK:  No, no, no.  You're fine.

12           MS. CERVANTES:  Good afternoon, my name is

13   Katherine Cervantes.  I am former Plaintiff's counsel.

14           THE COURT:  Good afternoon.

15           MR. HILL:  Anthony Hill.  Good afternoon, your

16   Honor.  Plaintiff, Pro Se.

17           THE COURT:  Good afternoon.

18           MS. TOTTEN:  Good afternoon, your Honor.  Julie

19   Totten and I am here with Kayla Grundy from Orrick,

20   Herrington and Sutcliffe on behalf of Workday.

21           THE COURT:  Good afternoon.

22       Okay.  So let's -- first let's talk about CMC stuff.  So

23   Ms. Cervantes, you can sit down if you want to until I call

24   you up.

25       All right.  So, I looked on the docket.  It was

4

1  mentioned in this case management statement about entering a
2  stipulated protective order.  Usually that's done early and
3  quickly.  I don't know why that hasn't been done yet.
4          MS. TOTTEN:  Your Honor, we have not engaged in a
5  significant amount of discovery to date because we were
6  waiting for the ruling on the second motion to dismiss.
7          THE COURT:  Yeah.
8          MS. TOTTEN:  As soon as we had the ruling on the
9  second motion to dismiss, we sprung into action to do
10 discovery on the one remaining claim.  That's when we
11 provided a -- around that time we provided a proposed
12 protective order, and with a change in counsel, we have not
13 yet had a response on our proposed protective order, but Mr.
14 Hill did actually respond yesterday saying that he was going
15 to be reviewing it and he would let us know if he had any
16 changes very shortly.
17         THE COURT:  Is it -- is it basically the Court's
18 model protective order?
19         MS. TOTTEN:  It is --
20         MR. HILL:  No, it's not.  It's --
21         MS. TOTTEN:  It has a few revisions, your Honor.
22         MR. HILL:  Yeah.
23         THE COURT:  Okay.
24         MR. HILL:  I can speak to those if your Honor
25 would like.

1          THE COURT:  No, I want you to work them out.

2          MR. HILL:  Yeah.  Yeah, that's --

3          THE COURT:  These are the kinds of things lawyers

4    should be able to work out.  And so -- but I don't want -- I'm

5    going to say this.  I don't want, and I've seen this in other

6    cases, the absence of a protective order to delay discovery.

7    You all have been -- you need to get going.  Okay?  And so,

8    I'm going to rule this from the bench.  Until the formal

9    protective order is entered that you're working on, I want

10   the parties to treat as if the model protective order is in

11   place and operate as such.  Okay?

12          MS. TOTTEN:  Yes, your Honor.

13          THE COURT:  And so, you can designate things as

14   confidential, or confidential outside counsel only, and

15   operate as if that model protective order were in place.

16       Now, Mr. Hill is acting as his own counsel, so he gets

17   to see things that are marked "outside counsel only" okay?

18   Just so that's clear.

19          MR. HILL:  Thank you.  Thank you.  That would be

20   my position, so I -- I'm ready to adopt obviously the model

21   protective order today.  They suggested five revisions,

22   which I -- I think it would be more efficient if we

23   submitted a joint redline and --

24          THE COURT:  That's --

25          MR. HILL:  -- to your Honor and we could --

6

1          THE COURT:  That's in my standing order.

2          MR. HILL:  Yes.

3          THE COURT:  When you submit the stipulated

4 proposed protective order to me, you have to give me a

5 redline so I can see what the changes are from the model.

6          MR. HILL:  Yes, your Honor.

7          THE COURT:  Okay.  So just do that, but I want you

8 to -- again, I don't think I've had a case where people can't

9 agree on the terms of a protective order.  So work it out

10 and get it -- get it on file as quickly as possible.

11     All right.  So -- and then, there's a vague reference to

12 discovery and all of that in the case management statement.

13 So, just so -- you know, obviously I've got a fairly detailed

14 standing discovery order, which I assume everybody has read

15 and you're complying with.  You know, Mr. Hill, you are a

16 lawyer, so you are representing yourself pro se, so I'm going

17 to expect you to -- you know, as with any pro se party, to

18 abide by all of the standing orders and the procedures

19 there, and I'm going to hold you to a maybe, you know, a

20 slightly higher standard than a layperson, pro se litigant,

21 because you are a lawyer.  Do you understand that?

22          MR. HILL:  Yes, your Honor.

23          THE COURT:  Okay.  And I take it you haven't --

24 you're not expecting new counsel to enter?

25          MR. HILL:  Not as of yet.  I'm -- I am

1 transitioning.  Hopefully I find counsel, but if not, then I

2 will give it the old college try.

3          THE COURT:  All right.  Okay.  And then, there's

4 reference in the case management statement that the Defense

5 has only produced five documents to date.  Is that still

6 accurate?

7          MS. TOTTEN:  We have more documents to produce,

8 your Honor, and we will do so now that you have entered the

9 order that you just entered about the protective order.

10          THE COURT:  Okay.  Because, again, let's --

11          MS. TOTTEN:  And, your Honor, there are not very

12 many documents because there is only one cause of action

13 remaining.

14          THE COURT:  Well, I don't -- I don't know what

15 documents there are, but I know there's more than five.  So

16 that's my -- my only point is, you know, get your documents

17 produced and they are whatever they are, okay?

18          MS. TOTTEN:  We will do so, your Honor.

19          MR. HILL:  Thank you, your Honor.

20          THE COURT:  Okay.  All right.  So, we have the

21 renewed motion for leave to file the second amended

22 complaint.  I just -- maybe I'm being -- I'm not joking, I'm

23 just going to check.  Is the Defense going to oppose the

24 renewed motion?

25          MS. TOTTEN:  We are, your Honor.

8

1         THE COURT:  Okay.

2         MR. HILL:  Your Honor, if I could say, there was a

3    sealing issue that's since been withdrawn.  And as your Honor

4    knows, we withdrew it through prior counsel.  It was re-

5    filed, Rule 15, with the attached second amended complaint

6    that adopted Workday's exact redaction recommendation.  And

7    so, I thought that we had at least had agreement there.

8    Hopefully we do.

9         MS. TOTTEN:  On the sealing?

10        THE COURT:  On the sealing, I think we -- I

11   already granted that.  So that's all done.

12        MR. HILL:  Okay.

13        THE COURT:  Yeah.  Okay.  So -- all right.  Well,

14   we've got to -- you've got the briefing schedule, and we'll

15   wait to see the papers.  We'll keep the September 11th

16   hearing date on calendar.  I'm not going to change that.

17   After I see all of the papers, I'll make a decision on

18   whether or not we're going to really have a hearing or not or

19   if I can -- given there was already briefing --

20        MR. HILL:  Yes.

21        THE COURT:  -- previously, and I'm not expecting

22   huge differences in the Defense's opposition briefing, if you

23   want to preview it, but -- in which case, the hearing may

24   not be necessary because it basically -- it's a double dip on

25   the hearing, given the procedural posture of the motion.

9

1  But I'm not making any decisions on that, so you should hold

2  that date just in case.

3          MS. TOTTEN:  Yes, your Honor.

4          MR. HILL:  Absolutely, we'll hold that date,

5  September 11th, the day after my birthday.

6      I do have a question.  I'm obviously traveling from

7  Maryland.

8          THE COURT:  Yes.

9          MR. HILL:  I know your Honor prefers in person

10  hearings.  To the extent that -- if it's not decided on the

11  papers, your Honor may be willing to allow me to, you know,

12  remotely appear, that would be great.  If not, I will

13  obviously be here.

14          THE COURT:  My very strong preference is for

15  people to appear in person, because I like to look people in

16  the eye.  I get to -- a lot more happens, just through body

17  language and things at hearings.  I mean, obviously if

18  there's, you know, a family medical issue -- I mean, you

19  know, if there's emergencies, we could either postpone or

20  whatever, but my strong preference is, unless it is a true

21  hardship, is for motions to be -- hearings to be in person.

22          MR. HILL:  Then I will absolutely be here, your

23  Honor.  Thank you.

24          THE COURT:  Okay.  All right.

25      Now, just so everyone is clear, I don't want the

10

1  pendency of this motion to delay -- I don't want anybody to

2  say I'm going to delay discovery because of the pendency of

3  this motion.  Again, given the case schedule, you all -- you

4  know, until it's decided one way or the other, keep going.

5  You know what's in the case and obviously I'm not going to

6  agree to stay anything because of the pendency of the

7  motion.  I'm not going to alter the case schedule simply

8  because a motion is pending.  So I want you to keep working

9  on the case.  Okay?

10          MR. HILL:  Yes, your Honor.

11          MS. TOTTEN:  Yes, your Honor.

12          THE COURT:  Okay.  You had made vague reference to

13  the possibility of filing a motion for summary judgment, I

14  assume on the promissory fraud claim.  Just -- do you want

15  to preview what would be the issue or the basis for the

16  motion?

17          MS. TOTTEN:  Well we're still doing discovery.  Mr.

18  Hill is having his deposition taken -- taken later this

19  week.

20          THE COURT:  Yeah.

21          MS. TOTTEN:   And we'll have a better idea on the

22  exact grounds.

23          THE COURT:  Okay.

24          MS. TOTTEN:  But we don't believe that he is able

25  to stay the claim.

11

1          THE COURT:  Okay.  Well if you don't think he's able

2    to stay the claim, then is there a legal issue there, or do

3    you think it's going to be -- I mean, if summary judgment

4    should -- goes through, he can't meet the facts --

5          MR. HILL:  Right.

6          THE COURT:  -- is -- we all know that's --

7          MS. TOTTEN:  We don't think --

8          THE COURT:  -- an uphill battle, right?  As

9    opposed to there's a legal silver bullet here.

10          MS. TOTTEN:  Well, let's take his deposition, but

11    at this point in time, you know, we -- we believe that -- we

12    need to hear every aspect of what he believes has --

13          THE COURT:  Okay.

14          MS. TOTTEN:  -- caused the promissory fraud from

15    the aspects that were already outlined in the complaint.

16          THE COURT:  Okay.

17          MS. TOTTEN:  There's an offer letter that says

18    something different.

19          MR. HILL:  And, your Honor, obviously I haven't

20    briefed this, but I would say that, you know, Rule 56 is

21    sufficiently -- is not -- is not met.  They don't -- I don't

22    think they would be able to prevail on the promissory fraud

23    claim.  I also don't think, should your Honor allow the 12

24    federal claims to come in, that they would be able to

25    prevail there either.

12

 1          THE COURT:  Okay.  All right.

 2          MR. HILL:  So, if -- if we brief it, I'm ready to

 3 go.

 4          THE COURT:  Okay.  I just want to -- I'm not saying

 5 this is what's going to happen, but obviously a motion for

 6 summary judgment where, you know, stepping back and it looks

 7 like there are issues of fact, I don't waste anybodies time

 8 on that kind of motion.  Okay?

 9          MS. TOTTEN:  Understood, your Honor.

10          THE COURT:  All right.  I know you've got your next

11 settlement conference with Judge Cisneros set for November

12 3rd.  Right.  What I would suggest is, certainly between now

13 and then is, to the extent you're prioritizing things,

14 especially on the discovery front, I would prioritize things

15 that help in the aid of settlement, since that -- you know,

16 that would be the next opportunity to see if the case can

17 settle, because I want that settlement conference to be as

18 productive as possible, as always.  So, workout -- you know

19 workout between yourselves how to -- how to address that,

20 I'll call it, kind of encouragement and recommendation.

21      And I know there was a dispute about scheduling issues

22 and how late that is set.  I don't know, given the change in

23 counsel if that alters the calculates for either side on

24 scheduling, but if there is -- again, especially in the

25 context of settlement discussions, you should be able to

13

1  talk openly and freely about those kinds of things.  And if

2  you want to workout scheduling issues, we -- Judge Cisneros

3  knows her calendar, so you should work it out with her, but

4  if not, you've got the date in November anyways.  So that's

5  set still.  Okay?

6         MS. TOTTEN:  Yes, your Honor.

7         MR. HILL:  Yes, your Honor.

8         THE COURT:  Okay.  Let's go through the -- so,

9  that was most of what I wanted to -- that left out for me in

10 the CMC statement.  Oh, you mentioned Mr. Hill's deposition.

11 Mr. Hill, for both sides, but it's kind of asymmetric in the

12 sense that you are just one person and they're a company, to

13 the extent you want to start -- you're thinking about

14 wanting to take depositions of people at Workday, whether

15 it's a 30(b)(6) or individual --

16        MR. HILL:  Right.

17        THE COURT:  -- depositions.  Again, if you look at

18 my standing discovery order, I encourage, and actually

19 require the lawyers to talk early about identifying the

20 people, working out schedules, you know, avoiding holidays,

21 those kinds of things, right, and working out those

22 schedules.  So I don't know if you've started those

23 discussions yet or not, but to the extent you haven't, start

24 them.

25        MR. HILL:  Yes.

14

1          THE COURT:  And to the extent you have, keep doing

2    that, because what I don't like to see is things get jammed

3    at the last minute and all of sudden depositions -- you

4    know, I get a motion to compel because a deposition can't

5    happen because somebody is gone on vacation and we've hit

6    the cutoff.

7        So, early planning and early, you know, open disclosure

8    on both sides, as to who you want to depose and then working

9    out those schedules and figuring out dates now, it can --

10   goes a long way towards alleviating those last minute jams.

11   Okay?

12          MR. HILL:  Yes, your Honor.

13          THE COURT:  Okay.  So -- and maybe you don't want

14   to take that many depositions, which is even better, and so

15   it's only a couple or one or two to work out, but I just

16   want to make sure you understand that expectation from the

17   Court.

18       Okay.  I'm just looking further ahead.  Is -- let's

19   assume, and I'm not prejudging anything, so don't take this

20   as a hint either way, but let's assume it's the promissory

21   fraud claim that goes forward to trial.  Is it really a

22   three-day trial at that level?  I mean if it's one cause of

23   action?

24          MR. HILL:  I can't imagine it would be more than

25   two, but --

1          THE COURT:  Yeah.

2          MR. HILL:  But, you know, your Honor -- I mean,

3   obviously I know you're not prejudging the others.

4          THE COURT:  Yeah.

5          MR. HILL:  But I think it behoove us to add

6   additional days, or at least keep them open.

7          THE COURT:  Okay.

8          MR. HILL:  Given the 12 remaining, and the strong

9   likelihood under Rule 15 that they would -- they would at

10  least see the light of day.

11         THE COURT:  All right.  Do you expect this to be

12  an expert-heavy case.

13         MR. HILL:  No.  No, I don't think so.

14         THE COURT:  Okay.  That's good to know.  Okay.

15     On case management or case scheduling, is there

16  anything else anybody wants to talk about or raise with me?

17         MS. TOTTEN:  No, your Honor.

18         MR. HILL:  No, your Honor.

19         THE COURT:  Okay.  So I -- and I want to thank

20  you, Mr. Hill, for coming out here.  It's given me a chance

21  to meet you and speak with you, and, you know, obviously,

22  again, Judge Cisneros is a great settlement judge, so if

23  you're able to settle cases, that's -- you know, we all know

24  90-percent plus of all cases settle.  So if you're able to

25  settle, work with her on it and I obviously encourage --

16

1  encourage that.

2       So, if there's nothing else on case management.  Oh,

3  right.  So what I'd like to do is, at least for now, put a

4  marker for a further CMC.  Remind me -- you're going to see

5  her in November.  That's about three months out.  Let's

6  assume you're going to see her on Monday, November 3rd, do

7  you want to come in on Tuesday, November 4th?

8            MR. HILL:  That works.

9            THE COURT:  So you're all out here anyway.  So how

10 about Tuesday, November 4th at 11:00 a.m.  Does that work?

11           MR. HILL:  It works for me, your Honor.

12           MS. TOTTEN:  Yes, your Honor.

13           THE COURT:  Okay.  Next hearing -- next CMC set --

14 further CMC set for November 4th at 11:00 a.m.  And then,

15 you can give me a further status conference statement, but

16 it doesn't need to be -- I mean, just update me on new

17 things.  You don't have to go back and revisit stuff that's

18 already been reported on.  So, just give me a status report,

19 let's say, Monday, October 27th.  Does that work for

20 everyone?

21           MR. HILL:  It works, your Honor.

22           MS. TOTTEN:  It does, your Honor.  Thank you.

23           THE COURT:  Okay.  All right.  Let me -- okay.  On

24 case management, anything further from either side?

25           MR. HILL:  No, your Honor.  Nothing.

17

1          THE COURT:  Okay.  So, Ms. Cervantes, why don't

2   you approach the podium.

3          MS. CERVANTES:  Yes, your Honor.

4          THE COURT:  Okay.  All right.  So, Ms. Galang, why

5   don't you -- why don't you swear Ms. Cervantes, please?

6       (Pause.)

7        KATHERINE ELAINE CERVANTES - WITNESS - SWORN

8          THE COURT:  That's sufficient.  Okay, thank you.

9   And for the record, you are Katherine Cervantes -- was,

10  until recently, lawyer for the Plaintiff, Mr. Hill.

11         MS. CERVANTES:  Yes, your Honor.

12         THE COURT:  And, Mr. Lenden Webb is not expected

13  to appear, or is he here in the audience and I just don't --

14         MS. CERVANTES:  No, he's not expected be here,

15  your Honor.

16         THE COURT:  Okay.  All right.  So, as background,

17  docket number 17 was a joint letter brief on discovery

18  dispute filed on July 21, 2025.  It was signed by Ms.

19  Cervantes, is that correct?

20         MS. CERVANTES:  Yes, your Honor.

21         THE COURT:  Okay.  But the signature line has both

22  her name and Mr. Webb.  I take it he's -- he was lead trial

23  counsel, or lead counsel?

24         MS. CERVANTES:  Correct.  I was the majority --

25  the one dealing with this matter.

1          THE COURT:  Okay.  And what initiated the issuance

2   of the order to show cause is that on page five of that

3   joint letter brief, Plaintiff's counsel at the time cited a

4   non-existing case with a parenthetical -- and just for the

5   record, the non-existent case citation was <u>South Pointe</u>

6   <u>Wholesale, Inc. vs. Vilardi</u>, number 16-CV6758, 2017 Westlaw

7   11570668, page star two, Eastern District of New York, May

8   2nd, 2017

9        So, we all agree, Ms. Cervantes, this is no case with

10  these parties in the Eastern District of New York?

11          MS. CERVANTES:  Yes, your Honor.

12          THE COURT:  And we all agree the case docket

13  number in the citation, 16-6758 is for a completely

14  different case, an irrelevant case called <u>Thompson vs.</u>

15  <u>Marticello</u> (phonetic) out of the Eastern District of New

16  York, right?

17          MS. CERVANTES:  Yes.

18          THE COURT:  And that's on a habeas petition.  It

19  has nothing to do with discovery, right?

20          MS. CERVANTES:  Yes.

21          THE COURT:  Okay.  And the Court has checked and

22  there are no orders on the docket in that <u>Thompson</u> case that

23  have anything to do with the discovery dispute here.  Do you

24  agree with that?

25          MS. CERVANTES:  Yes, your Honor.

19

1          THE COURT:  All right.  The Westlaw citation and
2    the incorrect citation in the briefing, that is 2017 Westlaw
3    11570668 is to a different completely irrelevant other case
4    from the Southern District of New York called Sengage
5    Learning vs. Wang (phonetic), which has docket number
6    17CV4914JFK, that's dated September 14th, 2017.  Right, Ms.
7    Cervantes?

8          MS. CERVANTES:  Yes, your Honor.

9          THE COURT:  Okay.  And that Sengage opinion dealt
10   with expedited discovery issues under Rule 26(d)(1), not the
11   discovery issue that was at issue in the joint letter brief
12   here, right?

13         MS. CERVANTES:  Yes, your Honor.

14         THE COURT:  Okay.  And, in fact, that case, that
15   Sengage case was initiated or filed on June 29th, 2017,
16   which is after the date in the fictitious incorrect citation
17   of May 2nd, 2017, right?  June comes after May.

18         MS. CERVANTES:  Yes, yes, yes.

19         THE COURT:  Okay.  And, again, the pinpoint cite
20   to page star two in the briefing here is to a completely
21   irrelevant portion of the cited Westlaw order from the
22   Sengage case, right?

23         MS. CERVANTES:  Yes, your Honor.

24         THE COURT:  All right.  And, checking the docket
25   in the Thompson case, that Southern District of New York

20

1  case, there is not order from that court dated May 2nd,

2  2017, right?

3          MS. CERVANTES:  Yes, your Honor.

4          THE COURT:  And going back to the -- sorry --

5  Sengage.  There's no order in the Southern District of New

6  York dated 20 -- May 2nd, 20 -- there's no order dated May

7  2nd, 2017 from the Eastern District of New York in the

8  Thompson case, right?

9          MS. CERVANTES:  Yes, your Honor.

10         THE COURT:  Okay.  All right.  And as it was

11 pointed out on the order to show cause, there are five

12 orders available on Westlaw for a case with the parties,

13 South Pointe Wholesale and Vilardi.  Those all come from the

14 Western District of Kentucky, right?

15         MS. CERVANTES:  Yes, your Honor.

16         THE COURT:  And none of those are dated May 2nd,

17 2017?

18         MS. CERVANTES:  Correct, your Honor.

19         THE COURT:  And none of these Western District of

20 Kentucky cases have the docket number 16-6758, right?

21         MS. CERVANTES:  Correct, your Honor.

22         THE COURT:  Right.  They all have docket number

23 1752.  None of these Western District of Kentucky cases are

24 dated May 2nd, 2017, right?

25         MS. CERVANTES:  Correct, your Honor.

21

1           THE COURT:  And none of these Western District of

2   Kentucky cases have Westlaw citations anything remotely

3   similar to the one in the briefing here that was 2017

4   Westlaw 11570668, right?

5           MS. CERVANTES:  Yes, your Honor.

6           THE COURT:  In fact, four of those Western

7   District of Kentucky orders are from 2018, not even 2017,

8   right?

9           MS. CERVANTES:  Correct.

10          THE COURT:  And as discussed in the order to show

11  cause, two of these Western District of Kentucky orders have

12  nothing to do with a discovery dispute, they had to do with

13  motions to dismiss and things like that, right?

14          MS. CERVANTES:  Correct, your Honor.

15          THE COURT:  And so, what we have in the briefing

16  here is a citation that is a mishmash, or mosaic, of at

17  least five different things that are unconnected to each

18  other, right?  We've got parties that are wrong.  We've got

19  a docket number that doesn't correspond to anything else in

20  the citation.  We've got a Westlaw citation that doesn't

21  correspond to anything in the citation -- else in the

22  citation.  We've got the court, Eastern District of New

23  York, which doesn't correspond to anything else in the

24  citation, and then we've got a date of May 2nd, 2017 that

25  doesn't correspond to anything else in the citation.  So

22

1 these are all -- five different pieces of information mashed

2 together into one cite in the brief, right?

3          MS. CERVANTES:  Yes, your Honor.

4          THE COURT:  And there's nothing -- no two of them

5 belong together in any other case, right?

6          MS. CERVANTES:  Correct.

7          THE COURT:  All right.  So, in response to the

8 order to show cause, we have Ms. Cervantes' declaration,

9 which is docket 131, which the Court has reviewed, and in

10 the declaration you state that you intended to cite to one

11 of the Western District of Kentucky orders, specifically the

12 one with citation 2017 Westlaw 3877860.  Is that right?

13          MS. CERVANTES:  Yes, your Honor.

14          THE COURT:  That was your intention?

15          MS. CERVANTES:  Yes, your Honor.

16          THE COURT:  Okay.  And that's a September 5th,

17 2017 order from the Western District of Kentucky in the

18 South Pointe Wholesale vs. Vilardi case, right?

19          MS. CERVANTES:  The case that I cited in my

20 declaration, yes.

21          THE COURT:  Okay.  And you state in your

22 declaration that you used the -- you used the Westlaw copy

23 with reference function to obtain the citation to that case,

24 and that somehow that came up with the incorrect citation

25 that ended up in the brief.  Is that -- is that what you're

23

1   saying?

2           MS. CERVANTES:  Yes, your Honor.  I did use

3   Westlaw to research and I copy and pasted, and I apologize,

4   something messed up and I should have taken more care in

5   reviewing everything.

6           THE COURT:  Okay.  But specifically you used the

7   Westlaw feature called "copy with reference" to get the

8   citation that ended up in the brief.  Is that what you're --

9           MS. CERVANTES:  Yes.

10          THE COURT:  Is that what happened here?

11          MS. CERVANTES:  Yes, your Honor.

12          THE COURT:  All right.  So -- so are you saying

13  that the Westlaw copy with reference function, not just gave

14  you the wrong citation to a different case, but it gave you

15  -- it created a wholly fictitious citation, a mash-up of

16  these five different things that aren't related to each

17  other?

18          MS. CERVANTES:  No, your Honor.  I copied and

19  pasted it from the Westlaw function and then I copied and

20  pasted it into my document, so I don't -- somehow it got

21  messed up and I do apologize.

22          THE COURT:  Okay.  I appreciate the apology, but

23  what I'm trying to understand is, how could the Westlaw copy

24  with reference function take party names and combine it with

25  the wrong docket number, and combine that with the wrong

24

1   Westlaw citation, and combine that with the wrong court, and
2   combine that with the wrong date?

3          MS. CERVANTES:  I understand the -- I'm confused
4   how I copied and pasted off of Westlaw and got that.  I
5   really don't know how that would have happened, because I
6   did use Westlaw and I copied and pasted from Westlaw.  I
7   also have my -- my search history.  That's how I was able to
8   do and file the declaration that day.  I have my search
9   history and that's how I was able to find everything so
10  quickly.

11         THE COURT:  Okay, but I don't under -- I mean, for
12  the record, the Court obviously has access to Westlaw and
13  has used the copy with reference function.  All it does is
14  copy the -- you go into the case and you copy the cite
15  there.  It doesn't have any way to mishmash or create a
16  Frankenstein monster of, like I said, parties that are
17  unconnected to a docket number, that's unconnected to a
18  Westlaw cite, that's unconnected to a court, that's
19  unconnected to a date.  I just don't understand how copying
20  and pasting from Westlaw could have created that mishmash,
21  that amalgamation.

22         MS. CERVANTES:  I understand and I copied and
23  pasted it from Westlaw, and like I said, in my document
24  perhaps I messed it up somehow.

25         THE COURT:  Okay.  All right.  So, I mean I hinted

25

1  at this in the order to show cause, everyone -- every lawyer

2  in this room, everybody out in -- every lawyer hopefully out

3  in the -- in the bar understands the -- and seeing cases

4  involving lawyers who have misused ChatGPT to find

5  hallucinated citations, they never check them and then they

6  put them in a brief, right?  And ChatGPT, we all know, does

7  create wholly fictitious citations that combine wrong

8  parties with wrong dockets with wrong Westlaw cites with

9  wrong courts and wrong dates.  Right?  So, I'm going to --

10  you're under oath, and as an officer of the Court, I'm going

11  to ask you, did that incorrect citation get into the brief

12  because it was the result of someone, maybe you or somebody

13  in your firm, misusing either ChatGPT or an AI or an LLM or

14  something like that?

15        MS. CERVANTES:  No, your Honor.  I really did use

16  Westlaw and I can provide my history to the Court.  I did

17  not use ChatGPT.  I was the one who created this and no one

18  else at my firm drafted it.

19        THE COURT:  I just -- I don't see how -- it's just

20  not believable.

21        MS. CERVANTES:  And, your Honor, to clarify,

22  Westlaw does have an AI assisted research tool and I did use

23  the AI assisted research tool that's within the Westlaw

24  portal, but I did not use ChatGPT, and like I said, I can

25  provide that to you.  I have the history, I saved it on my

26

1  computer, I screen shotted it so it's there.

2      THE COURT:  Yeah, but your search history won't

3  show where this fictitious citation came from.

4      MS. CERVANTES:  It actually does show on there,

5  the copy and paste where I copied and pasted it from.

6      THE COURT:  Have you tried copying and pasting it

7  again to see if it still comes up with that fake citation?

8      MS. CERVANTES:  So when I copied and pasted it

9  again, it just said, like, the f supplement, like, not found

10 in the WL.  So I don't know how when I initially copied and

11 pasted it it did that.  And I have that history and I can

12 provide that to the Court.

13     THE COURT:  Okay.  When you prepared this part of

14 the brief with the fake citation in it, are you the only one

15 who worked on it?  You didn't work on it with a staff

16 member?  Somebody didn't provide you with a citation, a

17 summer associate?

18     MS. CERVANTES:  I did have -- so, because I used

19 the Westlaw AI assisted research, I printed it out, I put it

20 on my desk, I had my paralegal -- I told her, "Can you

21 please check the citations to make sure they're correct?"  I

22 have it in my recycle bind.  And she confirmed with me,

23 "Yeah, everything looks fine there."  So, did she change a

24 citation?  I don't know.  I don't think she did.  I asked

25 her.  There was -- I don't have any reason to believe she

27

1  did that.  That was the way I prepared it and obviously I

2  made a grave mistake.  I shouldn't have used the Westlaw AI

3  assisted research and I shouldn't have just copied and

4  pasted it, your Honor, but that's what I did.

5          THE COURT:  Have you talked to your firm's Westlaw

6  representative to see if they've ever heard of anything like

7  this happening with Westlaw's copy with reference function?

8          MS. CERVANTES:  No, but I can say that we have had

9  several trainings after this incident with all of our team

10 and it's -- you know, I told everybody in the firm what

11 happened and everyone has now been trained on that research

12 tool.

13         THE COURT:  Either before this happened or since,

14 have you ever seen Westlaw's copy reference function doing

15 anything similar?

16         MS. CERVANTES:  No, your Honor.  And to be honest,

17 this is the first time -- well, not to be honest -- but this

18 is the first time I've ever even used the AI assisted

19 research on Westlaw, because we just upgraded our firm's

20 account to have that feature.

21         THE COURT:  Okay.  I mean, have you read the case

22 law on sanctions of lawyers who put in -- regardless of the

23 source, put in fake citations?

24         MS. CERVANTES:  Yeah, I heard about the Alabama

25 case.  I know it's very -- I'm very embarrassed and I

28

1  apologize to the Court.

2        THE COURT:  Okay.  But have you seen or heard of

3  any published reports, any newsletter, blogs, anything where

4  people talk about don't trust Westlaw, or --

5        MS. CERVANTES:  Well not --

6        THE COURT:  -- it could create fake citations like

7  this?

8        MS. CERVANTES:  Not about Westlaw, no.  I've heard

9  about it -- about ChatGPT, but I did use -- I'm under oath.

10 I did use Westlaw.

11       THE COURT:  Okay.  So I'm a little concerned that

12 Mr. Webb isn't here.  I mean he's -- the firm has his name

13 on it.  He's the senior partner of the firm, or the owner of

14 the firm, isn't he?

15       MS. CERVANTES:  He is.  Yes.

16       THE COURT:  All right.  I mean, presumably the

17 buck stops with him.  Is he ultimately responsible for the

18 filings made by the attorneys in your firm?

19       MS. CERVANTES:  It is likely, yes, but I told him

20 I submitted the declaration and his attendance wasn't

21 necessary.  So --

22       THE COURT:  Okay.  I mean, that's admirable of

23 you, but his name is on the pleading.  It was on the

24 pleadings.  And his name is on the signature block there.  I

25 mean, what, if anything, do you know that he did to check

29

1  the citations or review the brief before it was filed?

2          MS. CERVANTES:  He trusted me to handle that.

3          THE COURT:  Okay.  All right.  So, since all this,

4  what investigation -- tell me more about what your firm has

5  done in response to all of this.

6          MS. CERVANTES:  So we have weekly trainings with

7  -- we have attorney trainings and then paralegal/legal

8  assistant trainings, and we have our -- the hour during our

9  lunch break, the hour -- they're paid.  We pull up exactly,

10 like -- I pulled up exactly, and I went into both of them,

11 showed everyone what happened.  I showed the Court's

12 standing order, as I also showed them how to find federal

13 court standing orders, and then I -- another attorney at our

14 firm also found the Alabama case.  I don't know if you're

15 familiar with the ChatGPT attorney.  We also showed

16 everybody about that in both trainings.  So everybody has

17 been informed about the severity.  And I also showed them

18 how I researched it on Westlaw and how -- you know, so

19 essentially kind of like a Google in Westlaw's thing.  And I

20 told them we need to check everything, so we've done that.

21 And then we've also sent like an overview email about it as

22 well.

23         THE COURT:  So, I mean, I think you said this in

24 the declaration, but I just want to get this on the record.

25 You -- it's great, and you admit, you did not check the cite

30

1  before signing the letter brief when filing it, right?

2           MS. CERVANTES:  Yes, your Honor.

3           THE COURT:  Okay.  And you did not look for the

4  incorrect Westlaw citation at all until after the Court

5  raised it with you?

6           MS. CERVANTES:  That's correct, your Honor.

7           THE COURT:  All right.  And you weren't aware --

8  you didn't even notice the error until the Court raised it

9  with you, right?

10          MS. CERVANTES:  I'm sorry, can you repeat that?

11          THE COURT:  You weren't even aware of the error in

12  the citation until the Court raised it in the OSC, right?

13          MS. CERVANTES:  Yes, your Honor.  Correct.

14          THE COURT:  Okay.  So, I mean, at the end of the

15  day, whether or not the incorrect citation was a result of a

16  hallucination by Westlaw or some AI or whatever, that's not

17  the only issue the Court has here, right?  I mean, lawyers

18  are supposed to check their citations in their briefs and

19  had you looked for the case before signing off on the brief,

20  like the Court did, you would have found that that citation

21  doesn't exist and it doesn't do that.  And so, I know you

22  asked the Court to make a finding that this was excusable

23  neglect, I mean I think it was neglect, I'm not sure at this

24  point whether or not it's excusable, so I'm going to give

25  you one last shot to convince me why some form of sanction

31

1   or other result shouldn't occur as a result of all of this.

2          MS. CERVANTES:  I mean, your Honor, I told you

3   everything at this point and whatever sanction or whatever

4   you do, I understand.

5          THE COURT:  Okay.  I mean, my standing order talks

6   about AI at length and wrong hallucinations for a reason.  I

7   mean, we all knew that it was relatively a new technology

8   back when I first issued the order, but that was two years

9   ago.  And so, there's a lot more cases since then.  It's not

10  just Alabama.  Attorneys in Texas, Colorado, I think here in

11  -- there's cases here in California, New York.  There's a

12  Second Circuit opinion.  I mean, it's just all over the

13  place, right?  And, as I said, the fundamental issue here is

14  lawyers not checking their cites before they sign off on a

15  brief, right?  Actually, not that it doesn't matter, right?

16  But the source of the incorrect citation is one problem, but

17  the second and the more fundamental issue is not double

18  checking the cites before finalizing and signing off on a

19  brief.  I mean, that could happen back in the day when you

20  get a cite from an old treatise, right?  There could be

21  misprint there and if you don't double check it -- I'm old

22  enough.  I remember the olden days when you used to get

23  citations from case books, and, you know, they could be

24  wrong and so you had to double check on those.

25          Okay.  And just -- you are a member of the bar of this

32

1  court?

2          MS. CERVANTES:  Yes, your Honor.

3          THE COURT:  Okay.  And, just so I know, how long

4  have you been practicing law?

5          MS. CERVANTES:  I'm going on my fifth year.

6          THE COURT:  Okay.  And are you a member of the bar

7  in any other state besides California?

8          MS. CERVANTES:  No, your Honor.

9          THE COURT:  All right.  And have you ever been

10  sanctioned by any other court previously?

11          MS. CERVANTES:  No, your Honor.

12          THE COURT:  Has any -- has Mr. Webb?

13          MS. CERVANTES:  I don't believe so.

14          THE COURT:  Okay.  It's -- well, I just want to

15  clear.  I'm not here to pick on you.

16          MS. CERVANTES:  Oh, I understand, your Honor.

17          THE COURT:  Okay.  All right.

18          MS. CERVANTES:  I'm sorry.  I'm just embarrassed.

19          THE COURT:  No, no, but to me this is -- I mean, I

20  would have thought -- I'm just going to say this more

21  generally, but I would have thought that these issues of,

22  you know, again, whatever the source, incorrect citation,

23  would have let members of the bar across the country to be

24  -- you know a lot more vigilant about double checking their

25  citations and all of that.  And so, to me, I'm calling it a

33

1  learning moment.  I mean, to me, this is one of those things

2  that I would have thought all of the sanction orders would

3  have alerted people to the dangers here of using, again,

4  whatever -- any online tool, whatever it is.  We can't

5  outsource being a lawyer to Westlaw or an AI or anything,

6  okay?  Well -- all right.  Anyway.  Enough lecturing.

7      We'll issue a final order on the order to show cause

8  and I'm going to discharge it as to -- there will probably

9  be some -- some directives to you in there on how to

10 finalize the discharge, but I am -- I mean, you ought to

11 talk to Mr. Webb.  I am a little concerned that he didn't

12 show up, because, again, I would have thought as the

13 partner/owner of the firm, he would have shown up, if only

14 to support you.

15          MS. CERVANTES:  And Mr. Webb is at like a three-

16 day deposition that was like very difficult to get on

17 calendar.  So he is in a matter.  He's not just --

18          THE COURT:  Okay.

19          MS. CERVANTES:  -- sitting at the office.  So --

20          THE COURT:  So an order to show cause is at issue

21 as between the Court and Counsel, and, Ms. Grundy, you've

22 been standing there, I don't think there's anything you want

23 to say, but I'll give you a chance to chime in if you want

24 to.

25          MS. GRUNDY:  No, your Honor.

34

1          THE COURT:  Okay.  Mr. Hill, since you've been

2     standing by, I'll give you a chance to chime in too.

3          MR. HILL:  No, your Honor.

4          THE COURT:  Okay.  All right.  So, like I said, an

5     order will issue in due course on this.

6          MS. CERVANTES:  Thank you, your Honor.

7          THE COURT:  Okay.  Thank you, Ms. Cervantes.  And

8     thank you for coming for this.  Okay.

9          MS. GRUNDY:  Thank you, your Honor.

10          THE CLERK:  This matter is concluded.

11       (Proceedings adjourned at 1:49 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

35

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Thursday, September 4, 2025